# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

NORTH RIVER INSURANCE COMPANY )
)
      Plaintiff, )
)
v. )    Civil Action No. _____
)
BROWARD COUNTY SHERIFF'S )
OFFICE, KENNETH C. JENNE, II, )
NICK NAVARRO, ANTHONY )
FANTIGRASSI, MARK SCHLEIN, )
ROBERT A. BUTTERWORTH, )
PHILLIP AMABILE, RICHARD )
SCHEFF, VIRGINIA SMITH, in her )
capacity as personal representative of )
The ESTATE of FRANK LESS SMITH )
And JERRY FRANK TOWNSEND )
)
      Defendants. )

## NORTH RIVER INSURANCE COMPANY'S
## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES Plaintiff North River Insurance Company, by and through its undersigned

counsel, and for its Complaint for Declaratory Judgment pursuant to 28 U.S.C. §2201(a) against

Defendants Broward County Sheriff's Office, Kenneth C. Jenne, II, Nick Navarro, Anthony

Fantigrassi, Mark Schlein, Robert A. Butterworth, Phillip Amabile, Richard Scheff, Virginia Smith,

in her capacity as personal representative of the Estate of Frank Lee Smith, and Jerry Frank

Townsend:

### PARTIES

1.      Plaintiff North River Insurance Company ("North River") is a corporation domiciled

in New Jersey with its principal place of business in Morristown, New Jersey.

2.      Defendant Broward County Sheriff's Office ("BSO") is a municipal corporation

organized under the laws of the Florida, and maintains a business address in Broward County,

Florida.

3.    On information and belief, Defendant Kenneth C. Jenne, II ("Jenne") resides in Broward County, Florida.

4.    On information and belief, Defendant Nick Navarro resides in Broward County, Florida.

5.    On information and belief, Defendant Anthony Fantigrassi resides in Broward County, Florida.

6.    On information and belief, Defendant Mark Schlein resides in Broward County, Florida.

7.    On information and belief, Defendant Robert A. Butterworth resides in Broward County, Florida.

8.    On information and belief, Defendant Phillip Amabile resides in Broward County, Florida.

9.    On information and belief, Defendant Richard Scheff resides in Broward County, Florida.

10.    Upon information and belief, Defendant Virginia Smith, in her capacity as personal representative of the Estate of Frank Lee Smith resides in Broward County, Florida, and is included herein as a necessary party pursuant to FED. R. CIV. P. 19(a), but against whom no relief is sought.

11.    Defendant Jerry Frank Townsend resides in Osceola, Florida, and is included herein as a necessary party pursuant to FED. R. CIV. P. 19(a), but against whom no relief is sought.

## BACKGROUND

12.     The amount in controversy exceeds $75,000 exclusive of costs and interest.  This Court has jurisdiction pursuant to 28 U.S.C. §1332 and 28 U.S.C. §2201.

13.     Venue is proper under 28 U.S.C. §1391 (a) and (c).

14.     Defendants BSO, Jenne, Navarro, Amabile and Scheff seek a defense and indemnity for the Townsend Complaint under the 10/1/00 – 10/1/01 North River Policy, attached hereto as Ex. C.  A copy of their demand for coverage is attached as Ex. D.  North River contends that it has no duty to defend or indemnify these Defendants under the 10/1/00 – 10/1/01 North River Policy issued to BSO.  An immediate and actual controversy exists between the parties.

15.     Defendants BSO, Jenne, Fantigrassi, Schlein, Butterworth and Navarro seek a defense and indemnity to the Smith Complaint under the 10/1/00 – 10/1/01 North River Policy, attached hereto as Ex. C.  A copy of their demand for coverage is attached as Ex. D.  North River contends that it has no duty to defend or indemnify these Defendants under the 10/1/00 – 10/1/01 North River Policy issued to BSO.  An immediate and actual controversy exists between the parties.

## THE UNDERLYING COMPLAINTS

**A.     The *Smith* Complaint**

16.     Currently pending is a complaint filed on September 2, 2002 by Virginia Smith, in her capacity as personal representative of the Estate of Frank Lee Smith, against Defendants Richard Scheff, individually and in his official capacity as a Deputy Sheriff of Broward County, Florida, Phillip Amabile, individually and in his official capacity as a Deputy Sheriff of Broward County, Florida, Nick Navarro, individually and in his official capacity as Sheriff of Broward County, Florida, and Ken Jenne, individually and his official capacity as Sheriff of Broward County, Florida, in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, case No.

3

02017699, a copy of which is attached hereto as Exhibit "A" (hereinafter "Smith Complaint").

17.     The Smith Complaint seeks relief against all Defendants in connection with the arrest, trial, conviction and incarceration of Frank Lee Smith, who died after serving 15 years on death row for a crime, the murder of Shandra Whitehead, for which he was posthumously exonerated. (Ex. A).

18.     The Smith Complaint alleges that on April 14, 1985, Shandra Whitehead was raped and murdered in Fort Lauderdale, Florida. The Smith Complaint asserts that the police identified three people who they believe saw the killer outside of the victims home immediately following the crime. The Smith Complaint avers that these three individuals were coerced into identifying Mr. Smith by the conduct of Defendants Scheff and Amabile. Mr. Smith was arrested for the murder on April 18, 1985 and convicted, based on the eyewitness identifications, later that year. (Ex. A).

19.     The Smith Complaint alleges that on December 21, 1989, the primary eyewitness signed an affidavit that recanted her identification of Smith as the murderer. At that time, she identified Eddie Lee Mosley as the killer. Mosley is alleged to have been a serial killer hunting the streets of Fort Lauderdale. The Smith Complaint asserts that in reaction to the witness' recantation, Scheff and Amabile created a cover story for their actions, which story they told to the court in 1998, when they told the court at a post–conviction hearing that they had shown the primary witness a photo line-up with Mosley's picture. The Smith Complaint also alleges that Scheff and Amabile introduced into evidence a false confession by twisting Smith's words. (Ex. A).

20.     Count One of the Smith Complaint is titled "Section 1983 Unlawful Detention in Violation of Fourth and Fourteenth Amendments in 1985." The Smith Complaint alleges that Defendants Scheff, Amiable and Navarro lacked probable cause for his 1985 arrest but created it through the coerced identification of Smith and the falsified confession. The Smith Complaint avers that Defendants Scheff, Amiable and Navarro acted falsely and maliciously to create probable cause.

The Smith Complaint contends that at all times, Scheff and Amabile were carrying out the policies of Defendants Navarro, then Broward County Sheriff. (Ex. A).

21.     Count Two of the Smith Complaint is titled "Section 1983 Malicious Prosecution in Violation of Fourth and Fourteenth Amendments in 1985." The Smith Complaint alleges that Defendants Scheff, Amiable and Navarro proximately caused the commencement of criminal proceedings against Smith. The Smith Complaint asserts that Smith received a favorable outcome of the proceeding through his exoneration on December 22, 2000. The Smith Complaint avers that Defendants Scheff, Amiable and Navarro acted falsely and maliciously to create probable cause. (Ex. A).

22.     Count Three of the Smith Complaint is titled "Section 1983 Unlawful Detention in Violation of Fourth and Fourteenth Amendments in 1989–2000. The Smith Complaint asserts that beginning in 1989 when the identification of Smith was recanted, and continuing through 1998, Defendants Scheff, Amiable and Navarro fabricated evidence, specifically that they presented one of the witness a photographic lineup, which they allegedly did not, and repeatedly lied in order to use that lineup as a basis of Smith's detention.  (Ex. A).

23.     Count Four of the Smith Complaint is titled "Section 1983 Malicious Prosecution in violation of the Fourth and Fourteenth Amendments in 1989 –2000." The Smith Complaint asserts that that between 1989 and 2000, Defendants Scheff, Amiable, Navarro and Jenne proximately caused the continuation of criminal proceedings through the fabrication of the third line up and other alleged actions. (Ex. A).

24.     Count Five of the Smith Complaint is titled "Section 1983 Claim Based Upon Defendant's Planting of Evidence which violated Plaintiff's Right to a Fair Trial." The Smith Complaint alleges that Defendants Scheff and Amiable planted and created evidence included, but

not limited to, the identifications of Smith by the eyewitnesses, the so-called "confession", and the photo line-up. The Smith Complaint contends that at all times, Scheff and Amabile were carrying out the policies of Defendant Navarro, the Broward County Sheriff. (Ex. A).

25.    Count Six of the Smith Complaint is titled "Failure to Train and Supervise" and is brought pursuant to 42 U.S.C. § 1983. The Smith Complaint asserts that the Sheriffs failed to train and supervise Scheff and Amabile in the following areas: photographic line-ups, interviewing witnesses and suspects to obtain accurate information, investigative techniques and providing truthful testimony. (Ex. A).

26.    Count Seven of the Smith Complaint is titled "Section 1983 Sixth Amendment Claim "Brady v. Maryland." The Smith Complaint alleges that Defendants Scheff, Amiable and Navarro's hiding of exculpatory facts from Smith violated Smith's constitutional rights and caused his wrongful conviction and incarceration. The Smith Complaint contends that at all times, Scheff and Amabile were carrying out the policies of Defendant Navarro, the Broward County Sheriff. (Ex. A).

27.    Count Eight of the Smith Complaint is titled "Conspiracy." The Smith Complaint asserts that Defendants Scheff, Amabile, Navarro and Jenne conspired with one another to violate Smith's constitutional rights. (Ex. A).

28.    Count Nine of the Smith Complaint is titled "State Law False Imprisonment: 1985." The Smith Complaint alleges that Smith was imprisoned without probable cause as a result of Defendants Sceff, Amabile, and Navarro's conduct. The Smith Complaint contends that at all times, Scheff and Amabile were carrying out the policies of Defendants Navarro, the Broward County Sheriff. (Ex. A).

29.    Count Ten of the Smith Complaint is titled "State Law Malicious Prosecution." The Smith Complaint alleges that Defendants Scheff, Amabile and Navarro proximately caused the

commencement of criminal proceedings against Smith. The Smith Complaint asserts that Smith received a favorable outcome of the proceeding through his exoneration on December 22, 2000. The Smith Complaint avers that Defendants Scheff, Amabile and Navarro acted falsely and maliciously to create probable cause. (Ex. A).

30.     Count Eleven of the Smith Complaint is titled "State Law False Imprisonment: 1989-2000." The Smith Complaint asserts that beginning in 1989 when the identification of Smith was recanted, and continuing through 1998, Defendants Scheff, Amiable, Navarro and Jenne fabricated evidence, in the form of a photographic lineup and repeatedly lied in order to use that lineup as a basis of Smith's detention. (Ex. A).

31.     The Smith Complaint alleges the following damages: 15 years lost to a prison cell on death row, living under the dark cloud of the electric chair, living in highly restrictive death row conditions, lost earnings and earning capacity, great pain and suffering, mental anguish, loss of capacity for the enjoyment of life, and the virtual torture of dying a man wrongfully condemned, away from his family in a world that brought only injustice during his life. The Smith Complaint also seeks punitive damages.

## B.     The *Townsend* Complaint

32.     Currently pending is a Complaint filed on May 19, 2004 by Jerry Frank Townsend, which is a Third Amended Complaint against Defendants Kenneth C. Jenne, II, individually and in his official capacity as Sheriff of Broward County, Anthony Fantigrassi, individually and in his official capacity as a Deputy Sheriff for the Broward County Sheriff's Office, Mark Schlein, individually and as a former Deputy Sheriff for the Broward County Sheriff's Office, Robert Butterworth, in his individual capacity as the former Sheriff of Broward County, and Nick Navarro, in his individual capacity as the former Sheriff of Broward County, in the Circuit Court of the 17th

7

Judicial Circuit in and for Broward County, Florida, case No. 02-018346-03, a copy of which is attached hereto as Exhibit "B" (hereinafter "Townsend Complaint").

33.     The Townsend Complaint seeks relief against Defendants Jenne, Fantigrassi, Schlein, Butterworth and Navarro in connection with the arrest, trial, conviction and incarceration of Townsend, who was released from prison after being exonerated for five murders and a sexual assault. The Townsend Complaint alleges that Townsend served 22 years in jail prior to his release; he had been sentenced to two consecutive life sentences.  (Ex. B).

34.     The Townsend Complaint alleges that Townsend was first arrested on September 5, 1979 in connection with the murder of Wanda Virga.  The Townsend Complaint asserts that Townsend, age 27 at the time of his arrest, had the mental capacity of a seven or eight year old child and a severe speech impediment. (Ex. B).

35.     The Townsend Complaint avers that from September 6, 1979 to September 10, 1979, Defendants Fantigrassi and Schlein conspired with others to coerce Townsend into making self-incriminating statements to crimes they knew or should have known Townsend did not commit.  The Townsend Complaint contends that at the end of the four-day interrogation, Townsend had implicated himself in several homicides in Fort Lauderdale, Miami, Tampa and San Francisco.  The Townsend Complaint asserts that the interrogation was unconstitutional and that Defendants Fantigrassi and Schlein manipulated Townsend by coaching him, showing him evidence so he would implicate himself and preventing the recording of exculpatory statements. The Townsend Complaint asserts that based on the statements made during the interrogation, Townsend was charged by indictment with 7 rape murders in Broward County and two murders and a rape in Dade County. (Ex. B).

36.     The Townsend Complaint asserts the following acts of misconduct occurred during

the interrogation: (1) taking a mentally challenged Townsend to crime scenes and coaching him in order to fabricate evidence in the form of a tape recording that was to be used in a criminal proceeding; (2) tampering with evidence by altering the tape used to record the interrogation; (3) withholding and/or concealing evidence from criminal courts, prosecutors, Townsend's counsel and the public; (4) intentionally and/or incompetently failing to investigate or consider evidence that would have negated the fabricated evidence. (Ex. B).

37.     The Townsend Complaint alleges that in furtherance of their conspiracy to fabricate evidence, Defendants Fantigrassi and Schlein repeatedly made false material statements under oath in proceedings related to Townsend's prosecution for a capital crime.  The Townsend Complaint contends that Defendants Fantigrassi and Schlein are guilty of such intentional, malicious and/or incompetent conduct that they cannot be clothed with qualified immunity.  The Townsend Complaint asserts that Defendants Butterworth, Jenne, Fantigrassi and Schlein and others conspired to convict Townsend for crimes they knew or should have known had been committed by mass murderer Eddie Lee Mosley.  The Townsend Complaint asserts that Defendants Fantigrassi and Schlein did not have probable cause to arrest Townsend.  The Townsend Complaint asserts that only as a result of the intentional misconduct and/or incompetence of Defendants Butterworth, Jenne, Fantigrassi, and Schlein was Townsend arrested.   The Townsend Complaint contends that that the arrest and prosecution would have failed had Defendants Butterworth, Jenne, Fantigrassi, and Schlein provided the truth to the criminal courts, the prosecutors and the public concerning their conduct and fabrication. (Ex. B).

38.     The Townsend Complaint contends that notwithstanding Defendants Butterworth, Jenne, Fantigrassi and Schlein's responsibility to ensure that there was a valid legal basis to prosecute Townsend, they failed to adequately inform themselves of the facts and failed to promptly

withdraw the obviously flawed charges against Townsend. The Townsend Complaint alleges that the actions of Defendants Butterworth, Fantigrassi and Schlein constituted false arrest, false imprisonment, malicious prosecution, intentional affliction of emotional distress, negligence and unlawful search and seizure under Florida law. The Townsend Complaint asserts that Defendants Butterworth, Jenne, Fantigrass and Schlein's conduct constituted racketeering activities in violation of federal law and Florida law. (Ex. B).

39.     The Townsend Complaint asserts that on July 31, 1980 Townsend was found guilty of the murders of Naomi Gamble and Barbara Brown in Broward County, Florida. Townsend pled guilty to two more Broward County murders on October 4, 1982. On December 6, 1982, Townsend pled guilty to the two Dade County murders and to the sexual assault charges he was originally arrested on. The Townsend Complaint avers that Townsend was convicted on false evidence and that the same evidence was used to force him to confess to other crimes. The Townsend Complaint alleges that as a result of the false charges and convictions, Townsend was subjected to prosecution for additional murders, he was subjected to media harassment, which caused embarrassment, and he was placed in a life-threatening situation during his 22 years of incarceration. (Ex. B).

40.     The Townsend Complaint states that in 1998 and 1999, the Fort Lauderdale Police Department reopened one of the cases involving Townsend. When DNA evidence was examined, Townsend was exonerated of the crime. The Fort Lauderdale detectives requested the Broward County Crime Lab to conduct DNA analysis on evidence from other crimes, including crimes Townsend was convicted of. The Townsend Complaint asserts that when the DNA analysis exonerated Townsend, all of the cases involving Townsend were reopened. In April and May of 2001, DNA testing showed that mass murderer Eddie Lee Mosley and not Townsend had committed the murders. Townsend was released from prison on June 16, 2001. (Ex. B).

41.     The Townsend Complaint states the following allegations under the heading "Racketeering Activities":   Defendants Jenne, Butterworth, Navarro failed to provide proper oversight of the Broward County Sheriff's Office, failed to rein in and/or failed to follow the requirements of the U.S. Constitution and/or failed to stop Fantigrassi, Schlein and all Broward County deputy sheriffs, who, as a continuous group, have caused false charges to be made against innocent persons, have lied to prosecutors and on the witness stand to instigate and support false charges causing convictions on those charged, and who have done so as to Townsend.  Additionally, the Townsend Complaint alleges that Defendants Jenne, Butterworth and Navarro have, in violation of 18 U.S.C. §§1503 and 1512, Obstruction of Justice, which constitutes conduct proscribed by and in violation of 18 U.S.C. §1961, interfered with the due administration of justice, improperly terminated felony investigations and secured indictments and verdicts based on false testimony and false evidence.  (Ex. B).

42.     The Townsend Complaint asserts that Defendants Butterworth, Navarro, Jenne, Fantigrassi, Schlein and others conspired to commit and/or solicit another person to commit crimes chargeable by indictment or information as listed in various sections of the U.S. Code listed in 18 U.S.C. §1961(1), had an interest in and/or acquired and/or maintained control over the Broward County Sheriff's Office (hereinafter "the enterprise") through a pattern of racketeering activities, as set forth herein, in violation of 18 U.S.C. §1962(b) and, being associated with an enterprise, conducted and/or participated in said enterprise's affairs through a pattern of racketeering.  (Ex. B).

43.     The Townsend Complaint alleges that Defendants Butterworth, Navarro and Jenne, have joined in and participated in maintaining and continuing the pattern of criminal conduct of the enterprise from 1979 to the present day.  The Townsend Complaint avers that Defendants Fantigrassi and Schlein conspired with others to make and present a tape-recorded document to prosecutors for a

11

criminal trial, which they knew or in reckless regard for the truth, should have known to be false, repeatedly took Townsend to murder locations and prompted him with answers and showed Townsend crime scene pictures and had discussions to influence his answers.  (Ex. B).

44.    The Townsend Complaint alleges that in or around 1980, Defendants Fantigrassi and Schlein conspired with others to alter the tape recorded document to impair its truthfulness and to conceal and/or withhold other evidence that would have excluded Townsend as a suspect as well as to fabricate evidence against Townsend.  Fantigrassi and Schlein also are alleged to have had access to other exculpatory evidence.  (Ex. B).

45.    The Townsend Complaint asserts that Defendants Butterworth, Fantigrassi and Schlein withheld reports and exculpatory evidence, withheld evidence at Townsend's trial and have failed to investigate other exculpatory evidence.  The Townsend complaint alleges that between September 6, 1979 and July 31, 1980, Defendants Butterworth, Fantigrassi and Schlein are alleged to have conspired to close unsolved filed by conspiring to convict Townsend of the crimes. (Ex. B).

46.    The Townsend Complaint asserts that Defendants Butterworth, Navarro and Jenne are engaged in the conspiracy to conceal the criminal conduct of their agents, Fantigrassi and Schlein and aided and abetted the furtherance of their criminal conduct.  This was allegedly done to protect these two men in furtherance of the racketeering conspiracy and enterprise. (Ex. B).

47.    The Townsend Complaint asserts that after Townsend was convicted, it is alleged that Defendant Navarro had access to exculpatory evidence, which he withheld, concealed or destroyed allowing Townsend to languish in prison.  (Ex. B).

48.    According to the Townsend Complaint, Defendant Jenne is alleged to have participated in the ongoing obstruction of justice by concealing and withholding evidence and by promoting Fantigrassi to head of homicide.  Jenne is further alleged to have had access to

12

exculpatory evidence, which he withheld, concealed or destroyed allowing Townsend to languish in prison. Jenne is also alleged to have maintained written policies, which promoted his officers to undertake the conduct that led to Townsend's injury including the use of a quota system for arrests. (Ex. B).

49.     Under the heading "Defendant Jenne – Pattern and Practice of Misconduct by the Broward County Sheriff's Office", the Townsend Complaint alleges that the BSO, under Jenne, had a history of misconduct in pinning crimes on mentally disabled individuals and of covering up or destroying records of police misconduct. The Townsend Complaint asserts that these actions caused Townsend's injuries. (Ex. B).

50.     Count I of the Townsend Complaint is titled "State Tort Claim Against Defendant Fantigrassi for Intentional Infliction of Emotional Distress." The Townsend Complaint asserts that Fantigrassi's conduct constituted intentional infliction of emotional distress. The Townsend Complaint asserts that at all times, Fantigrassi acted outside his authority rendering him individually liable. The Townsend Complaint alleges that Townsend has provided notice pursuant to and satisfied all conditions of Florida Statute §768.28. (Ex. B).

51.     Count II of the Townsend Complaint is titled "State Tort Claim Against Defendant Jenne for Intentional Infliction of Emotional Distress." The Townsend Complaint asserts that Jenne's conduct constituted intentional infliction of emotional distress. The Townsend Complaint asserts that at all times Fantigrassi was acting within the scope of his authority and as agent of Defendant Jenne pursuant to Florida Statute §768.28 and §30.07, rendering Jenne liable in his official capacity. The Townsend Complaint alleges that Townsend has provided notice pursuant to and satisfied all conditions of Florida Statute §768.28. (Ex. B).

52.     Count III of the Townsend Complaint is titled "State Tort Claim Against Defendant

Schlein for Intentional Infliction of Emotional Distress." The Townsend Complaint asserts that Schlein's conduct constituted intentional infliction of emotional distress. The Townsend Complaint asserts that at all times, Schlein acted outside his authority rendering him individually liable. The Townsend Complaint alleges that Townsend has provided notice pursuant to and satisfied all conditions of Florida Statute §768.28. (Ex. B).

53.     Count IV of the Townsend Complaint is titled "State Tort Claim Against Defendant Jenne for Intentional Infliction of Emotional Distress." The Townsend Complaint asserts that Jenne's conduct constituted intentional infliction of emotional distress. The Townsend Complaint asserts that at all times Schlein was acting within the scope of his authority and as agent of Defendant Jenne pursuant to Florida Statute §768.28 and §30.07, rendering Jenne liable in his official capacity. The Townsend Complaint alleges that Townsend has provided notice pursuant to and satisfied all conditions of Florida Statute §768.28. (Ex. B).

54.     Count V of the Townsend Complaint is titled "42 U.S.C. §1983 Claim Against Defendants Fantigrassi and Schlein." The Townsend Complaint asserts that Fantigrassi and Schlein, under the color of state and federal law a deputy sheriffs for the BSO subjected Townsend to the deprivation of rights and privileges secured to Townsend by the Fourth, Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution. The Townsend action asserts that the actions and conduct of Fantigrassi and Schlein violated Townsend's right to due process under the Fifth Amendment, to a fair trial under the Sixth Amendment, and to be free from unreasonable detention, search and seizure under the Fourth Amendment to the U.S. Constitution. In particular, it is alleged that Fantigrassi and Schlein:

a)      caused Townsend to be illegally detained, illegally prosecuted, and illegally imprisoned in violation of his constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the U.S.

14

Constitution;

b)      caused the prosecution of Townsend to continue when they knew or should have known it was without probable cause;

c)      instituted and continued the interrogation of Townsend when they knew or should have known that Townsend did not understand his constitutional rights and that their coercive and illegal interrogation tactics would induce the Plaintiff to make false statements;

The Townsend Complaint asserts that Defendants Fantigrassi and Schlein acted under color of state law and with malice in instituting and proceeding with the prosecution, which was only able to continue as a result of their intentional acts of providing false information and evidence to the criminal courts, prosecutors, Townsend's counsel, and the public. (Ex. B).

55.     Count VI of the Townsend Complaint is titled "Conspiracy Claim Against Defendants Fantigrassi and Schlein to Violate Plaintiff's Constitutional Rights." The Townsend Complaint alleges that Defendants Fantigrassi and Schlein conspired with others deputies to deprive Townsend of his constitutional rights. (Ex. B).

56.     Count VII of the Townsend Complaint is titled "42 U.S.C. §1983 Claim Against Defendant Jenne." The Townsend Complaint alleges that Jenne, as Sheriff for Broward County, was responsible for hiring, screening, training, supervising, disciplining and controlling BSO officers. The Townsend Complaint contends Defendant Jenne failed in his duties by failing to recognize in Fantigrassi and Schlein characteristics making said deputies unfit for their duties. The Townsend Complaint asserts that Jenne permitted and tolerated and even encouraged illegal arrests, detentions and/or prosecutions and that making such arrests was the de facto policy and custom of BSO. The Townsend Complaint asserts that Defendant Jenne's practices led deputy sheriffs, including Fantigrassi and Schlein to believe their unlawful conduct would not be investigated, which led them to act unlawfully. The Townsend Complaint asserts that Townsend has been a victim of this

foreseeable unlawful activity, which was the foreseeable result of the acts, omissions, policies and customs of the Defendant Jenne. (Ex. B).

57.     Count VIII of the Townsend Complaint is titled "RICO-Violation of 18 U.S.C. §1962(d) Claim Against Defendants Jenne, Butterworth, Navarro, Fantigrassi and Schlein." The Townsend Complaint alleges that the identified Defendants entered into a conspiracy to violate 18 U.S.C. §1962(c). In particular, the Townsend Complaint alleges the following improper conduct:

(a)     Defendants Jenne, Butterworth and Navarro conspired to violate provisions of U.S.C. §1962 et seq. by interfering with the due administration of justice, improperly terminating felony investigations, securing indictments and verdicts based on false testimony and false evidence, withholding, concealing and/or destroying evidence and records pertaining to the illegal conduct of their agents against Townsend, violated U.S.C. §1962(c) by deliberately and knowingly continuing the wrongful detention of Plaintiff and/or delaying his release;

(b)     Defendants Jenne, Butterworth and Navarro conspired to violate 18 U.S.C. §1962 et seq. by aiding and abetting the proscribed conduct of their employees, conspired to conceal such conduct and deliberately perpetuated the continuous pattern of racketeering activities and ongoing obstruction of just, which caused Townsend injury;

(c)     Defendants Butterworth, Fantigrassi, Schlein and others conspired to conceal their wrongdoing with respect to Townsend;

(d)     Defendants Jenne, Butterworth and Navarro conspired to facilitate the conduct of the deputies through a pattern of racketeering activity for financial gain which victimized Townsend;

(e)     Defendants Jenne, Butterworth and Navarro have joined in and participated in maintaining the pattern of criminal conduct alleged from 1979 until this day;

(f)     Defendant Navarro, from 1989 forward participated in the conspiracy to obstruct justice that resulting in perpetuating and aggravating Townsend's continuing injury to business and/or property;

(g)     Defendant Jenne, from 2000 forward participated in the conspiracy to obstruct justice that resulting in perpetuating and aggravating Townsend's continuing injury to business and/or property.

(Ex. B).

58.     The Townsend Complaint further alleges in Count VIII that Defendants Fantigrassi and Schlein conspired to make false statements in reports and under oath in affidavits, which caused the indictments against Townsend on September 26, 1979 in Broward County and on September 19, 1979 and September 27, 1979 in Dade County, Florida.  In particular, the Townsend Complaint asserts that Fantigrassi and Schlein:

     (a)    knew Plaintiff was mentally retarded but testified under oath otherwise to get the Townsend's alleged confession admitted as evidence;

     (b)    falsely testified that Plaintiffs has waived his rights prior to making a confession;

     (c)    from September 5 to September 10, 1979 interrogated Townsend to the point he was crying and vomiting;

     (d)    from July 11 to July 21, 1980 gave false testimony concerning Townsend;

     (e)    discredited Townsend's alibi and concocted a theory where Townsend traveled from Chicago to Florida to commit the various crimes.  Attempted to implicate Townsend in murders that occurred in Chicago;

     (f)    from August 1979 to July 31, 1980, together with Butterworth, had evidence that Mosley was killer that they ignored based on representation of Mosley's parents that Mosley could not be the killer.

(Ex. B).

59.     The Townsend Complaint further asserts that Defendants Fantigrassi and Schlein conspired with others to close all of their unresolved case files on a series of well publicized and possibly related murders by making false and/or contradictory statements under oath prior to and during the prosecution of a capital felony.  (Ex. B).

60.     Count IX of the Townsend Complaint is titled "RICO-Violation of 18 U.S.C. §1962(b) Claim Against Defendants Butterworth, Jenne, Fantigrassi and Schlein."  The Townsend

Complaint alleges that between September 6, 1979 and July 31,1980, these Defendants used the interstate telephone system in furtherance of a continuing pattern and practice of racketeering activities with the purpose of defrauding and depriving Townsend of his legal rights and defrauding the legal system.   The Townsend Complaint alleges that in furtherance of their actions, these Defendants conspired to tamper with witnesses, tamper, fabricate and conceal evidence, and falsely testified during the time period alleged. (Ex. B).

61.     Count X of the Townsend Complaint is titled "RICO-Violation of 18 U.S.C. §1962(c) Claim Against Defendants Butterworth, Navarro, Jenne, Fantigrassi and Schlein." The Townsend Complaint alleges that Defendants Butterworth, Fantigrassi and Schlein conspired to conceal Fantigrassi and Schlein's wrongdoing.  The Townsend Complaint avers that Butterworth, Navarro and Jenne, for the purpose of financial gain and expansion of the BSO, conspired to obstruct justice and engaged in a pattern of racketeering activity, of which Townsend was one victim.   The Townsend Complaint alleges that Butterworth, Navarro and Jenne joined in the pattern of criminal conduct from 1979, 1985 and 2000 to the present day, respectively.  The Townsend Complaint asserts that Navarro and Jenne, from January 1985 and December 2000, during their terms as Sheriff of Broward County concealed and/or destroyed evidence and records and pertaining to their agents' illegal conduct against Townsend and deliberately and knowingly continued the wrongful detention of or delayed Townsend's release.  (Ex. B).

62.     The Townsend Complaint alleges that as a result of the Defendant Butterworth, Navarro, Jenne, Fantigrassi and Schlein's conduct, Townsend has suffered and continues to suffer physical and mental pain, loss of enjoyment of life, lost earnings and loss of earning capacity. Townsend seeks compensatory and punitive damages. (Ex. B).

## THE NORTH RIVER POLICY

63.    North River issued North River Insurance Company Policy No. 544-000008-6 issued

to Broward County Sheriff's Office as Named Insured, policy period of October 1, 1999 to October

1, 2002 ("1999-02 Policy"). The 1999-02 Policy provides general liability and public officials and

employees liability insurance coverage with a limits of $4 million per occurrence in excess of a self-

insured retention.  The limits apply separately to each 12-month period of coverage under the policy.

(A copy of this policy is attached hereto as Exhibit "C").

64.    The Insuring Agreement to Section I – Coverage A. Bodily Injury And Property

Damage to the Commercial General Liability Coverage Form contained in the North River Policy

provides as follows:

        a.     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend any "suit" seeking those damages.  We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. . . .

        b.     This insurance applies to "bodily injury" and "property damage" only if:

          (1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;" and

          (2)     The "bodily injury" or "property damage" occurs during the policy period.

(Ex. C).

65.    Section V – Definitions to the Commercial General Liability Coverage Form of the

North River Policy defines the term "Bodily Injury" at No. 3 as follows:

        "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

19

(Ex. C).

66.    Section V – Definitions to the Commercial General Liability Coverage Form

of the North River Policy defines the term "Occurrence" at No. 9 as follows:

> "Occurrence" means an accident, including continuous or repeated exposure
> to substantially the same general harmful conditions.

(Ex. C).

67.    The Insuring Agreement to Section I – Coverage B. Personal And

Advertising Injury Liability to the North River Policy provides as follows:

> a.    We will pay those sums that the insured becomes legally obligated to
> pay as damages because of "personal injury" or "advertising injury"
> to which this coverage part applies.  We will have the right and duty
> to defend any "suit" seeking those damages.   We may at our
> discretion investigate any "occurrence" or offense and settle any
> claim or "suit" that may result. . . .
>
> b.    This insurance applies to:
>
> (1)    "Personal injury" caused by an offense arising out of your
> business, excluding advertising, publishing, broadcasting or
> telecasting done by or for you;
>
> * * *
>
> but only if the offense was committed in the "coverage territory"
> during the policy period.

(Ex. C).

68.    Exclusion No. 3 to Section I – Coverage B. Personal And Advertising Injury

Liability to the North River Policy provides that "the insurance does not apply to "personal

injury":

> 3.    Arising out of the willful violation of a penal statute or ordinance committed
> by or with the consent of the insured.

(Ex. C).

20

69.     Section V – Definitions to the Commercial General Liability Coverage Form of the

North River Policy defines the term "personal injury" at No. 10 as follows:

> 10.     "Personal injury" means injury, other than "bodily injury" arising out
> of one or more of the following offenses:
>
> > a.     False arrest, detention or imprisonment;
> >
> > b.     Malicious prosecution;
>
> *  *  *

(Ex. C).

70.     The North River Policy  includes an endorsement titled "Limited Personal Injury

Liability Coverage (Applicable to Police / Peace Officers Only)," which provides, in pertinent part,

as follows:

> A.     <u>**COVERAGE – LIMITED PERSONAL INJURY LIABILITY**</u>
>
> We will pay on your behalf of the insured all sums which the insured shall
> become legally obligated to pay as damages because of injury (herein called
> "personal injury") sustained by any person or organization and arising out of
> one or more of the following offenses committed in the conduct of the named
> insured's business:
>
> > Group A     False arrest, detention or imprisonment, or malicious
> > prosecution;
>
> *  *  *
>
> If such offense is committed during the policy period within the United States
> of America, its territories or possessions, or Canada, and the company shall
> have the right and duty to defend any suit against the insured seeking
> damages on account of such personal injury even if any of the allegations of
> the suit are groundless, false or fraudulent, and may make such investigation
> and settlement of any claim or suit as it deems expedient, but the company
> shall not be obligated to pay any claim or judgment or to defend any suit after
> the applicable limit of the company's liability as, stated in the policy, has
> been exhausted by payment or judgments or settlements.

## EXCLUSIONS

This insurance does not apply:

* * *

    2.    to personal injury arising out of the willful violation of a penal statute or ordinance committee by or with the knowledge or consent of any insured.

* * *

**B.**    **PERSONS INSURED**

Each of the following is an insured under the insurance to the extent set forth below:

* * *

    4.    any employee of the Named Insured while acting within the scope of His duties as such.

* * *

**D.**    **ADDITIONAL DEFINITIONS**

* * *

"police/peace officer" is defined as a member of an official civil force or department of the named insured designated in the declarations of the policy, organized to maintain order, prevent and detect crime, and enforce law.

(Ex. C).

## Count I:

**No Coverage for the Smith Complaint Under
Section I – Coverage A. Bodily Injury And Property Damage to the
Commercial General Liability Coverage Form**

71.    North River alleges paragraphs 1 through 4, 8, 9, 12 through 31 and 63 through 66 as paragraph 71 as if fully set forth herein.

72.     For the Smith Complaint, no "bodily injury" occurred during the policy period of the North River Policy as required for the Policy's coverage to attach as set forth in the Insuring Agreement to Section I – Coverage A. Bodily Injury and Property Damage, as any "bodily injury" took place when it first manifested itself in 1985.   It was at this time when the alleged actions of Defendants Scheff, Amabile, and Navarro in their investigation and prosecution of the case against Smith first caused, to the extent any exists, "bodily injury" to Smith to manifest itself. This date is well before the inception of coverage under the North River Policy.

73.     Even assuming that the Smith Complaint alleged that "bodily injury" occurred during the effective dates of the North River Policy, the Smith Complaint does not allege "bodily injury" caused by an "occurrence" as required by the Insuring Agreement to the North River Policy.

74.     The terms, conditions and exclusions of the North River Policy preclude any obligation of North River to defend or indemnify Defendants BSO, Jenne, Navarro, Amabile or Scheff.

75.     The Smith Complaint seeks punitive damages.  Punitive damages are not insurable under Florida Law where relief is sought from the wrongdoer.

76.     Defendants BSO, Jenne, Navarro, Amabile or Scheff nevertheless contend that they are entitled to a defense for and indemnification from the Smith Complaint under the North River Policy, and an actual controversy therefore exists between the parties.

WHEREFORE, Plaintiff NORTH RIVER INSURANCE COMPANY respectfully requests that this Court enter a declaratory judgment finding and declaring as follows:

A.     That North River Insurance Company has no duty to defend BSO under Section I – Coverage A. Bodily Injury And Property Damage for the allegations in either the Smith Complaint.

B.  That North River Insurance Company has no duty to defend Jenne under Section I – Coverage A. Bodily Injury And Property Damage for the allegations in either the Smith Complaint.

C.  That North River Insurance Company has no duty to defend Navarro under Section I – Coverage A. Bodily Injury And Property Damage for the allegations in either the Smith Complaint.

D.  E.That North River Insurance Company has no duty to defend Amabile under Section I – Coverage A. Bodily Injury And Property Damage for the allegations in the Smith Complaint.

E.  That North River Insurance Company has no duty to defend Scheff under Section I – Coverage A. Bodily Injury And Property Damage for the allegations in the Smith Complaint.

F.  That North River be awarded the costs of this action and for such other relief as the Court may find just and equitable in the circumstances.

### Count II:

**No Coverage for the Townsend Complaint Under
Section I – Coverage A. Bodily Injury And Property Damage to the
Commercial General Liability Coverage Form**

77.     North River alleges paragraphs 1 through 7, 12 through 15, 32 through 66 as paragraph 77 as if fully set forth herein.

78.     For the Townsend Complaint, no "bodily injury" occurred during the policy period of the North River Policy as required for the North River Policy's coverage to attach as set forth in the Insuring Agreement to Section I – Coverage A. Bodily Injury and Property Damage, as any "bodily injury" took place when it manifested itself in the 1979 to 1980. It was during this time period when the alleged actions of Defendants Fantigrassi, Schlein, Butterworth, and Navarro in their investigation and prosecution of the case against Townsend took place and first caused, to the extent any exists, "bodily injury" to Townsend to manifest itself. This time period is well before the inception of coverage under the North River Policy.

24

79.     Even assuming that the Townsend Complaint alleged that "bodily injury" occurred during the effective dates of the North River Policy, the Townsend Complaint does not allege "bodily injury" caused by an "occurrence" as required by the Insuring Agreement to the North River Policy.

80.     The terms, conditions and exclusions of the North River Policy preclude any obligation of North River to defend or indemnify Defendants BSO, Butterworth, Jenne, Navarro, Fantigrassi or Schlein.

81.     The Townsend Complaint seeks punitive damages.   Punitive damages are not insurable under Florida Law where relief is sought from the wrongdoer.

82.     Defendants BSO, Butterworth, Jenne, Navarro, Fantigrassi, or Schlein nevertheless contend that they are entitled to a defense for and indemnification from the Townsend Complaint under the North River Policy, and an actual controversy therefore exists between the parties.

WHEREFORE, Plaintiff NORTH RIVER INSURANCE COMPANY respectfully requests that this Court enter a declaratory judgment finding and declaring as follows:

A.     That North River Insurance Company has no duty to defend BSO under Section I – Coverage A. Bodily Injury And Property Damage for the allegations in the Townsend Complaint.

B.     That North River Insurance Company has no duty to defend Butterworth under Section I – Coverage A. Bodily Injury And Property Damage for the allegations in the Townsend Complaint.

C.     That North River Insurance Company has no duty to defend Jenne under Section I – Coverage A. Bodily Injury And Property Damage for the allegations in the Townsend Complaint.

D.     That North River Insurance Company has no duty to defend Navarro under Section I – Coverage A. Bodily Injury And Property Damage for the allegations in the Townsend Complaint.

E.     That North River Insurance Company has no duty to defend Fantigrassi under Section I – Coverage A. Bodily Injury And Property Damage for the allegations in the Townsend Complaint.

F.     That North River Insurance Company has no duty to defend Schlein under Section I – Coverage A. Bodily Injury And Property Damage for the allegations in the Townsend Complaint.

G.     That North River be awarded the costs of this action and for such other relief as the Court may find just and equitable in the circumstances.

## Count III:

**No Coverage for the Smith Complaint Under
Section I – Coverage B. Personal Injury and Advertising Injury to the
Commercial General Liability Coverage Form**

83.     North River alleges paragraphs 1 through 4, 8, 9, 12 through 31, 63 and 67 to 69 as paragraph 83 as if fully set forth herein.

84.     For the Smith Complaint, no "personal injury" occurred during the policy period of the North River Policy as required for the Policy's coverage to attach as set forth in the Insuring Agreement to Section I – Coverage B. Personal Injury and Advertising Injury, as any "personal injury" took place when it first manifested itself in 1985. It was at this time when the actions of the Defendants Scheff, Amabile, and Navarro, in their investigation and prosecution of the case against Smith took place and first caused "personal injury" to Smith to manifest itself. This date is well before the inception of coverage under the North River Policy.

85.     Exclusion 3 to Section I – Coverage B. Personal Injury and Advertising Injury, provides that coverage is not provided for "personal injury" "[a]rising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured." To the extent that the Smith Complaint alleges such injury, it is not covered.

86.     The terms, conditions and exclusions of the North River Policy precludes any obligation of North River to defend or indemnify Defendants BSO, Jenne, Navarro, Amabile or Scheff.

87.     The Smith Complaint and the Townsend Complaint seek punitive damages. Punitive damages are not insurable under Florida Law where relief is sought from the wrongdoer.

88.     Defendants BSO, Jenne, Navarro, Amabile or Scheff nevertheless contend that they are entitled to a defense for and indemnification from the Smith Complaint under the North River Policy, and an actual controversy therefore exists between the parties.

WHEREFORE, Plaintiff NORTH RIVER INSURANCE COMPANY respectfully requests that this Court enter a declaratory judgment finding and declaring as follows:

A.     That North River Insurance Company has no duty to defend BSO under Section I – Coverage B. Personal Injury And Advertising Injury for the allegations in the Smith Complaint.

B.     That North River Insurance Company has no duty to defend Jenne under Section I – Coverage B. Personal Injury And Advertising Injury for the allegations in the Smith Complaint.

C.     That North River Insurance Company has no duty to defend Navarro under Section I – Coverage B. Personal Injury And Advertising Injury for the allegations in the Smith Complaint.

D.     That North River Insurance Company has no duty to defend Amabile under Section I – Coverage B. Personal Injury And Advertising Injury for the allegations in the Smith Complaint.

E.     That North River Insurance Company has no duty to defend Scheff under Section I – Coverage B. Personal Injury And Advertising Injury for the allegations in the Smith Complaint.

F.     That North River be awarded the costs of this action and for such other relief as the Court may find just and equitable in the circumstances.

## Count IV:

### No Coverage for Townsend Complaint Under
### Section I – Coverage B. Personal Injury and Advertising Injury to the
### Commercial General Liability Coverage Form

89.     North River alleges paragraphs 1 through 8, 12 through 15, 32 through 63 ,and 67 to 69 as paragraph 89 as if fully set forth herein.

90.     For the Townsend Complaint, no "personal injury" occurred during the policy period of the North River Policy as required for the Policy's coverage to attach as set forth in the Insuring Agreement to Section I – Coverage B. Personal Injury and Advertising Injury, as any "personal injury" took place when it first manifested itself in the 1979 to 1980.  It was during this time period when the alleged actions of Defendants Fantigrassi, Schlein, Butterworth, and Navarro in their investigation and prosecution of the case against Townsend took place and first caused, to the extent any exists, "personal injury" to Townsend to manifest itself.  This time period is well before the inception of coverage under the North River Policy.

91.     Exclusion 3 to Section I – Coverage B. Personal Injury and Advertising Injury, provides that coverage is not provided for "personal injury" "[a]rising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured."  To the extent that the Townsend Complaint alleges such injury, it is not covered.

92.     The terms, conditions and exclusions of the North River Policy precludes any obligation of North River to defend or indemnify Defendants BSO, Butterworth, Jenne, Navarro, Fantigrassi or Schlein.

93.     The Townsend Complaint seeks punitive damages.  Punitive damages are not insurable under Florida Law where relief is sought from the wrongdoer.

94.     Defendants BSO, Butterworth, Jenne, Navarro, Fantigrassi or Schlein nevertheless contend that they are entitled to a defense for and indemnification from the Townsend Complaint under the North River Policy, and an actual controversy therefore exists between the parties.

WHEREFORE, Plaintiff NORTH RIVER INSURANCE COMPANY respectfully requests that this Court enter a declaratory judgment finding and declaring as follows:

A.     That North River Insurance Company has no duty to defend BSO under Section I – Coverage B. Personal Injury And Advertising Injury for the allegations in the Townsend Complaint.

B.     That North River Insurance Company has no duty to defend Butterworth under Section I – Coverage B. Personal Injury And Advertising Injury for the allegations in the Townsend Complaint.

C.     That North River Insurance Company has no duty to defend Jenne under Section I – Coverage B. Personal Injury And Advertising Injury for the allegations in the Townsend Complaint.

D.     That North River Insurance Company has no duty to defend Navarro under Section I – Coverage B. Personal Injury And Advertising Injury for the allegations in the Townsend Complaint.

E.     That North River Insurance Company has no duty to defend Fantigrassi under Section I – Coverage B. Personal Injury And Advertising Injury for the allegations in the Townsend Complaint.

F.     That North River Insurance Company has no duty to defend Schlein under Section I – Coverage B. Personal Injury And Advertising Injury for the allegations in the Townsend Complaint.

G.     That North River be awarded the costs of this action and for such other relief as the Court may find just and equitable in the circumstances.

## Count V:

### No Coverage for the Smith Complaint Under
### The "Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only)" Endorsement

95.     North River alleges paragraphs 1 through 4, 8, 9, 12 through 31, 63 and 70 as paragraph 95 as if fully set forth herein.

96.     For the Smith Complaint, no "personal injury" occurred during the policy period of the North River Policy as required for the Policy's coverage to attach as set forth in the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement, as any "personal injury" took place when it first manifested itself in 1985.  It was at this time when the actions of the Defendants Scheff, Amabile, and Navarro, in their investigation and prosecution of the case against Smith took place and first caused "personal injury" to Smith manifest itself.  These dates are well before the inception of coverage under the North River Policy.

97.     Exclusion 3 to the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement provides that coverage is not provided "to personal injury arising out of the willful violation of a penal statute or ordinance committee by or with the knowledge or consent of any insured.  To the extent that the Smith Complaint alleges such injury, it is not covered.

98.     The terms, conditions and exclusions of the North River Policy precludes any obligation of North River to defend or indemnify Defendants BSO, Jenne, Navarro, Amabile or Scheff.

99.     The Smith Complaint seeks punitive damages.  Punitive damages are not insurable under Florida Law where relief is sought from the wrongdoer.

100.    Defendants BSO, Jenne, Navarro, Amabile or Scheff nevertheless contend that they are entitled to a defense for and indemnification from the Smith Complaint under the North River Policy, and an actual controversy therefore exists between the parties.

WHEREFORE, Plaintiff NORTH RIVER INSURANCE COMPANY respectfully requests that this Court enter a declaratory judgment finding and declaring as follows:

A.    That North River Insurance Company has no duty to defend BSO under the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement for the allegations in the Smith Complaint.

B.    That North River Insurance Company has no duty to defend Jenne under the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement for the allegations in the Smith Complaint.

C.    That North River Insurance Company has no duty to defend Navarro under the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement for the allegations in the Smith Complaint.

D.    That North River Insurance Company has no duty to defend Amabile under the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement for the allegations in the Smith Complaint.

E.    That North River Insurance Company has no duty to defend Scheff under the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement for the allegations in the Smith Complaint.

F.    That North River be awarded the costs of this action and for such other relief as the Court may find just and equitable in the circumstances.

## Count VI:

## No Coverage for the Townsend Complaint Under
## The "Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only)" Endorsement

101.    North River alleges paragraphs 1 through 8, 12 through 15, 32 through 63 and 70 as paragraph 101 as if fully set forth herein.

31

102.    For the Townsend Complaint, no "personal injury" occurred during the policy period of the North River Policy as required for the Policy's coverage to attach as set forth in the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement, as any "personal injury" took place when it first manifested itself in the 1979 to 1980 time period.  It was during this time period when the alleged actions of Defendants Fantigrassi, Schlein, Butterworth, and Navarro in their investigation and prosecution of the case against Townsend took place and first caused, to the extent any exists, "personal injury" to Townsend to manifest itself.  This timer period is well before the inception of coverage under the North River Policy.

103.    Exclusion 3 to the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement provides that coverage is not provided "to personal injury arising out of the willful violation of a penal statute or ordinance committee by or with the knowledge or consent of any insured.  To the extent that the Townsend Complaint alleges such injury, it is not covered.

104.    The terms, conditions and exclusions of the Policies preclude any obligation of North River to defend or indemnify Defendants BSO, Butterworth, Jenne, Navarro, Fantigrassi or Schlein.

105.    The Townsend Complaint seeks punitive damages.  Punitive damages are not insurable under Florida Law where relief is sought from the wrongdoer.

106.    Defendants BSO, Butterworth, Jenne, Navarro, Fantigrassi or Schlein nevertheless contend that they are entitled to a defense for and indemnification from the Townsend Complaint under the North River Policy, and an actual controversy therefore exists between the parties.

WHEREFORE, Plaintiff NORTH RIVER INSURANCE COMPANY respectfully requests that this Court enter a declaratory judgment finding and declaring as follows:

A.     That North River Insurance Company has no duty to defend BSO under the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement for the allegations in the Townsend Complaint.

B.     That North River Insurance Company has no duty to defend Butterworth under the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement for the allegations in the Townsend Complaint.

C.     That North River Insurance Company has no duty to defend Jenne under the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement for the allegations in the Townsend Complaint.

D.     That North River Insurance Company has no duty to defend Navarro under the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement for the allegations in the Townsend Complaint.

E.     That North River Insurance Company has no duty to defend Fantigrassi under the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement for the allegations in the Townsend Complaint.

F.     That North River Insurance Company has no duty to defend Schlein under the Limited Personal Injury Liability Coverage (Applicable to Police / Peace Officers Only) Endorsement for the allegations in the Townsend Complaint.

G.     That North River be awarded the costs of this action and for such other relief as the Court may find just and equitable in the circumstances.

Dated this _____ day of _____ 2005.

Respectfully submitted,

JOSHUA D. LERNER
Florida Bar No. 0455067
MANU LEILA DAVIDSON
Florida Bar No. 0672882
RUMBERGER, KIRK & CALDWELL
Brickell Bayview Centre
Suite 3000
80 S.W. 8th Street (33130-3047)
Post Office Box 01-9041
Miami, Florida  33101
Telephone:  (305) 358-5577
Telecopier:  (305) 371-7580

and

Darcy L. Ibach (*pro hac vice*)
BOLLINGER RUBERRY & GARVEY
500 W. MADISON STREET, SUITE 2300
Chicago, IL  60661-2511
Telephone:  (312) 466-8000
Telecopier:  (312) 466-8001

Attorneys for Plaintiff

# 379300

34

IN THE CIRCUIT COURT OF THE 17ᵀᴴ
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO:

VIRGINIA SMITH, in her capacity as
personal representative of the
**ESTATE of FRANK LEE SMITH**,

       Plaintiff,

v.

**RICHARD SCHEFF**, individually and in
his official capacity as a Deputy Sheriff
of Broward County, Florida, **PHILLIP AMABILE**,
individually and in his official capacity as a
Deputy Sheriff of Broward County, Florida,
**NICK NAVARRO**, individually and in his
official capacity as Sheriff of Broward County,
Florida, and **KEN JENNE**, individually and in
his official capacity as Sheriff of Broward County, Florida.

       Defendants.

_____/

02017699

13

A TRUE COPY
HOWARD C. FORMAN
CLERK OF CIRCUIT COURT
SEP 13 2002

## COMPLAINT

    Plaintiff, **VIRGINIA SMITH**, in her capacity as personal representative of the

Estate of Frank Lee Smith, by and through undersigned counsel, sues Defendants,

**RICHARD SCHEFF**, individually and in his official capacity as a Deputy Sheriff of

Broward County, Florida, **PHILLIP AMABILE**, individually and in his official capacity as

a Deputy Sheriff of Broward County, Florida, **NICK NAVARRO**, individually and in his

official capacity as Sheriff of Broward County, Florida from 1985, through 1993, and

**KEN JENNE**, individually and in his official capacity as Sheriff of Broward County,

Florida, from 1997 throughout the present, and alleges:

1



## I. THE PARTIES AND JURISDICTION

1.  Plaintiff, **VIRGINIA SMITH** is the duly appointed personal representative of the estate of Frank Smith, who died on January 30, 2000.

2.  Defendant **NAVARRO** was the Sheriff of Broward County from 1985 through 1993.

3.  Defendant **JENNE** is the present Sheriff of Broward County, Florida and has been since 1997.

4. At all times relevant hereto, Defendants **SCHEFF** and **AMABILE** were Deputy Sheriffs of Broward County.

5.  The events alleged herein all occurred within the State of Florida.  This is a civil rights action and Counts I-VIII are brought pursuant to the Civil Rights Act, 42 U.S.C Section 1983, *et seq*.  Venue is proper in this court since Defendants maintain their offices in this County and the acts underlying the claims herein were committed in this County.

6.  This is an action for damages in excess of $15,000.00.

## II. INTRODUCTION

7. As will be more fully set out herein, this case arises out of the violation of Plaintiff's constitutional rights by Defendants through the false imprisonment and malicious prosecution of Plaintiff by Defendants.  Plaintiff spent some fifteen (15) years wrongly imprisoned for murder before he was fully and completely exonerated by undisputed DNA evidence, and his wrongful conviction set aside.  Plaintiff spent most of all that time on death row awaiting his execution for a crime he did not commit, owing to

the misdeeds of these Defendants. Plaintiff died in prison, strapped to a gurney, while imprisoned for a crime he did not commit.

8. On or about April 14, 1985, young Shandra Whitehead was brutally raped and murdered in her home. These Defendants knew or should have known that Eddie Lee Mosley, Shandra's cousin and a known homicidal maniac who prowled the streets of Broward County periodically for some 12 years, from 1968 to 1985, raping and killing young women, killed Shandra. However, these Defendants knew that they could not successfully prosecute Mosley because of his mental condition. Thus, they looked for anybody, that is, somebody else on whom they could pin the crime. By pressuring witnesses to make false identifications and by fabricating a "confession" and a photographic line-up, these Defendants caused the wrongful arrest, prosecution, conviction and the continued detention on death row of Plaintiff until his death in 2000. Indeed, it was not until shortly after Plaintiff's death that DNA tests would conclusively show that Plaintiff was wholly innocent of this crime and that Eddie Lee Mosley was the killer. Plaintiff's conviction was set aside by the Circuit court of Broward County, Florida, *see* Exhibit "A", but this came too late for Plaintiff, who died of a painful cancer in a lonely prison bed away from his family after spending fifteen (15) years wrongfully imprisoned for the murder of Shandra Whitehead, a crime he did not commit. Plaintiff was, for all practical purposes, robbed of his life by these Defendants.

3

### III. TERROR IN BROWARD COUNTY FROM 1968 TO 1985 AND BEYOND

#### A. 1968-1973

9.   The many violent sexual crimes of Eddie Lee Mosley began relatively mildly in 1968. From April, 1968, through May, 1970, Broward County law enforcement was aware that Eddie Lee Mosley had committed a variety of offenses in Broward County, including indecent proposal by asking a six (6) year old girl to remove her pants, loitering and prowling, carrying a concealed weapon, and robbery.

10. In 1970, Eddie Lee Mosley was sentenced to eighteen (18) months in a Florida state prison for robbery. He was released in November, 1971. Shortly after his release, Mosley's crimes escalated and his stream of rapes and murders of young women began.

#### B.  1973-1979

11. On February 22, 1973, young Cynthia Yvonne Williams was stalked by Mosley. Mosley approached her from behind, hit her in the mouth, and raped her in an alley. On July 23, 1973, Ms. Williams would eventually identify Mosley in a live line-up.

12.   On April 3, 1973, Mosley raped a young woman in the 700 block of N.W. 15th Avenue in Ft. Lauderdale.

13. The next day, on April 4, 1973, Mosley raped a young woman in a vacant lot near 620 N.W. 22nd Road in Ft. Lauderdale. On July 31, 1973, the victim identified Mosley in a line-up.

14. About a month later, on May 7, 1973, Mosley attempted to rape a Ft. Lauderdale woman, although she managed to flee. She would later identify Mosley in a line-up.

4

15. A week later, on May 16, 1973, Mosley raped sixteen (16) year old Helen Delores Young in some shrubbery as she walked home from the store in Ft. Lauderdale. She would later identify Mosley on July 23, 1973.

16. The following day, on May 17, 1973, Mosley attempted to rape a young woman in the 700 block of N.W. 11th Avenue in Ft. Lauderdale, although the woman managed to escape. On August 8, 1973, she would identify Eddie Lee Mosley as her assailant.

17. Less than two weeks later, on May 31, 1973, Mosley raped Gloria Jean McCoy in some bushes at 714 N.W. 7th Terrace in Ft. Lauderdale after stabbing her with scissors. The victim would identify Mosley on July 31, 1973.

18. Two weeks later, on June 18, 1973, Mosley hid inside the house at 519 N.W. 14th Avenue, Ft. Lauderdale and raped the occupant. The victim would later identify Mosley on August 16, 1973.

19. Just two days later on June 20, 1973, Mosley raped a young girl at an elementary school in Ft. Lauderdale. On July 31, 1973, the victim identified Mosley as her rapist.

20. Just nine days later, on June 29, 1973, Mosley raped and murdered Thelma Bell in Ft. Lauderdale, Florida. In 1979, Broward County Sheriff's officers would coerce a retarded man, Jerry Townsend, into confessing to this murder as well as others. Townsend was ultimately cleared through DNA evidence and Mosley was positively identified as the perpetrator.

21. Five days later, on July 4, 1973, Mosley raped a young woman in Ft. Lauderdale at 727 N.W. 19th Avenue as she was taking the garbage out from her home.

22. Five days later, on July 9, 1973, the body of Vetta Turner was discovered in a vacant lot near 626 N.W. 22nd Road. Ms. Turner had been murdered by Mosley.

23. Ten days later, on July 19, 1973, Mosley would rape another woman in Ft. Lauderdale.

24. The next day, on July 20, 1973, Mosley raped and murdered Naomi Campbell. Once again, Broward County Sheriff's officials would later charge the mentally retarded Jerry Townsend with this murder after extracting a false confession from him. Townsend would eventually be cleared by DNA evidence and Mosley identified as the perpetrator of this brutal rape/murder.

25. Towards the end of July and in early August, 1973, several of the rape victims mentioned above identified Mosley from photographs. A warrant was obtained for Mosley's arrest for the rapes of Gloria Jean McCoy and Helen Delores Young (*see* paras. 15, 17, *supra*).

26. On January 28, 1974, Mosley was found not guilty by reason of insanity of the rape of Helen Delores Young. Mosley was also found to be incompetent to stand trial for other charges and he was committed to the South Florida State Hospital for the purpose of restoring his competency.

27. After about three years at South Florida State Hospital, the hospital reported that Mosley's competency to stand trial was not restorable. He remained hospitalized as insane and/or incompetent to stand trial until 1979.

6

### C. 1979-1987

28. On June 4, 1979, Mosley was granted a conditional release from Florida State Hospital and permitted to reside in the Broward County community. Although Mosley was receiving out-patient treatment at the Henderson Mental Health Center upon his release, Mosley immediately resumed his rape/murder spree.

29. In the summer of 1979, in Broward County, Mosley murdered four women and attempted to murder another. More particularly, on July 9, 1979, Mosley murdered Ernestine German; on July 27, 1979, Mosley murdered Sonia Marian; and on or about August 2, 1979, Mosley murdered Kathy Moore. On August 7, 1979, law enforcement located the body of Terry Cumming, who had been murdered by Mosley shortly before that date. On August 10, 1979, Mosley attempted to rape Lisa Wiseman at 2820 N.W. 11th Court in Ft. Lauderdale. Some time in August, 1979, Mosley is believed to have murdered Wanda Vigra in Dade County, although her body would not be found until September 2, 1979.

30. Although these crimes were obviously the handiwork of Mosley, Mosley had become like "teflon" to Broward County law enforcement due to the fact that his mental condition seemed to always allow him to avoid successful prosecution. Thus, on or about September 5, 1979, the Broward County Sheriff's Department arrested and secured false confessions to the killings of Ernestine German, Sonia Marian, Kathy Moore, Naomi Campbell, and Thelma Bell, from Jerry Townsend, a mentally retarded man. Each of these murders and rapes were falsely pinned on Townsend. Townsend would later be exonerated by DNA evidence and Mosley proved the killer.

7

31. In the case of Lisa Wiseman, the only victim who survived the attempt on her life, she identified Eddie Lee Mosley from a line-up, but she was ultimately persuaded to testify by Broward County Sheriff's officials against Jerry Townsend.

32. In August or September, 1979, Mosley left the Ft. Lauderdale area and went to Lakeland to stay with his grandfather.

33. On October 8, 1979, shortly after Mosley moved to Lakeland, Florida, the body of 22 year old Ida Igles was found in a vacant lot in Lakeland. A witness identified Eddie Lee Mosley as having been with the victim shortly before the murder.

34. Other murders by Mosley in the Lakeland area would later be discovered. For example, on March 24, 1980, the body of young Lethe Mae Williams was found in an open field. The date of death was believed to be four months to one year prior to finding the body during the time in which Mosley was in Lakeland.

35. At the end of 1979, Mosley returned to south Florida and continued his string of homicides. Two days before Christmas, on December 23, 1979, Broward County police found the body of Susie Boynton. She had been raped and strangled to death by Mosley.

36. On February 22, 1980, Broward County police found the body of Annette Tukes who had been raped and strangled to death by Mosley.

37. Just a few weeks later, on March 8-9, 1980, Mosley killed sixteen year old Gloria Irving, whose body was found at 2000 N.W. 1st Street in Ft. Lauderdale on March 16, 1980. Ironically, the victim was a cousin of Plaintiff.

38. Just a day or two later, on March 10, 1980, Mosley raped Cynthia Maxwell in Ft. Lauderdale. The victim would identify Mosley on April 12, 1980.

8

39. Shortly thereafter, on April 12, 1980, Mosley raped Mary Louise Wright in a vacant lot in Ft. Lauderdale. The victim identified Mosley in a live line-up on the same date.

40. On April 12, 1980, Mosley was arrested for the two sexual batteries involving Cynthia Maxwell and Mary Louise Wright (see paras. 38, 39, supra).

41. On April 21, 1981, Mosley was convicted of the rape of Cynthia Maxwell. Finally -- it seemed -- Mosley would be put away. He was sentenced to fifteen (15) years in a Florida state prison.

42. However, just a few months later, after serving less than a year of his sentence, on February 2, 1982, Mosley moved to vacate and set-aside his judgment and sentence for the rape of Cynthia Maxwell. On May 24, 1982, that motion was granted, finding that Mosley's trial counsel was ineffective for not pursuing an insanity defense on his behalf. As a result of the conviction and sentence being overturned, on November 16, 1983, Mosley was able to "cop a plea" for both the Cynthia Maxwell and Mary Louise Wright rapes, whereby he would be released immediately. Mosley was once again released into the community to resume his ravenous conduct upon Broward County's young women. It did not take long for his killing to begin again. But to law enforcement, Mosley's teflon coat now made him invincible.

43. On December 20, 1983, law enforcement discovered the naked body of Geraldine Barfield at 729 N.W. 15th Way in Broward County. Mosley had killed her.

44. Five days later, on Christmas Day, December 25, 1983, the body of Emma Cook -- another of Mosley's victims -- was found at 735 N.W. 15th in Ft. Lauderdale.

9

This case was specifically worked by Defendants Scheff and Amabile, the Defendants herein.

45. On May 16, 1984, Angela Scott was raped by Mosley in the presence of her two year old son. Mosley was prosecuted and found not guilty, reinforcing his teflon coat.

46. On November 26, 1984, Mosley murdered Loretta Brown behind a church in Broward County. Defendants Scheff and Amabile worked this case.

47. On December 18, 1984, Mosley murdered 22 year old Teresa Giles in Broward County. Defendants Scheff and Amabile worked this case.

48. On March 15, 1985, law enforcement investigated a suspicious incident involving a prostitute in Broward County and Eddie Lee Mosley was considered a suspect.

49. On April 14, 1985, Mosley murdered young Shandra Whitehead in her home. This is the offense that would later falsely be pinned on Plaintiff by these Defendants, just as Townsend had been set up in 1979 for a number of Mosley's other offenses. At the time, law enforcement was well aware that Mosley was "teflonized" and that his mental incompetency allowed him to beat every charge they could throw at him. Since they could not get Mosley, they decided to look elsewhere and they recklessly and willfully decided to get whoever they could arrest and convict for these crimes.

50. Although Plaintiff would be arrested four days later and incarcerated for the Whitehead murder, the murder spree did not end. The body of Santral Lowe was found at 2100 N.W. 6th Place on February 24, 1987. Mosley had murdered Brown around the time he murdered Whitehead.

10

51. Finally, on May 20, 1987, Mosley was charged with the 1983 murder of Emma Cook after he confessed (*see* para. 44).   The officers on the case were Defendants Scheff and Amabile.   However, Mosley was subsequently ruled to be incompetent and in 1987 was sent to a mental hospital, where he remains today.

52.   Although Mosley ended up in a mental hospital, he has never been convicted of any of these offenses, save for the plea bargain for time served that he took on the two rapes.   While Mosley has escaped without a conviction, Plaintiff was not so lucky: he paid with his life.

53.   During the investigation of Plaintiff's case and prior to his trial, Defendants knew that Mosley was the most likely suspect.   Defendants knew that a murder spree was being committed by Mosley.   However, Defendants also knew that Mosley was "teflon" to them and that they could not successfully prosecute him.   Thus, Defendants sought someone else on whom they could pin the killing, appease their supervisors and community, and Plaintiff became their victim.   Although Defendants knew the above facts and had much other substantial information in their possession which linked Mosley to this crime, they failed to disclose to prosecutors or to Plaintiff's criminal defense counsel these matters as required by *Brady v. Maryland*.   More particularly, Defendants were aware that Mosley typically and had the *modus operandi* where he approached people on the street, says that he is from New York and asks the person about doing drugs with him.   This pattern was followed by the person who approached Gerald Davis on the night of the murder of Shandra Whitehead.   Defendants were aware that Mosley had a "droopy eye," just as was described by Chiquita Lowe and Gerald Davis in their descriptions of the man they saw in relation to the murder of

11

Shandra Whitehead.   Defendants knew that Mosley typically walked around with a grocery cart, often containing stolen items, such as the person who came to Ms. Lowe's home[1] a few days later after the murder of Shandra Whitehead.   Defendants knew that Mosley's crimes all involved African-American female victims who were raped or raped and murdered.    Defendants were aware that in several of his other offenses, Mosley strangled his victims with a ligature.[2]   Defendants were aware that in addition to the similarity of the crimes, the rapes and murders of which Mosley was suspected were all committed in the same geographical location as the Whitehead murder.    Defendants did not provide any of this evidence -- inculpatory of Mosley and exculpatory of Plaintiff -- to Plaintiff's criminal defense lawyers, even though they were well aware they were required to provide said information pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963).

## IV.  THE INVESTIGATION OF THE SHANDRA WHITEHEAD MURDER

54.   On April 14, 1985, eight-year-old Shandra Whitehead was raped and murdered in Ft. Lauderdale, Florida.  The crime occurred between 10:30 or 10:40 p.m., when Shandra's aunt checked on her and her brother Reginald, and 11:30 p.m., when Shandra's mother arrived home from work and found her daughter.  This is the crime for which Plaintiff was falsely charged, arrested, convicted and imprisoned and placed on death row for 15 years, where he died.

---

[1]  A May 17, 1987, police report concerns a complaint about this and an evaluation by Dr. Bruce Frumpkin on October 17, 1987, states that " Mosley makes his money by selling various items, fruit, soda cans, etc. from a push buggy shopping cart."

[2]  Although the cause of death in this case was blunt force trauma to the head, the victim was found with her pajama bottoms tied tightly around her neck.  In several of the cases, Mosley strangled his victims with a piece of their own clothing.

12

## A. The "Eyewitnesses" to the Shandra Whitehead Murder

55.  Shandra's mother, Ms. Dorothy McGriff, testified that as she pulled her car into the driveway that night, she saw a man at the side of the house reaching in through a window.  Ms. McGriff yelled at the man and then jumped out of the car, grabbed a slingblade, and chased the man away from the house.  Ms. McGriff then went into the house where she found her daughter.

56.  In addition to Ms. McGriff, the police found two witnesses whom they believed may have seen the man who raped and killed Shandra Whitehead -- Gerald Davis and Chiquita Lowe, two teenagers who lived in the victim's neighborhood.  Mr. Gerald Davis testified that on the night of the murder he was out walking at about 9:30 or 10:00 p.m. when a man called to him from the empty field across the street from Shandra's house.  As Mr. Davis continued walking, Chiquita Lowe drove up to him and stopped to talk.  After Ms. Lowe drove away, the man ran to Mr. Davis; he told him that he had just moved from New York, offered him drugs, and made a sexual proposition. Mr. Davis testified that he "paid him no mind because [he] didn't want to be bothered."

57.  Chiquita Lowe testified that at about 10:30 p.m. she was driving down Shandra's street when a man came out of Shandra's yard and flagged her down; the man approached the car, leaned into the driver's side window, and asked for money. The man left when Ms. Lowe told him that she had no money.  Ms. Lowe continued driving and stopped about a minute later to talk to Mr. Davis.

58.  On April 17th, Mr. Davis and Ms. Lowe assisted the police in the creation of a composite sketch of the suspect.  Defendant Amabile testified that Ms. McGriff did not participate in drawing the composite sketch because Ms. Lowe and Mr. Davis "had

13

more of an eye for detail" and because Ms. McGriff was "emotionally distraught" and was "a simple woman and could not articulate what she was trying to tell us". Defendant Scheff testified that Ms. McGriff did not participate in creating the composite because, although he was "fairly certain" that she had seen the same man as Lowe and Davis, Lowe and Davis "were much more articulate than she was," and "[t]he ability to do a composite depends upon the witness' ability to visualize the person." Before the composite sketch was distributed in the neighborhood, it was shown to Ms. McGriff who, according to Defendant Scheff, "gave . . . a very positive reaction."

59.   Defendant Scheff received a call from Ms. Lowe regarding a man who had come to her house with a shopping cart trying to sell a television.  Defendant Scheff testified at trial and in his deposition that Ms. Lowe spoke to the man with the television and immediately recognized him as the man she saw near the crime scene.  Defendant Scheff explained that Ms. Lowe believed that the man had used the television as a ruse to get to her because he somehow knew she was a witness in this case.  However, Ms. Lowe testified that when the man came to her house with the television, she was asleep.  Her family members spoke to the man with the television, saw the composite sketch, and became convinced that he was the same man.  Plaintiff was arrested several hours later.  Plaintiff was never seen by the police with either a shopping cart or a television, although Mosley was known to sell things from a shopping cart in the neighborhood.

60.   Although all three of these witnesses identified Plaintiff in some way, as the Florida Supreme Court noted, the testimony of Ms. McGriff and Mr. Davis identifying Mr. Smith was extremely weak:   Ms. McGriff, though positive about her identification,

14

admitted that she did not see the man's face, and Mr. Davis, who reluctantly identified Mr. Smith, repeatedly told the police he did not remember what the man looked like. Both Davis and Lowe made their identifications after substantial coercion by Defendants to "identify" Plaintiff, even though these Defendants knew or should have known that Plaintiff had not committed the offense.

### 1. The McGriff "Identification"

61.  On April 15, 1985, Ms. McGriff gave the following description of the man to the police: "medium build, heavy in the chest, lower haircut, black man, dark skin with jeans, pair of brown suede shoes, orange T-Shirt with writing across the chest." Ms. McGriff testified that when she gave her first statement to the police she did not know what the man looked like and that she told the police she would not be able to recognize the man's face.[3]  At her deposition, Ms. McGriff testified that she could not describe the man's face. Ms. McGriff testified that she only saw the man for a couple seconds. She explained:

> Q     Isn't it true you weren't actually paying too much attention to the man itself? You were basically interested in getting him away from your window?
>
> A     That is true.
>
> Q     Isn't it true when the person turned his face around it was flashing so quickly you didn't get a good look to see whether he was wearing glasses or not?
>
> A     That's right.

---

[3]  Defendant Amabile, who interviewed Ms. McGriff at the hospital, confirmed that she provided no details about the man's face except that he had a beard.  In contrast, Defendant Scheff, who did not interview Ms. McGriff, testified that he believed Ms. McGriff did see the man's face.

Ms. McGriff explained how she identified Mr. Smith from the photographic line-up:

Q      (By Mr. Washor)  You didn't get a good look at his face, isn't that correct?

A      No.

Q      Isn't it fair to say there was nothing about this person's face that stuck out in your mind at all because everything happened in a flash?

A      Pardon me?

Q      Nothing about this person stuck out in your mind because everything happened in a flash?

A      Yes.

Q      Isn't it also fair to say everything was dark from this person's head down to his shoulders?

A      Yes.

Q      But from his shoulders down, you can describe his clothing because the light was shining on the clothing; isn't that correct?

A      Yes.

Q      Wouldn't it be fair to say you picked that picture of Mr. Smith based upon his shoulders?

A      Yes.

Q      You couldn't identify his face, right?

A      No.

Q      If I showed you a picture of his face, you couldn't tell me whether that was the man or not; correct?

A      Yes, from his shoulders.

Q      Yes, I'm correct.  If I show you a picture of the face of the man you couldn't tell me?

16

A      No.

Q      You could not, correct?

A      No.

Q      Isn't it true that you couldn't see the person's face at all, describe it, because it was just a flash that you saw?

A      Yes.

Although Ms. McGriff testified that she identified Mr. Smith from his shoulders, his shoulders are not visible in the photo line-up which includes only Mr. Smith's face and neck. As Defendant Scheff defensively told Mr. Smith's attorney during his deposition when asked whether Ms. McGriff identified Mr. Smith from his face: "there is nothing else in the picture that would identify other than his face."

   2. The Davis "Identification"

   62.   Mr. Davis gave the following description of the suspect to the police: "maybe six feet, a hundred and sixty, hundred seventy pounds, like muscular, chubby stomach, really couldn't tell, it was dark and he had a beard that was very tacky, like he did not keep it up and kinky hair." Mr. Davis testified that he was trying to avoid the man: "I didn't really want to be bothered with him because I did not know the guy. . . . I was like paid him no mind because I didn't want to be bothered." Mr. Davis explained that he did not get a good look at the man because the streetlights were out, he was ignoring the man and hoping he would go away, he only looked at him for a few seconds, and he "was never looking at him directly." Mr. Davis tried to explain his numerous inconsistent descriptions:

   What I'm saying, I said it was dark. I was trying to avoid the
   guy. I don't remember exactly.

17

Mr. Davis told the police that nothing about the man stuck out in his mind and that he was unsure whether he would be able to recognize the man.

63. Mr. Davis could not identify Plaintiff from the photo line-up that was shown to all three witnesses and insisted on seeing a live line-up before he would make an identification. Mr. Davis was uncomfortable with his identification of Plaintiff from the live line-up because, as he told Defendant Scheff, Plaintiff did not look as large as the man he saw on the night of the crime; Mr. Davis explained that when he voiced his concern about Plaintiff 's size, the police "said to me that the reason it's like that because all the guys are between six one and six feet and that is why they all seem the same size." After being reassured by the police, Mr. Davis erroneously identified Plaintiff.

64. Defendant Scheff lied to Mr. Davis: the men in the live line-up were not all between six feet and six one. Defendant Scheff tried to claim that the men were "[a]bout six feet tall, as close as we could get. I think one was six feet tall, all appeared to be the same." However, on cross-examination, he was forced to admit that one man was five feet ten inches tall and another was only five feet nine inches tall. Plaintiff was placed between the two shortest men in the line-up. Defendant Scheff claimed that he "tried to get as many people that physically resembled [Mr. Smith] as possible," but he was forced to admit that two men were obviously shorter than the others. Defendant Scheff also admitted that none of the men in the line-up weighed more than one hundred and eighty pounds although the descriptions of the suspect in this case all indicated a weight heavier than that. Defendant Scheff also agreed that three of the men in the line-up were substantially younger than Plaintiff: by fourteen, seventeen,

18

and thirteen years.  Defendant Amabile confirmed that Plaintiff was the oldest and the tallest man in the line-up and that he was situated between the two shortest men.

65.  Mr. Davis also testified that the police pressured him to make an identification and used suggestive tactics.  During Mr. Davis' first statement to the police, he said in response to their questions that the man did not have any scars on his face.[4]  However, during his second statement, Mr. Davis said that the man had a scar on his cheek.  Mr. Davis explained why his description regarding this detail changed:

> Q    What, if any, recollection do you have regarding whether the fellow had any scars?
>
> A    I don't remember.
>
> Q    Do you recall having a conversation with the police or in a deposition later on about scars?
>
> A    Yes.
>
> Q    Do you recall what that conversation was?
>
> A    It was, did he have a scar.  I said, I think so.
>
> Q    Would that have been based on something that you were remembering or something that the police had told you or do you know?
>
> A    Something that they were telling me.
>
> Q    You don't have any recollection of the scar?
>
> A    No, I don't remember a scar.

66. Between Mr. Davis' first and second statements, Plaintiff Smith was arrested. Defendants, noticing that Plaintiff has a scar on one cheek, realized that they needed to alter Mr. Davis' description so it could be applied to Plaintiff.  As Mr. Davis explained,

---

[4]  In her initial statement to the police, Chiquita Lowe also told the police that the man she saw did not have any scars on his face.

19

his revised description of the scar on the man's cheek was based "[o]n something that [the police] were telling me." Mr. Davis was clearly confused at the trial when he tried to explain his inconsistent statements regarding the scar: "I probably said scar at one time but I probably said he didn't have any scars. He didn't have any scars."

67. Defendants Scheff and Amabile were also forced to explain Mr. Davis' inconsistent statements regarding whether the man he saw on the night of the crime had a scar. Defendant Amabile initially confirmed Mr. Davis' memory of his first statement to the police when he said that the man had no facial scars. During redirect examination, Defendant Amabile changed his testimony:

> Q     Did you all come out point blank and say, did the guy have any scars?
>
> A     No.
>
> Q     What exactly was Gerald Davis asked?
>
> A     He was asked if he had any scars, marks, tattoos, missing gold teeth. It was all one sentence that was asked.
>
> Q     What was his response to the whole line of things?
>
> A     No.
>
> Q     Now when he said no, did you catch that he was saying no to scars?
>
> A     No.
>
> Q     Had he previously told you about a scar?
>
> A     Prior to taking a taped statement is when he told us about the scar.

On cross-examination, Defendant Scheff became defensive when Plaintiff's attorney asked about Mr. Davis' description of the suspect regarding the scar:

Q      I believe on your direct examination when you said when speaking to Davis during this first statement, that he stated that the man had a scar on his face?

A      That's correct.

Q      Are you positive about that?

A      Absolutely.

Q      Would you like to refresh your memory at all?

A      No, sir.

Q      Do you remember Mr. Davis saying anything contrary during your conversation with him, your taped conversation with him?

A      Well, I know I believe I know what you are referring to.

Q      What am I referring to?

A      You're referring to the question in which he responds with a, no, to the question in reference to scars and he responds with a negative and says, no, but I believe that was my fault and not his.

Q      Did he or did he not say that?

A      If you want to refer to the question, I'll show you what I'm talking about.  I know what you are talking about.

Q      The first statement, page five, was there anything about him you remember, anything like missing teeth, anything that stands out in your mind, scars he might have had.  And his answer, no.

A      That's correct.

Q      He did say no?

A      Yes, but actually if you take a look at that question I have really asked him four questions and unfortunately if you are asking me why this happened, I can only --

Q      I'm asking you what he said?

A      He said no on the tape.

21

Q      But it's your testimony that when he was off the tape he said, yes?

A      That's correct.

68. Mr. Davis said on tape that the man had no facial scars. Because this description is inconsistent with Mr. Smith's appearance, Defendant Scheff falsely claimed that off the tape Mr. Davis said the man did have a facial scar. Although Defendant Scheff admitted that a facial scar would be "an important factor" to use in identifying a suspect, he did not think that Mr. Davis' untaped description of the scar was important enough to be included in his handwritten notes.

69. Mr. Davis testified at his deposition that the police were also giving him hints and speaking in a suggestive manner when they showed him the photo line-up. When he viewed the live line-up, the police instructed him to pick out the person who "looks like" the man he saw near the crime scene; they did not tell him to pick only the man he actually saw. In addition, Mr. Davis was shown a picture of Plaintiff Smith immediately before he viewed the live line-up, a procedure which is impermissible. At his deposition, Mr. Davis testified that the police instructed him to pick out the man who looked most like the man in the picture he had just been shown.

70. Mr. Davis admitted that he was unsure of his identification but that he felt compelled by the police to make an identification:

> Q      Isn't it true you can't honestly swear to me right now that the man you picked out in the live line-up is the same man you saw that night?
>
> A      No, I can't say he is exactly the same guy but he looks like the guy.
>
> Q      My question is:  You can't honestly say that is the same man, can you?

22

A      No.

Q      But the police had you fill out a form, correct, to indicate that you picked out number five or whoever?

A      Yes.

Q      And didn't you keep on saying you weren't sure, only that he looks like the guy?

A      Yes.

Q      Isn't it true that if the guy came up to you right now you couldn't say whether it was the guy you saw on the street or not?

A      No.

Q      Why did you identify Mr. Smith?

A      I identified him as the guy I picked out of the line-up and the guy I talked to but - which I have been saying from the beginning, I don't remember how the guy looked.

Q      Didn't you feel compelled by the police in the live line-up to pick somebody out?

A      Yes.

Q      Isn't it true that the man you picked out in the live line-up, Frank Smith, was not as big as the guy you saw on the street?

A      No.

Q      That's true, isn't it?

A      Yes.

Q      Didn't you keep saying to the police, I don't know if this is the guy and didn't they keep saying to you, don't feel that you are going to send an innocent man to jail in an effort to get you to stick to your story?

A      Yes.

Q      Wasn't it apparent to you that the police wanted you to make an identification?

23

A      Yes.

71. Mr. Davis also testified that the police did not record his statements when he told them he was unsure of his identification; the only statement that was taped was his reluctant agreement with the Defendants that Plaintiff was the man he saw near the crime scene.  The Defendants therefore induced and coerced Mr. Davis to make a false identification, and failed to record any statement of Mr. Davis that did not comport with the false identification of Plaintiff.

3. The Lowe "Identification" and Defendant's Coercion of Ms. Lowe

72. Chiquita Lowe was the State's strongest and only substantial identification witness at Plaintiff's trial.  She identified Plaintiff as the man she saw on the victim's street on the night of the crime.  However, like the "identification" made by Gerald Davis, Ms. Lowe's "identification" was the result of substantial unlawful coercion by Defendants.  At the time of Plaintiff's trial, Ms. Lowe was an impressionable, 19-20 year old youth.

a. The Droopy Eye

73. Ms. Lowe testified that the man she saw had a droopy eye "like it was weak. It needed glasses."  Ms. Lowe and Mr. Davis testified that the man they saw was not wearing glasses.  Ms. Lowe told Defendants about the droopy eye, and the composite sketch clearly indicates that both she and Mr. Davis observed this distinctive characteristic.  Plaintiff never had a droopy eye.

74. The description of the droopy eye offered   presented two problems for Defendants after Plaintiff's arrest: although Mosley has a distinctive "droopy" eye,

24

Plaintiff does not have a droopy eye. Second, Plaintiff is legally blind and cannot function without very thick glasses.

75. In order to reconcile these significant discrepancies in the case, Defendants coaxed Ms. Lowe to say that the man she saw needed glasses, in order to strengthen the false charges against Plaintiff.

### b. The clothing of the Perpetrator

76. In her initial statement to Defendants, Ms. Lowe said she was unsure what the suspect was wearing, but thought she may have seen a white shirt or a white shirt with red stripes. Ms. Lowe never mentioned a blue windbreaker to the police.

77. However, Defendants found a blue windbreaker in a truck across the street from the victim's house. Defendants sought to link the windbreaker to the crime, although it was of no evidentiary value.

78. Owing to Defendant's coercion, Ms. Lowe testified that the man she saw on the night of the crime was wearing a blue windbreaker. Again, this was done by Defendants to strengthen the false charges against Plaintiff and to make it more likely that a false conviction of Plaintiff would be obtained.

### c. The Description of the Perpetrator

79. Ms. Lowe's initial description of the man she saw was that of a man with big arms and a big chest.[5]

80. When Ms. Lowe viewed Plaintiff in court, she realized that Plaintiff did not match the description she had given.

_____

[5] Ms. Lowe's description of the suspect's physique is consistent with that of the other witnesses: Mr. Davis told the police that the man was muscular with a chubby stomach, and Ms. McGriff described the man as a husky football player.

81. Owing to Defendant's coercion of Ms. Lowe, at trial, Ms. Lowe denied her prior description.

### d. Scars

82. Ms. Lowe, like Gerald Davis, told the police that the man she saw did not have any scars on his face. Plaintiff has a scar on one cheek.

83. Defendants told Ms. Lowe that the man she saw did have a scar under his eye. Owing to Defendant's coercion of Ms. Lowe, Ms. Lowe agreed at trial that Plaintiff was the man she saw. Defendants undertook this action to bolster their false charges against Plaintiff.

### e. The Photographic Line-up

#### (1) The Identification of Plaintiff in a Photographic Line up

84. Owing to coercion by Defendants, Ms. Lowe identified Plaintiff from a photographic line up.

85. Although Ms. Lowe admitted picking out Mr. Smith from a photo lineup, she was emphatic that she initially told the Defendants "that the hair was like the guy that [she] saw". When questioned about her identification of Mr. Smith from the photo lineup, she testified:

> They asked me is one of these the guy. I said no, but I said that his hair was like the guy I seen that night.

Prior to or at Plaintiff's trial, this information was never disclosed to Plaintiff or his attorneys, in violation of *Brady v. Maryland,* 373 U.S. 83 (1963).

26

86. To whatever extent Ms. Lowe identified Plaintiff from the photographic line up, that identification and her subsequent testimony concerning that identification were the result of Defendant's coercion of Ms. Lowe.

87. Ms. Lowe explained that Defendants placed her under "a lot of pressure" to make an identification of Plaintiff as the man she saw that night from a photo lineup. She testified that she was under:

> "A lot of pressure ... from the police officer that came out there telling me that the man is dangerous and if he stays out there, he's going to do it to someone else. So I was up on a lot of pressure."

She explained further:

> I only told them that the hair look like the man that did it. And when I say the hair that looks like the man that did it, they kept pushing me "Is this the man, Is this the man, Is this the man." ... They kept saying that.

88. In 1991, Ms. Lowe again testified that Defendants attempted to influence her when she looked at the first photo line-up. Ms. Lowe testified that the police "kept pointing at [James Freeman's[6] photo] and talking about it" and "kept on telling me is Freeman the one who did it, because Freeman known of doing that to little girls." The police used the same suggestive tactics when they showed her the line-up including Plaintiff's picture:

> They showed me the second [line-up] and I looked at them and they say -- I'm not certain which number he said but I know it was a number with Frank Lee face on it. I'm just saying, for instance, say number two.

> They said this is the one that Shandra mother said and Gerald said this is the one, Frank Lee. This is who did it.

---

[6] Freeman was the suspect presented in the first photo line-up.

27

This is the one that we have to get off the street because he
hurt little girls.

And he just kept on pointing to the picture and telling me that
this is the one, we have to get him off the street.

THE COURT:        Who's saying that?

THE WITNESS:      The two police officers.

THE COURT:        Scheff and somebody else?

THE WITNESS:      Yes.

THE COURT:        Did you know him beforehand, Plaintiff?

THE WITNESS:      I never laid eyes on him.

                  *        *         *

THE COURT:        They said to you that he was the one that did
this homicide?

THE WITNESS:      They said he the one that did it.

Ms. Lowe testified that Defendants told her that Ms. McGriff and Mr. Davis had already

identified Plaintiff as the man they saw on the night of the murder.  Ms. Lowe believed

this false statement that Defendants had made to her concerning the other witnesses.

   89.  Ms. Lowe explained on cross-examination that she would not have chosen

Mr. Smith from the photo line-up if not for police coercion:

Q        Okay.  Do you recall picking out number two?

A        They was pointing number two out to me.

Q        They were pointing number two out to you?   Have you ever
testified in any court of law that Defendants Scheff and Amabile and/or
Amabile told you to pick out number two?

A        They kept on pointing at that one saying this is the one.

28

Q      At the time you made the selection?

A      What selection?

Q      At the time that you did this photo lineup, originally did this photo lineup?

A      They brought these pictures to me and they kept pointing at number two telling me that this is the one, this is the one.

Q      Okay.

THE COURT:      So in other words, you're saying the only reason you pointed out number two is because they kept saying this is the one, this is the one?

THE WITNESS:      Uh-huh.

THE COURT:      You're saying but for them saying that to you, you would not have picked out number two?

THE WITNESS:      No, I wouldn't have picked number two out.

THE COURT:      You wouldn't have?

THE WITNESS:      I wouldn't have picked none of those that he just showed me. I wouldn't have picked none of them.

*(2) Ms. Lowe's identification of Plaintiff at trial*

90. At trial, Ms. Lowe became "convinced" that Plaintiff was not the individual she saw on the night of the murder.[7]  At the first post-conviction evidentiary hearing, she testified:

Only thing I remember is when I walked into the courtroom . . . I seen Mr. Frank [Smith] standing up there. I had my -- they kept saying is that the man, but I had my doubts that was the man because the man I seen that night he was muscular, big and Mr. Frank [Smith] was not."

---

[7] Prior to the trial, Ms. Lowe had never seen Plaintiff in person. She had only seen a photograph of Plaintiff in a photo line up.

29

Ms. Lowe testified that despite her doubts she identified Mr. Smith at trial as the man

she saw . When asked why she didn't tell the court and jury that she made a mistake,

she testified:

> Q.    Can you tell me as best you can what you are thinking? What was it that you were confused about?
>
> A.    That they saying they got the man.  The man needs to be off the street.  He's dangerous and they kept saying "this is the man," you just have to say "this is the man because he need to be off the street."  And I was thinking about the little girl's mama, that she's going through this, that had happened with her daughter and everything.  I was just confused.
>
> Q.    Did you feel a lot of weight on your shoulders?
>
> A.    Yes.
>
> Q.    When you were in the courtroom and you looked at Plaintiff, did you have nagging doubts in the back of your head?
>
> A.    Yes.
>
> *    *    *
>
> Q.    When you looked at Mr. Smith in the courtroom, what were you thinking?
>
> A.    What they told me, "the man was dangerous and he needs to be off the street."
>
> Q.    What were you thinking about his fitting the description?
>
> A.    He didn't fit that description that I sketched out.
>
> Q.    When you got off the witness stand, what did you think?
>
> A.    Terrible.

91. Ms. Lowe also felt pressured by Defendants to say that the man she saw that

night had a scar under his eye .  Of course, Mr. Smith has a significant noticeable scar

30

under his right eye.  Ms. Lowe said she was pressured to testify at trial about the scar

but refused to do so.

92.  Ms. Lowe also testified about Defendant's coercion of her at the time of

Plaintiff's trial at the second post-conviction hearing in 1998.  She said:

> Both of the police officers told me that go in there and tell
> the truth.  We captured the person that did this to this little
> girl here and he needs to be off the street.
>
> *          *          *
>
> And they kept on saying this person here is bad, he need to
> be off the street, and just go in there and just tell the truth.
> They just kept on telling me that over and over and over and
> over again.

Ms. Lowe testified that she was afraid to go into the courtroom because "[t]hey said

they captured the person that killed that little girl, and I was afraid to go in the courtroom

on account of death . . . . and looking at the person in there in their face knowing that

they did an awful crime like that."

93.  Ms. Lowe's 1998 testimony on re-cross was consistent about the pressure

that caused her to identify Plaintiff at his trial:

> Q      You had no hesitation in pointing him out and saying that's
> the man I saw on April 14th, 1985?
>
> A      The police told me that Miss Dorothy and Gerald say that is
> the man and I went ahead and said also because they said the
> man needed to be off the street and he hurt that little girl and that
> was him.

### (3) Ms. Lowe's Recantation

94. On the night of December 20, 1989, Jeff Walsh, an investigator for Plaintiff

showed Ms. Lowe a picture of Eddie Lee Mosley.  She immediately identified him as the

person who had run up to her car on the night of April 14, 1985.  The next morning

Chiquita Lowe provided the following affidavit:

1.  My name is Chiquita Lowe and I live in Ft. Lauderdale, Florida. I am presently twenty-four years old.

2.  In 1985, I testified during a murder trial.  A little girl was raped and killed near my grandmother's house.  I saw the man in the street right before the crime happened.

3.  In 1985, I told the police and the state attorney about how the man asked me for money.  I told them that I only saw the man for an instant and that the only things I remembered were the droopy eye, scraggly hair, pot marks on his face, and the ring on his finger.

4.  The police and the attorney told me the man had a scar under his eye.  I never saw a scar and they knew that.  The state attorney told me that the man on trial had committed several crimes just like the one that happened near my grandmother's house.  The state attorney also told me that the man on trial was dangerous, guilty of the crime, and needed to be taken off the streets.

5.  While I was in the courtroom telling about what I saw, I knew that the man on trial was too thin to be the same man I saw on the street. The police and the state attorney put so much pressure on me to testify against the man on trial.

6.  The state attorney told me not to worry about my testimony because the man would be locked up and electrocuted the following May. He also pointed out the man's entire family to me.  I was just feeling so pressured.

7.  I have not forgotten about the trial and every few months I picture the man's face in my mind.  I also remember how sorry I felt for the little girl.

8.  On December 20, 1989, I was shown a photo and asked if this was the man who approached me and asked for fifty cents back in 1985. When I looked at the picture everything came back to me.  The photo is attached to this affidavit.  The man in the photo is without a doubt the man I saw.  I know that he is not the same man who was on trial for the little girl's murder.  I am so sorry that the wrong man is in prison and sentenced to death.  I had doubts in the courtroom but I was under so much

32

pressure. Also, the state attorney told me about how dangerous the man was and how he needed to be locked up forever.

9. I feel so bad that I did not tell the state attorney about my doubts. I did not know what to do. I felt a lot of pressure to say that the man on trial was the man I saw, even though I had doubts, and the man's hair did look the same.

10. I swear on my mother's grave that the man in the photo is the man I saw on the street the night when the little girl was raped and killed. I identified the wrong man in the courtroom.

95. She would later testify that when Plaintiff's investigator approached her on December 20, 1989 and showed her a photograph of Mr. Mosley, she knew that:

This is the one that flagged me down in the car... [I]t brought moments back of the incident when it happened. ... A warm feeling came over me.

When asked if she was certain Mr. Mosley was the man she saw, Ms. Lowe testified that she was "very, very, very, certain"

96. In 1998, Ms. Lowe once again testified that she was shown only two lineups: one including a picture of James Freeman [an early suspect] and the other including a picture of Plaintiff.

### (4) The Cover-up

97. In light of Ms. Lowe's 1989 affidavit and testimony that the man she saw on the night of the crime was Mosley, Defendants began to assert that Ms. Lowe was confused. As proof of Ms. Lowe's "confusion," Defendants began to claim that they showed a photo lineup to Ms. Lowe at the time of the initial investigation containing Mr. Mosley's photo, which she failed to recognize. More specifically, in 1998, Defendant Scheff testified that he and Defendant Amabile considered Eddie Lee Mosley a suspect in this case "because he was notorious for committing crimes of violence in the area"

33

and that "simply in an abundance of caution I considered him a suspect," and that he showed a photo line-up of Eddie Lee Mosley to Ms. Lowe, Ms. McGriff, and Mr. Davis. This assertion by Defendants was a lie used by Defendants to cover up their prior coercion of Ms. Lowe and to deliberately continue the wrongful incarceration of Plaintiff.

98. Not only did Defendants concoct this lie in order to cover up their prior coercion of Ms. Lowe and to deliberately continue the wrongful incarceration of Plaintiff, but, at the 1998 hearing, Defendants also concocted and fabricated a lineup containing a photo of Mosley, which Defendants produced and identified as the Mosley line-up that was shown to the witnesses in the initial investigation. However, this lineup which was never shown to any witness in this case. Defendants caused that fabricated evidence to be introduced into evidence at the 1998 post-conviction hearing to further cover up their prior coercion of Ms. Lowe and to deliberately continue the wrongful incarceration of Plaintiff.

99. When asked if she had been shown a lineup/photograph of Mr. Mosley pre-trial, Ms. Lowe emphatically stated she would recognize Mosley if she saw him, that "they didn't show me no picture of him," and that "the only thing that was close to the guy that I seen that night" was the composite sketch they drew. Ms. Lowe's testimony at the evidentiary hearing was consistent with her trial testimony that she had only been shown two photo lineups -- the one containing Mr. Smith's photograph and another containing a photograph of a previous suspect, a Mr. Freeman.

100. Defendant's claim made in 1989 and thereafter that there had been a third line-up containing a photograph of Mosley was completely inconsistent with Defendant's previous reports and testimony. Specifically, although Defendants always

34

acknowledged that Eddie Lee Mosley was a suspect, Defendant Scheff testified through his police reports and throughout his pre-trial deposition and trial testimony that other than an individual named James Freeman, no suspects other than Plaintiff were ever shown to the witnesses in either a live or a photo line-up.[8] At trial, only the two photo line-ups were offered into evidence by the State.

101. Defendant Scheff made and maintained handwritten notes which included an account of the investigation detailing the activity done each half hour. The notes do not mention showing a line-up including Mosley to Chiquita Lowe, Dorothy McGriff, or Gerald Davis. The notes make no mention of Eddie Lee Mosley at all although they do mention other suspects who were investigated such as James Freeman, Neely Williams, and Edwin McGriff.

102. In addition to making and maintaining detailed notes, Defendant Scheff gave a lengthy and detailed deposition covering in chronological order everything he did in this case. He never mentioned that Mr. Mosley was a serious suspect that they actively investigated. He did not mention that there was a third photo lineup containing Mr. Mosley's photograph.[9] He was asked if any of the relatives of Mrs. McGriff were investigated (Mosley was a cousin of Ms. McGriff) and he indicated that only Mr.

---

[8] Defendant Scheff testified that he investigated two other men as suspects: Arcy Nealy Williams was eliminated because he had an alibi, and James Freeman was eliminated because the witnesses did not choose him from a line-up. Defendant Scheff also testified that Edwin McGriff, Eddie Lee Mosley, "Gator Mouth," and "Big John" were suspects.

[9] Defendant Scheff testified in detail about the Freeman photo lineup and the Smith photo lineup, but never mentioned a third photo lineup.

Freeman (another cousin of McGriff) was investigated and ultimately eliminated as a suspect through a line-up shown to Ms. Lowe, Mr. Davis, and Mrs. McGriff.

103.   At his pre-trial deposition, defense counsel specifically asked Defendant Amabile if any of Mrs. McGriff's cousins were ever suspected of the murder. Defendant Amabile responded that Edwin McGriff was the only cousin ever considered a suspect.

104. During his deposition, Defendant Scheff did not mention Eddie Lee Mosley at all despite Plaintiff's attorney's exhaustive questioning regarding the four day investigation of this case. Defendant Scheff detailed his activities for each day and each time was asked whether anything else was done:

Q       Did that finish it for the 16th?

A       Yeah, sure did.

(Scheff depo at 41).

Q       Anything else happen on the 17th of any consequence?

A       No.

(Scheff depo at 48).

Q       Was anything else done on the 18th that we haven't discussed?

A       No.

(Scheff depo at 69).

Q       After the 4 a.m., April 19th meeting with the Irvings, Bertha and family, where did your investigation take you?

A       Then, it took me home to bed.

(Scheff depo at 81). Defendant Scheff repeatedly told Plaintiff's attorney that nothing else had been done that was not discussed. He provided information about other

36

suspects, including a tip regarding a possible suspect named "Gator Mouth" that was received after Plaintiff's arrest, and discussed potential evidence that was determined to be unreliable and was not used in the case against Plaintiff. The deposition concluded with the following question and answer:

> Q   Is there anything else that's happened in this case that we haven't discussed?
>
> A   I don't think so. Not that I can think of.

105. In his deposition, Defendant Scheff said nothing about Eddie Lee Mosley, another cousin of the victim's mother, being a suspect. He said nothing about checking Mosley's criminal history for similar crimes. He said nothing about eliminating Mosley through a comparison of his modus operandi and that of this crime. Defendant Scheff said nothing about showing the three witnesses a line-up including a photo of Eddie Lee Mosley.

106. At Plaintiff's trial, Defendant Scheff admitted that Mosley was a suspect, but never said he was eliminated by the three witnesses through a photo lineup or that he was a cousin of Mrs. McGriff. In fact, Defendant Scheff testified that he did not show a photo lineup containing Mr. Mosley's picture to any of the witnesses:

> Q   Was Eddie Lee Mosley ever a suspect in this case?
>
> A   Eddie Lee Mosley was a suspect in this case along with Edwin McGriff. Initially when we first began investigating the case, really had no specific direction to go in.
>
> Q   How about Jessie Smith?
>
> A   Jessie Smith is Eddie Lee Mosley under an alias name.
>
> Q   Lee Greely, G-r-e-e-l-y Smith?

37

A      I don't know.

Q      That's all I have.

A      Spell it again?

Q      G-r-e-e-l-y.  Doesn't ring a bell?

A      No.

Q      The man called Gator Mouth ever a suspect in this case?

A      Yes.

Q      The man that went by the name of Gator Mouth?

A      Right.

Q      Was a guy by the name of Big John ever a suspect in this case?

A      Yes.  I wouldn't say they were suspects in the case.  I would say they were people who were brought to our attention for one reason or another.

Q      How about Edward Simmons, did you ever check with John Boucada of your department?  He supposedly looks like Mr. Smith.

MR. DIMITROULEAS:  I will object to counsel testifying and I'm objecting to the form of the question.

THE COURT:  Objection sustained, may be rephrased.

Q      (By Mr. Washor)  Did you ever investigate Edward Smith?

A      Edward Simmons?

Q      Simmons.

A      No, sir.

Q      Never had any contact with Defendant Boucada regarding him?

A      No, sir.

38

**Q**      <u>Were any of these people ever shown to any of the witnesses in either a photo or live lineup, people whose names I just read off other than Freeman?</u>

**A**      <u>Other than Freeman, no.</u>

107.  Defendant Amabile, like Defendant Scheff, testified at trial that none of the suspects, with the exception of Freeman, were displayed in a photo lineup:

**Q**      There were a slew of other suspects in this case, weren't there, besides Mr. Freeman?

**A**      A slew or --

**Q**      More than one?

**A**      Yes.

**Q**      Was there a Carspelia (phonetic) Williams who was a suspect?

**A**      His name was given to us.

**Q**      Eddie Lee Mosley?

**A**      Yes.

**Q**      Jessie Smith?

**A**      I don't recall that name.

**Q**      Greeley (phonetic) Smith?

**A**      Again, I don't recall that name.

**Q**      Edward Calvin McGriff?

**A**      Yes.

**Q**      Was he related to the family at all?

**A**      I believe so, yes

39

Q      A person by the name of Gator Mouth?

A      Yes.

Q      A person by the name of Big John who Defendant Frost said in his report somebody identified a composite?

A      Yes.

Q      Were any of these leads followed up on?

A      Yes.

Q      Were they all followed up on?

A      Yes, to the best of my knowledge with the exception of the two names I don't recall hearing.

Q      What became of Big John?

A      That I believe Defendant Scheff and myself checked out and he did not fit the physical description at all.

Q      Is that reflected in anywhere in your notes or reports or anything of that nature?

A      No, that would be Defendant Scheff's.

Q      He should have it somewhere?

A      He should.

Q      Were any of these other people other than Mr. Freeman in the photographic display or in the live lineup shown to any other witnesses?

A      No.

Q      Did you investigate any of the family members backgrounds to see whether they were ever involved in this kind of thing before?

A      I believe Edward McGriff.

Q      Anybody else?

A      No.

40

108.   At Plaintiff's trial, Defendant Scheff was again asked about relatives and again he indicated that a cousin, Edwin McGriff, was the only family member who was investigated.   Similarly, Defendant Amabile testified at Mr. Smith's trial that no family members, other than Edwin McGriff, were investigated.

109.  The first time that Defendants ever mentioned the existence of a lineup containing Mosley was at the first post-conviction proceeding in 1991, in response to Ms. Lowe's recantation and identification of Mosley as the killer.   At that 1991 hearing, when Defendant Scheff was asked if he had any written documentation in the homicide file reflecting the existence of a Mosley lineup, he testified:

> A.   I don't think so.  I might.  I would have to look through the file.
>
> Q.   With the file that you brought, is there any indication in there of showing a photo of Eddy Lee Mosley to any of the witnesses?
>
> A.   The file is -- I just brought this so I could have some hope of remembering this stuff.
>
> Q.   In what you brought that you thought would help you, and with your memory, is there anything to indicate you showed a photo lineup containing Eddy Mosley?
>
> A.   No.
>
> THE COURT:   Showed who?
>
> THE WITNESS:   Eddy Lee Mosley.
>
> MR. MCCLAIN:   A photo lineup containing Eddy Lee Mosley.
>
> THE COURT:   To whom?
>
> BY MR. MCCLAIN:
>
> Q.   To --
>
> A.   Anybody.

41

Q.    <u>Anybody</u>.  <u>To these three witnesses that we've been talking about</u>?

A.    <u>No</u>.

Moreover, in 1991, Defendant Scheff had no explanation for this glaring contradiction

between his pre-trial and trial testimony and his testimony at the evidentiary hearing:

Q.    I'm going to hand you pages from your trial testimony.  I have three pages to show you and starting with was Eddy Lee Mosley (sic) a suspect.  If you can just read from there on until the middle of the third page.

A.    I am sorry read to where?

Q.    Let me show you.

A.    Wait a minute, which is the first page?

Q.    Eddy Mosley's on the first page.

A.    Was Eddy Lee Mosley ever a suspect - Do you want me to read it out loud?

Q.    You can read it to yourself.

A.    Okay.

Q.    In those three pages, does that help refresh your recollection as to your trial testimony?

A.    Yes.

Q.    You were asked out a series of suspects by the prosecutor --

A.    Yes.

Q.    -- if Eddy Lee Mosley was one of those suspects?

A.    Yes.

Q.    In fact, he read you a list of names and asked you for a response?

A.    That's correct.

42

Q.     At the end he asked you were any of those names he read to you were shown to the witnesses?

A.     Yes.

Q.     And you said other than Freeman --

A.     Yes, I'm assuming that's accurate.  I have no reason to not doubt it's accurate.

Q.     Is that consistent with your testimony here today?

A.     No it's not.

110.   Defendant's testimony at the 1991 hearing concerning the existence and showing of a supposed Mosley lineup was fabricated for the purpose of covering up their previous conduct and in order to continue to wrongfully incarcerate Plaintiff and maintain the false conviction and imprisonment of Plaintiff obtained by Defendants.

111.   Between 1991 and 1998, Plaintiff's case remained bogged down in various legal arguments on primarily procedural matters.  However, in 1998, Plaintiff ultimately prevailed and a full hearing on the subject of Ms. Lowe's recantation and identification of Mosley as the killer was required to be held.

112.   At the 1998 hearing, Defendant Scheff once again falsely claimed that he had shown Ms. Lowe and the other witnesses a lineup containing a photo of Mosley. This time, he even went so far as to produce the supposed lineup which was apparently not in his file in 1991, but which he now claimed to be in his file.  However, Defendant Scheff was unable to explain the inconsistency between his hearing testimony regarding the Mosley line-up and all the other evidence in the case.  Specifically, Defendant Scheff could not adequately explain his failure to mention the Eddie Lee Mosley line-up in his handwritten notes, his final report, his deposition and his trial

43

testimony.  In regard to his trial testimony that he did not show a line-up including Mosley's picture to the witnesses, Defendant Scheff explained that he "made a mistake".  In regard to his reports and deposition testimony, he said he did not consider the Mosley lineup important.[10]  However, this explanation makes no sense in light of Defendant's discussion in his reports and deposition of the many other suspects, in light of the fact that he specifically discusses the showing of the Freeman lineup, and in light of the fact that he was repeatedly asked whether anything else had been done on the case.

113.  The actual photographic lineup that Defendants produced for the 1998 hearing was never showed to any witnesses and was not in Plaintiff's case file at the time of trial.  Indeed, prior to Plaintiff's trial, the trial judge had ordered that all photographs and photographic line-ups used during the investigation be turned over to the defense.  William Dimitrouleas, the prosecutor on Mr. Smith's case who is now a federal district court judge, turned over to the defense all photographic line-ups used during the investigation.  Judge Dimitrouleas and Plaintiff's trial attorney, Andrew Washor, both agree that two photographic line-ups -- one of Mr. Smith and one of James Freeman -- were all the photographic lineups that was turned over and that were known to exist.  Mr. Washor received nothing about Eddie Lee Mosley during discovery and never saw the lineup that Defendants produced in 1998.[11]

---

[10]  Defendant Scheff claimed in 1998 that Mosley was not a suspect, while at Mr. Smith's trial he testified that Mosley was a suspect.

[11]  Judge Dimitrouleas never saw the Mosley line-up that was produced by Defendant Scheff prior to 1998.  He explained:

   A:   [I]t's an unusual arrangement for a photographic line-up.  I'm not saying I never saw it but I would think that a line-up where it wasn't three across and three across, it would be something that I might

44

## B. The False "Confession"

114. At Plaintiff's trial, Defendant Scheff also testified regarding a statement or confession that Plaintiff had supposedly made. Defendant Scheff testified that he and Defendant Amabile interviewed Plaintiff shortly after his arrest. After telling Plaintiff that Lowe, Davis, and Mrs. McGriff were eyewitnesses and receiving no response, Defendant Scheff lied to Mr. Smith, telling him that the victim's brother, who was asleep at the time of the offense, had seen the suspect. According to Defendant Scheff, Plaintiff became upset and spontaneously said there was no way the boy could have seen him because it was too dark.

115. Defendant Scheff's testimony about this statement was inconsistent with a police report written by a Sergeant Carry. According to this report, Defendants Scheff and Amabile were in fact the first officers to interview Mr. Smith after his arrest. This interview lasted approximately two and a half hours. Sgt. Carry's report indicates that Defendants Scheff and Amabile were unable to establish any rapport with Mr. Smith or

remember.

Q   But you don't recall ever seeing this?

A   Never recall seeing that.

Q   And in your experience the formation of the line-up is different than your normal line-up?

A   Yeah. Normally they'll have three pictures across and three pictures on the bottom or some other situation.

Q   Two parallel lines?

A   Usually that's what they have. That's an unusual configuration that I might remember if I had seen that before.

45

to obtain any statements, so they requested that Sgt. Carry and another officer interview Mr. Smith, which they did at about 6:35 p.m

116.   In fact, Plaintiff never made this statement in an incriminatory fashion and Defendants knew it.  Defendants fabricated this false statement or confession to bolster their false case against Plaintiff and to keep Plaintiff wrongfully imprisoned for a crime he did not commit.  Defendants told Plaintiff that it was dark at the house.  Then they told him that the little boy saw the killer.  When he responded to the effect "I thought you said it was dark in the house," they changed that statement to one where he purportedly knew it was dark in the house, thereby making a perfectly innocent statement incriminatory.  This is the equivalent of fabricating a confession.  This false statement was knowingly used by Defendants as a major part of the arrest and criminal case against Plaintiff.

### C. The DNA Evidence & Plaintiff's Exoneration

117.   Plaintiff embarked on a campaign for DNA testing to prove his innocence. However, Defendants and the State resisted Plaintiff's efforts, in a concerted effort to keep the truth of Plaintiff's innocence from seeing the light of day.  Finally, in 2000, Plaintiff was able to obtain DNA testing, the results of which conclusively demonstrated that he was not the killer of Whitehead, and that Mosley was the killer.

118.   On December 22, 2000, the Circuit Court of Broward County set aside Plaintiff's conviction.  A copy of the order doing so is attached hereto as Exhibit "A". Unfortunately, Plaintiff had died a few months earlier, in prison, on death row, strapped to a gurney, with the weight of the false conviction and incarceration on his shoulders, so he never learned of his exoneration.

46

## V.  THE LEGAL CLAIMS

## COUNT I: SECTION 1983 UNLAWFUL DETENTION IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS IN 1985

Plaintiff re-alleges the allegations of paragraphs 1-118 as alleged herein, incorporates those allegations in this Count, and further alleges as follows:

119.  This count is brought pursuant to the provisions of 42 U.S.C. Section 1983 and is based upon the unlawful detention of Plaintiff caused by Defendants through their actions leading to Plaintiff's arrest and prosecution in 1985, as are more fully described herein, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

120.  At the time of Plaintiff's arrest and prosecution, Defendants lacked even arguable probable cause for the detention and continued detention of Plaintiff, but supplied arguable probable cause to the magistrate only through the coerced identification of Plaintiff by Ms. Lowe and others and the falsified "confession" of Plaintiff, as are more fully described elsewhere in the complaint.  Indeed, Defendants were aware that Mosley was the likely perpetrator of this offense but decided to falsely and maliciously create probable cause as against Plaintiff where none existed through their manipulation of the evidence.

121.  At all times of the acts complained of herein, Defendants were acting under color of state law.

122.  At all times relevant hereto, Defendants Scheff and Amabile were carrying out the policies of the reigning Defendant Navarro, Broward County Sheriff.

47

123.  As a result of the unlawful acts complained of in this Count, Plaintiff was arrested and wrongfully incarcerated for some 15 years, and suffered great damage, as is more fully set out herein.

## COUNT II: SECTION 1983 MALICIOUS PROSECUTION IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS IN 1985

Plaintiff re-alleges the allegations of paragraphs 1-118 as alleged herein, incorporates those allegations in this Count, and further alleges as follows:

124.  This count is brought pursuant to the provisions of 42 U.S.C. Section 1983 and is based upon the malicious prosecution of Plaintiff proximately caused by Defendants through their actions leading to Plaintiff's arrest and prosecution in 1985, as are more fully described herein, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

125.  Defendants proximately caused the commencement of criminal proceedings against Plaintiff.

126.  Plaintiff received a favorable outcome of the proceeding through his exoneration on December 22, 2000.  See Exhibit "A."

127.  At the time of Plaintiff's arrest and prosecution, Defendants lacked even arguable probable cause for the detention and continued detention of Plaintiff, but falsely supplied arguable probable cause to the magistrate only through the coerced identification of Plaintiff Ms. Lowe and the falsified "confession" of Plaintiff, as are more fully described elsewhere in the complaint.

128.  Defendants acted out of malice towards Plaintiff and, although they were aware that Mosley was the likely perpetrator of this offense, they nevertheless

48

maliciously decided to create probable cause as against Plaintiff where none existed through their manipulation of the evidence.

129.  At all times of the acts complained of herein, Defendants were acting under color of state law.

130.  At all times relevant hereto, Defendants Scheff and Amabile were carrying out the policies of Defendant Sheriff.

131.  As a result of the unlawful acts complained of in this Count, Plaintiff was wrongfully incarcerated for some 15 years, and suffered great damage, as is more fully set out herein.

### COUNT III: SECTION 1983 UNLAWFUL DETENTION IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS IN 1989-2000

Plaintiff re-alleges the allegations of paragraphs 1-118 as alleged herein, incorporates those allegations in this Count, and further alleges as follows:

132.  This count is brought pursuant to the provisions of 42 U.S.C. Section 1983 and is based upon the unlawful detention of Plaintiff caused by Defendants through their actions in 1989-2000, as are more fully described herein, leading to Plaintiff's continued detention, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

133.  Upon Ms. Lowe's recantation of her prior identification of Plaintiff and her positive identification of Mosley in 1989, any arguable probable cause for the continued detention of Plaintiff evaporated.  Some time after 1989, up to and including 1998 and thereafter, Defendants fabricated physical evidence, in the form of a photograph line-up, and repeatedly lied concerning that line-up, as is more fully described herein, in

49

order to create a false basis to continue Plaintiff's detention when no probable cause otherwise existed.

134.  At all times of the acts complained of herein, Defendants were acting under color of state law.

135.  At all times relevant hereto, Defendants Scheff and Amabile were carrying out the policies of reigning Broward County Sheriff.

136.  As a result of the unlawful acts complained of in this Count, Plaintiff was wrongfully incarcerated for some 10 years, and suffered great damage, as is more fully set out herein.

## COUNT IV: SECTION 1983 MALICIOUS PROSECUTION IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS IN 1989-2000

Plaintiff re-alleges the allegations of paragraphs 1-118 as alleged herein, incorporates those allegations in this Count, and further alleges as follows:

137.  This count is brought pursuant to the provisions of 42 U.S.C. Section 1983 and is based upon the malicious prosecution of Plaintiff caused by Defendants through their actions in 1989-2000, as are more fully described herein, leading to Plaintiff's continued detention, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

138.  Defendants proximately caused the continuation of criminal proceedings against Plaintiff in 1989 and thereafter through the fabrication of the Mosley line-up and other acts alleged herein.

139.  Plaintiff received a favorable outcome of the legal proceeding through his exoneration on December 22, 2000.  See Exhibit "A."

50

140.   Upon Ms. Lowe's recantation of her prior identification of Plaintiff and her positive identification of Mosley in 1989, any arguable probable cause for the continued detention of Plaintiff evaporated.  Some time after 1989, up to and including 1998 and thereafter, Defendants fabricated physical evidence, in the form of a photograph line-up, and repeatedly lied concerning that line-up, as is more fully described herein, in order to create a false basis to continue Plaintiff's detention when no probable cause otherwise existed.

141.   Defendants acted out of malice towards Plaintiff and, although they were aware that Mosley was the likely perpetrator of this offense, they nevertheless maliciously decided to manipulate the evidence against Plaintiff so as to cause his continued detention.

142.   At all times of the acts complained of herein, Defendants were acting under color of state law.

143.   At all times relevant hereto, Defendants Scheff and Amabile were carrying out the policies of reigning Broward County Sheriff.

144.   As a result of the unlawful acts complained of in this Count, Plaintiff was wrongfully incarcerated for some 10 years, and suffered great damage, as is more fully set out herein.

## COUNT V:  SECTION 1983 CLAIM BASED UPON DEFENDANT'S PLANTING OF EVIDENCE WHICH VIOLATED PLAINTIFF'S RIGHT TO A FAIR TRIAL

Plaintiff re-alleges the allegations of paragraphs 1-118 as alleged herein, incorporates those allegations in this Count, and further alleges as follows:

51

145. This count is brought pursuant to the provisions of 42 U.S.C. Section 1983 and is based upon Defendant's actions in planting evidence, as is more fully set out herein, which denied to Plaintiff a fair trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

146. As is more fully explained herein, Defendants planted and created evidence throughout Plaintiff's state court ordeal. That planted and created evidence included, but is not limited to, the identifications of Plaintiff by the eyewitnesses, the so-called "confession" of Plaintiff, and the photo line-up of Mosley.

147. As a result of Defendant's acts in planting and creating this evidence, Plaintiff was denied his right to a fair trial, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

148. At all times of the acts complained of herein, Defendants were acting under color of state law.

149. At all times relevant hereto, Defendants Scheff and Amabile were carrying out the policies of reigning Broward County Sheriff.

150. As a result of the unlawful acts complained of in this Count, Plaintiff was wrongfully incarcerated for some 15 years, and suffered great damage, as is more fully set out herein.

## COUNT VI:  FAILURE TO TRAIN AND SUPERVISE

Plaintiff re-alleges the allegations of paragraphs 1-118 as alleged herein, incorporates those allegations in this Count, and further alleges as follows:

52

151. This count is brought pursuant to the provisions of 42 U.S.C. Section 1983 and is based upon the failure of Defendants Sheriffs to properly train and supervise the other Defendants, which failure resulted in the constitutional deprivations alleged herein.

152. Defendants Sheriffs failed to properly train and supervise Defendants Scheff and Amalie in one or more of the following areas: appropriate and proper procedures to be utilized in presenting photographic line-ups; appropriate and proper procedures to be utilized in interviewing witnesses and suspects so as to insure accurate information and statements; appropriate and proper investigative techniques; and testifying truthfully.

153. As a result of Defendants Sheriffs' failure to properly train and supervise Defendants in the above area, the constitutional violations set out herein occurred.

154. At all times of the acts complained of herein, Defendants were acting under color of state law.

155. As a result of the unlawful acts complained of in this Count, Plaintiff was wrongfully arrested and incarcerated for some 15 years, and suffered great damage, as is more fully set out herein.

**COUNT VII: SECTION 1983 SIXTH AMENDMENT CLAIM
(*BRADY V. MARYLAND*)**

Plaintiff re-alleges the allegations of paragraphs 1-118 as alleged herein, incorporates those allegations in this Count, and further alleges as follows:

156. This count is brought pursuant to the provisions of 42 U.S.C. Section 1983 and is based upon the withholding of exculpatory evidence by Defendants in violation

53

of Plaintiff's constitutional rights under the Sixth Amendment, as interpreted by *Brady v. Maryland* and its progeny.

157.   At the time of Plaintiff's trial and during the investigation of the case, Defendants were aware of substantial exculpatory evidence, which they hid from Plaintiff and his counsel.   More particularly, Defendants were aware of all of the evidence implicating Mosley, as is more fully set out herein, Defendants were aware that they had coerced Ms. Lowe into identifying Plaintiff, Defendants were aware that they had attempted to coerce the other eyewitnesses into the identification, Defendants were aware that Plaintiff had not confessed to them, and Defendants were aware of other exculpatory facts which they hid from Plaintiff and his counsel.

158.   Defendant's hiding of the exculpatory facts from Plaintiff violated Plaintiff's constitutional rights under the Sixth Amendment, as interpreted by *Brady v. Maryland* and its progeny, and caused Plaintiff's wrongful conviction and wrongful incarceration.

159.   At all times of the acts complained of herein, Defendants were acting under color of state law.

160.   At all times relevant hereto, Defendants Scheff and Amabile were carrying out the policies of the reigning Sheriff of Broward County.

161.   As a result of the unlawful acts complained of in this Count, Plaintiff was wrongfully convicted and incarcerated for some 15 years, and suffered great damage, as is more fully set out herein.

## COUNT VIII: CONSPIRACY

Plaintiff re-alleges the allegations of paragraphs 1-161 as alleged herein, incorporates those allegations in this Count, and further alleges as follows:

54

162.  This count is brought pursuant to the provisions of 42 U.S.C. Section 1983 and is based upon the Defendant's conspiracy with one another to violate the constitutional rights of Plaintiff, as has been alleged in Counts I - VII of this complaint.

163.  Beginning with the investigation of this case, and continuing through the trial and the post-trial procedures, Defendants have engaged in a conspiracy with one another to wrongfully cause Plaintiff's arrest, conviction, and continued detention, incarceration and placement on death row.  That conspiracy consisted of an agreement to procure these outcomes through the means alleged in this complaint.  The conspiracy was successful in achieving its objectives until the DNA evidence positively exonerated Plaintiff.

164.  At all times of the acts complained of herein, Defendants were acting under color of state law.

165.  At all times relevant hereto, Defendants Scheff and Amabile were carrying out the policies of the reigning Broward County Sheriff.

166.  As a result of the conspiracy complained of in this Count, Plaintiff was wrongfully convicted and incarcerated for some 15 years, and suffered great damage, as is more fully set out herein.

### COUNT IX: STATE LAW FALSE IMPRISONMENT: 1985

Plaintiff re-alleges the allegations of paragraphs 1-118 as alleged herein, incorporates those allegations in this Count, and further alleges as follows:

167.  At the time of Plaintiff's arrest and prosecution, Defendants lacked even arguable probable cause for the detention and continued detention of Plaintiff, but supplied arguable probable cause to the magistrate only through the coerced

identification of Plaintiff Ms. Lowe and the falsified "confession" of Plaintiff, as are more fully described elsewhere in the complaint.   Indeed, Defendants were aware that Mosley was the likely perpetrator of this offense but decided to create probable cause as against Plaintiff where none existed through their manipulation of the evidence.

168.   At all times relevant hereto, Defendants Scheff and Amabile were acting within the scope of their authority and acting as agents of Defendant Sheriff.

169.   As a result of the unlawful acts complained of in this Count, Plaintiff was wrongfully arrested and incarcerated for some 15 years, and suffered great damage, as is more fully set out herein.

## COUNT X: STATE LAW MALICIOUS PROSECUTION: 1985

Plaintiff re-alleges the allegations of paragraphs 1-118 as alleged herein, incorporates those allegations in this Count, and further alleges as follows:

170.   Defendants proximately caused the commencement of criminal proceedings against Plaintiff.

171.   Plaintiff received a favorable outcome of the proceeding through his exoneration on December 22, 2000.  See Exhibit "A."

172.   At the time of Plaintiff's arrest and prosecution, Defendants lacked even arguable probable cause for the detention and continued detention of Plaintiff, but supplied arguable probable cause to the magistrate only through the coerced identification of Plaintiff Ms. Lowe and the falsified "confession" of Plaintiff, as are more fully described elsewhere in the complaint.

173.   Defendants acted out of malice towards Plaintiff and, although they were aware that Mosley was the likely perpetrator of this offense, they nevertheless

56

maliciously decided to create probable cause as against Plaintiff where none existed through their manipulation of the evidence.

174. At all times relevant hereto, Defendants Scheff and Amabile were acting within the scope of their authority and acting as agents of Defendant Sheriff.

175. As a result of the unlawful acts complained of in this Count, Plaintiff was wrongfully incarcerated for some 15 years, and suffered great damage, as is more fully set out herein.

### COUNT XI: STATE LAW FALSE IMPRISONMENT: 1989-2000

Plaintiff re-alleges the allegations of paragraphs 1-118 as alleged herein, incorporates those allegations in this Count, and further alleges as follows:

176. Upon Ms. Lowe's recantation of her prior identification of Plaintiff and her positive identification of Mosley in 1989, any arguable probable cause for the continued detention of Plaintiff evaporated. Some time after 1989, up to and including 1998 and thereafter, Defendants fabricated physical evidence, in the form of a photograph line-up, and repeatedly lied concerning that line-up, as is more fully described herein, in order to create a false basis to continue Plaintiff's detention when no probable cause otherwise existed.

177. At all times relevant hereto, Defendants Scheff and Amabile were acting within the scope of their authority and acting as agents of the reigning, Broward County Sheriff.

178. As a result of the unlawful acts complained of in this Count, Plaintiff was wrongfully incarcerated for some 10 years, and suffered great damage, as is more fully set out herein.

184.   As a result of the unlawful acts complained of in this Count, Plaintiff was wrongfully incarcerated for some 10 years, and suffered great damage, as is more fully set out herein.

## VI. DAMAGES

185.   As a result of each of the wrongful acts complained of herein, Plaintiff has suffered grave damages and has sustained great losses for which his estate is entitled to compensation.

186.   Plaintiff's losses include, but are not limited to, some 15 years lost to a prison cell on death row for a crime he did not commit, living under the dark cloud of the electric chair, living in the highly restrictive death row conditions, lost earnings and earning capacity, great pain and suffering, mental anguish, loss of capacity for the enjoyment of life, and the virtual torture of dying a man wrongfully condemned, away from his family in a world that brought him only injustice during his life.

187.   As a result of the gross, willful and flagrant violations of Plaintiff's constitutional rights, as alleged herein, Plaintiff is also entitled to an award of punitive damages as against the individual Defendants.

**WHEREFORE**, based upon all of the foregoing, Plaintiff respectfully demands judgment against Defendants, and that he be awarded as follows:

a. For compensatory damages in an amount to be determined at trial;

b. For punitive damages in an appropriate amount where allowable by law;

c. For all costs, disbursements, expert fees and attorney's fees;

d. For whatever other relief the court deems equitable and just under the circumstances.

59

## VII.  DEMAND FOR TRIAL BY JURY

Plaintiff demands trial by jury.


Respectfully Submitted this _13th_ day of September, 2002.


_William D. Matthewman_, for
EDWARD S. STAFMAN, ESQ.
EDWARD S. STAFMAN, P.A.
6950 Bradfordville Road
Tallahassee, Florida 32309
(850) 681-7830
FL Bar I.D. No. 251526

_William D. Matthewman_
WILLIAM MATTHEWMAN, ESQ.
FL Bar I.D. No. 372757
ANDREW SEIDEN, ESQ.
FL BAR I.D. No. 373672
SEIDEN, ALDER & MATTHEWMAN
2300 Glades Road, Suite 340-W
Boca Raton, FL 33431
(561) 416-0170

and

44 West Flagler Street
Courthouse Tower, Suite 1100
Miami, Florida 33130
(305) 424-1705


## COUNSEL FOR THE PLAINTIFF


W:\642.001\P\Complaint9-10-02(rl).wpd

60

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

CASE NO. 85-4654 CF10A

JUDGE : SPEISER

STATE OF FLORIDA,

      Plaintiff,                    :

vs.

FRANK LEE SMITH ,                    :

      Defendant.                    :

_____    :

**ORDER GRANTING STATE'S MOTION TO**
**VACATE AND SET ASIDE JUDGMENTS AND SENTENCES**

THIS CAUSE having come before this Court upon State's Motion to Vacate and Set Aside Judgments and Sentences, and this Court having considered same, hereby GRANTS the State's Motion to Vacate and Set Aside Judgments and Sentences, based upon newly discovered DNA evidence.

DONE AND ORDERED in Fort Lauderdale, Broward County, Florida, this 29 day of December, A.D., 2000.

HONORABLE
JUDGE, CIRCUIT COURT

cc:    Barry Scheck
cc:    Geoffrey D. Smith
cc:    Carolyn V. McCann, Esquire
        Assistant State Attorney

**EXHIBIT**

A

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY,
FLORIDA

**TIG CHICAGO CLAIMS**

CASE NO: 02-018346-03   NOV 1 5 2004

JERRY FRANK TOWNSEND

       Plaintiff,

v.

KENNETH C. JENNE, II, individually and in
his official capacity as the Sheriff of
Broward County; ANTHONY FANTIGRASSI,
individually and in his official capacity
as deputy sheriff for the Broward County
Sheriff's Office; MARK SCHLEIN, individually
and as a former deputy sheriff for the Broward
County Sheriff's Office; ROBERT A. BUTTERWORTH,
in his individual capacity as the former
Sheriff of Broward County; and NICK NAVARRO,
in his individual capacity as the former
Sheriff of Broward County,

       Defendants.

_____/

KIM COOPER

**A TRUE COPY**
HOWARD C. FORMAN
CLERK OF CIRCUIT COURT

**MAY 19 2004**

TIG CHICAGO CLAIMS
NOV 1 5 2004
JILL ROHRBACK

## THIRD AMENDED COMPLAINT

    Plaintiff, JERRY FRANK TOWNSEND, sues Defendants, jointly
and severally, and alleges:

### JURISDICTION

    1.    This is an action for damages in excess of Fifteen
Thousand ($15,000.00) Dollars, arising out of one or
more violations of State and Federal laws, detailed below.

    2.    This action is brought pursuant to 42 U.S.C.
§§1983, 1988, 18 U.S.C. §§1961, 1962, and the Fourth, Fifth,



5/19

Sixth and Fourteenth Amendments to the United States
Constitution, and the tort law of Florida. Jurisdiction is
founded on 28 U.S.C. §§1331, 1343, 42 U.S.C. §1988, the
constitutional provisions mentioned above, and under Florida tort
law.

3.    In connection with the acts, practices and
violations alleged below, the Defendants have each, either
directly or indirectly, violated the Plaintiff's constitutional
rights.

4.    This action is also instituted pursuant to 18 U.S.C.
§1964 Civil Remedies, paragraph (c).

5.    All conditions precedent under Florida law for the
filing of this lawsuit have been satisfied. (Exhibit F).

6.    The Plaintiff seeks an award of damages for permanent,
physical, mental and emotional injuries, loss of earning
capacity, loss of enjoyment of life, punitive damages, court
costs and attorney fees.


## PARTIES

7.    The Plaintiff JERRY FRANK TOWNSEND, at all times
material hereto, has been a United States citizen.

8.    Defendant KENNETH C. JENNE II is the Sheriff of Broward
County. Said Defendant is responsible, as Sheriff, for the
conduct of the deputies in his employ and ensuring that his

2

deputies, employees, servants and agents obey the laws of the State of Florida and the United States. Defendant JENNE is being sued in his official capacity as Sheriff of Broward County and, therefore, said Defendant is synonymous with the Broward County Sheriff's Office. Additionally, Defendant JENNE is being sued in his individual capacity, pursuant to 18 U.S.C. §1964(c).

9. Defendant ANTHONY FANTIGRASSI, at all times material to this complaint, was a duly appointed and acting deputy sheriff of the Broward County Sheriff's Office, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Florida and/or Broward County. Defendant FANTIGRASSI is being sued in his individual and official capacity.

10. Defendant MARK SCHLEIN, at all times relevant to this complaint, was a duly appointed and acting deputy Sheriff of the Broward County Sheriff's Office, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Florida and/or Broward County. Defendant SCHLEIN is being sued in his individual capacity.

11. Defendant ROBERT A. BUTTERWORTH was the Sheriff of Broward County from 1979 through 1982. During his tenure as Sheriff of Broward County, Defendant was responsible for the conduct of the deputies in his employ and ensuring that his

3

deputies, employees, servants and agents obey the laws of the State of Florida and the United States. Defendant is being sued in his individual capacity.

12. Defendant NICK NAVARRO was the Sheriff of Broward County from 1985 through 1993. During his tenure as Sheriff of Broward County, Defendant was responsible for the conduct of the deputies in his employ and ensuring that his deputies, employees, servants and agents obey the laws of the State of Florida and the United States. Defendant is being sued in his individual capacity.

13. Defendants FANTIGRASSI and SCHLEIN violated the Plaintiff JERRY FRANK TOWNSEND's constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution. It is further alleged that these violations were committed as a result of the deliberate indifference, and the policies and customs of Defendants JENNE, BUTTERWORTH, and NAVARRO.

14. Defendants BUTTERWORTH, NAVARRO, JENNE, FANTIGRASSI, SCHLEIN, and James E. Boone and Bruce Roberson, former police officers for the City of Miami Police Department, are each persons under 18 U.S.C. §1961(3).

15. The Broward County Sheriff's Office is an enterprise within the meaning of 18 U.S.C. §1961(4). The activities of said enterprise affects interstate commerce.

4

16.   The relationship between Defendants FANTIGRASSI, SCHLEIN, BUTTERWORTH, NAVARRO and JENNE constitutes an enterprise under 18 U.S.C. 1961(4).

17.   Defendants FANTIGRASSI, SCHLEIN, BUTTERWORTH, NAVARRO and JENNE have engaged in a pattern of conspiracy and racketeering activities in violation of 18 U.S.C. §§1962, et. seq..

18.   The relationship between Defendants FANTIGRASSI, SCHLEIN, JENNE, BUTTERWORTH, NAVARRO and James E. Boone and Bruce Roberson, former police officers for the City of Miami Police Department, constitutes an association-in-fact enterprise under 18 U.S.C. §1961(4).

19.   Defendants FANTIGRASSI, SCHLEIN, BUTTERWORTH, NAVARRO, JENNE, and James E. Boone and Bruce Roberson, former police officers for the City of Miami Police Department, have engaged in activities or a pattern or practice of conspiracy constituting racketeering activities in violation of 18 U.S.C. §§1962, et. seq..

20.   At all times material hereto, and in all of their acts described herein, Defendants were acting under color of State law and color of their authority as public officials and public employees.

5

## ALLEGATIONS OF FACT

**A.    "THE RAPE MAN"**

21.    From 1973 through 1987, Eddie Lee Mosley committed approximately 41 rapes and 17 rape murders.

22.    Beginning in April, 1969 through May, 1970, Eddie Lee Mosley committed a variety of offenses in Dade County, including an indecent proposal to a nine year old girl, loitering and prowling, carrying a concealed weapon and armed robbery.  The arresting agency was the City of Miami Police Department.

23.    In 1971, following his release from state prison for armed robbery, Mosley's crimes escalated to rapes and rape murders.

24.    In 1973, Eddie Lee Mosley committed four rape murders, two attempted rapes, and nine rapes in Broward County, Florida.  The two victims of the attempted rapes and six rape victims identified Eddie Lee Mosley as the perpetrator.

25.    Said crimes were committed against young African American women and girls and were all within a few miles of his home in Broward County, Florida.  The primarily African American community had nicknamed him the "Rape Man."

26.    Said incidents were investigated by both the Broward County Sheriff's Office and/or the Fort Lauderdale Police Department.

27.    From January 28, 1974 to June 4, 1979, Eddie Lee

6

Mosley, having been found incompetent to stand trial, was under legal commitment to a mental institution for the criminally insane.

28.   Upon his release in 1979, Eddie Lee Mosley committed seven rape murders, including two in Lakeland, Florida, where he had gone to live with family members, and one attempted rape.

29.   In 1980, Eddie Lee Mosley committed two rape murders and two rapes.   The victims of the rapes identified Eddie Lee Mosley as the perpetrator.

30.   In 1983, during one month, Eddie Lee Mosley committed two rape murders.

31.   In 1984, Mosley committed two rape murders and one rape.

32.   In 1985, Mosley committed one rape murder.

33.   In 1987, Mosley committed one rape murder.

34.   On May 20, 1987, Eddie Lee Mosley was declared incompetent to stand trial for the murder of Emma Cook, who had been killed on December 25, 1983.   He was sent to a mental hospital for the criminally insane, where he remains today.

35.   Defendants BUTTERWORTH, JENNE, and NAVARRO have purged many reports reflecting other rapes where Mosley was a suspect.

36.   Law enforcement officers of both the Broward County Sheriff's Office and the Fort Lauderdale Police Department were

7

made aware, both orally and in writing, that the rapes and rape
murders committed in the primarily African American community had
the following similarities:

(A) The victims were all young African American women
and children.

(B) The victims were all assaulted and/or killed in the
same general geographic area where Eddie Lee Mosley was known to
live or travel.

(C) Many of the attempted rape and rape victims
identified Eddie Lee Mosley as the perpetrator.

(D) The modus operandi was the same with respect to the
killings and the condition of the victims' bodies.

37. During this period, Eddie Lee Mosley was arrested
and charged with numerous offenses. He was known by deputy
sheriffs of the Broward County Sheriff's Office and police
officers of the Fort Lauderdale Police Department as a violent
rapist and murderer.

38. At all material times, the Defendants FANTIGRASSI
and SCHLEIN, as members of the Broward County Sheriff's Office
Homicide Unit, were either involved in investigations concerning
Mosley, or were aware through reports, oral and written, from
other deputy sheriffs and/or other law enforcement agencies, of
investigations and arrests of Eddie Lee Mosley.

39. At all material times, Defendants JENNE, BUTTERWORTH,

8

FANTIGRASSI and SCHLEIN knew or should have known, based upon the Mosley reports and investigations, as well as the misconduct of Defendants FANTIGRASSI and SCHLEIN, that at the time of the arrest of the Plaintiff, he was innocent of the charges they eventually brought against him.

40. At all material times, Defendants JENNE, BUTTERWORTH, FANTIGRASSI and SCHLEIN, intentionally and/or incompetently withheld exculpatory evidence from the criminal courts, the prosecutors, Plaintiff's counsel, and the public.

## B. THE INNOCENT MAN

41. On September 5, 1979, Detective Bruce Roberson of the City of Miami Police Department arrested the Plaintiff JERRY FRANK TOWNSEND for the alleged sexual battery of Pilbyian Beckford.

42. At the time of the arrest, Detective James Boone, Roberson's partner, was investigating the murder of Wanda Virga whose body was found in Dade County, Florida.

43. The Plaintiff had been arrested in the general area where the Virga homicide had taken place. It was also the area where the Plaintiff lived and worked.

44. At the time of his arrest, the Plaintiff was a 27 year old man, who had the mental capacity of a seven or eight year old child, as well as a severe speech impediment.

9

45. Due to his obvious and easily discernable disabilities, the Plaintiff could be easily led and manipulated. Much like a seven or eight year old child, the Plaintiff sought acceptance and approval from the adults with whom he came in contact.

46. While on route to the City of Miami Police Department with the Plaintiff, Detective Roberson contacted Detective Boone to arrange the interrogation of the Plaintiff for the Virga homicide. Detectives Roberson and/or Boone also contacted Defendants FANTIGRASSI and SCHLEIN to arrange further interrogation of the Plaintiff for a number of crimes that had taken place in Broward County, Florida.

47. Thereafter, the Plaintiff underwent four days of aggressive and coercive interrogation by Detectives Roberson and Boone, and Defendants FANTIGRASSI and SCHLEIN, at the end of which, he had implicated himself in several homicides in Fort Lauderdale, Miami, Tampa and San Francisco, California. (Exhibit G).

48. Defendants FANTIGRASSI and SCHLEIN, and Detectives Roberson and Boone, were aware that the interrogation of the Plaintiff was coercive, improper and unconstitutional.

49. At all material times, Defendants FANTIGRASSI and SCHLEIN and Detectives Roberson and Boone intentionally and improperly conducted the interrogation of the Plaintiff, stopping and starting the audio cassette tapes for the purpose of coaching

10

the Plaintiff and either purging the tapes of exculpatory evidence or not allowing exculpatory evidence to be tape recorded.

50. At all material times, Defendants FANTIGRASSI and SCHLEIN and Detectives Roberson and Boone, while the audio cassette tapes were turned off, took the Plaintiff to various crime scenes, showed him pictures of said crime scenes and provided him with information concerning said crimes in order to assist him in the story they wished him to tell on tape.

51. At all material times, the interrogation tactics engaged in by Defendants FANTIGRASSI and SCHLEIN and Detectives Roberson and Boone were in violation of state and federal law, as well as against accepted police practices within the United States.

52. Based upon the coerced statements taken by Defendants FANTIGRASSI and SCHLEIN and Detectives Roberson and Boone, as well as false statements given by said Defendants and Detectives within the criminal courts, to the prosecutors, Plaintiff's counsel, and the public, the Plaintiff was charged by indictment with the rape murders of Ernestine German, Cathy Moore, Terry Cummings, Sonja Marion, Naomi Gamble, Thelma Jean Bell, and Barbara Ann Brown in Broward County, Florida, and with the murders of Wanda Virga and Dorothy Gibson and the rape of Pilbyian Beckford in Dade County, Florida.

11

53.  Prior to, during and after the criminal trial of the Plaintiff, Defendants FANTIGRASSI and SCHLEIN and Detectives Roberson and Boone, provided additional false statements to the criminal courts, the prosecutors, Plaintiff's counsel and the public concerning other murders including Mosley rape murders, i.e., Wanda Virga and Dorothy Gibson in Miami, Cathy Moore, Ernestine German, Terry Jean Cummings, Naomi Gamble, Thelma Jean Bell and Sonja Marion in Broward County, which they stated had been committed by the Plaintiff.

54.  From September 6, 1979 through to September 10, 1979 Defendants FANTIGRASSI and SCHLEIN engaged in and/or joined in a conspiracy with James E. Boone and Bruce Roberson, former police officers for the City of Miami Police Department, to coerce, by intimidation and deception, the Plaintiff JERRY FRANK TOWNSEND, a mentally retarded man, into making self-incriminating statements to crimes they knew or should have known he did not commit.

55.  Defendants FANTIGRASSI and SCHLEIN, in concert with Detective James E. Boone and Bruce Roberson, engaged in the following misconduct:

(A) Took the mentally challenged Plaintiff to various crime scenes and then coached him with information, photographs and detailed facts of the crimes in order to fabricate evidence by making and presenting a tape recorded document to a criminal proceeding, knowing it to be false and misleading.

12

(B) Tampered with the evidence by altering said audio tape for the purpose of creating a false and incomplete record.

(C) Withholding and/or concealing other evidence from the criminal courts, the prosecutors, Plaintiff's counsel and the public that would have negated the fabricated evidence created by said Defendants.

(D) Intentionally and/or incompetently failing to investigate or consider other evidence which would have negated the fabricated evidence created by said Defendants.

56. Defendants BUTTERWORTH, NAVARRO, JENNE, FANTIGRASSI and SCHLEIN knew or should have known, based upon their investigations and those of other law enforcement agencies, that Mosley was the perpetrator of the crimes for which they had charged and convicted the Plaintiff, particularly in light of the fact that the rapes and rape murders continued after Plaintiff's arrest and before and after his criminal trial.

57. In furtherance of this conspiracy to fabricate evidence, Defendants FANTIGRASSI and SCHLEIN, as well as Detectives James E. Boone and Bruce Roberson, repeatedly made false material statements under oath in official proceedings that related to the prosecution of the Plaintiff for a capital felony.

58. Said federal and state law, as well as accepted police practices at the time of the Plaintiff's arrest, at the time of trial and post trial, provided "fair warning" to Defendants

13

JENNE, BUTTERWORTH, FANTIGRASSI, SCHLEIN, and Detectives Roberson and Boone that their conduct was improper, incompetent, illegal and in violation of the Plaintiff's constitutional and state rights.

59. Defendants FANTIGRASSI, SCHLEIN and Detectives Roberson and Boone are guilty of such intentional, malicious and/or incompetent conduct that they can not be clothed with the defense of qualified immunity which protects all but the plainly incompetent or those who knowingly violate the law.

60. Defendants BUTTERWORTH, JENNE, FANTIGRASSI, SCHLEIN and Detectives Roberson and Boone conspired to convict the Plaintiff of crimes that they knew or should have known were committed by Eddie Lee Mosley. In securing a conviction against the Plaintiff for crimes committed by Eddie Lee Mosley, Defendants obtained both financial and promotional benefits which they would not have obtained had they arrested Mosley.

61. Defendants FANTIGRASSI and SCHLEIN had no probable cause to arrest the Plaintiff.

62. It was only as a result of the intentional misconduct and/or incompetence of Defendants BUTTERWORTH, JENNE, FANTIGRASSI, SCHLEIN and Detectives Roberson and Boone that the Plaintiff was wrongfully arrested, indicted, convicted and incarcerated for twenty-two years. Said arrest and prosecution would have failed had said Defendants provided the truth to the

14

criminal courts, the prosecutors and the public concerning their conduct and fabrication.

63.  Notwithstanding Defendants BUTTERWORTH, JENNE, FANTIGRASSI, and SCHLEIN's responsibility to ensure that there was a valid legal basis to prosecute the Plaintiff JERRY FRANK TOWNSEND, they failed to adequately inform themselves of the facts and failed to promptly withdraw the obviously flawed charges against the Plaintiff.

64.  The wrongful actions of the Defendants BUTTERWORTH, JENNE, FANTIGRASSI and SCHLEIN, constitute false arrest, false imprisonment, malicious prosecution, intentional infliction of emotional distress and unlawful search and seizure under the laws of the State of Florida.

65.  Throughout his highly publicized trial, Plaintiff was portrayed in the media as a serial rapist and murderer, and compared to mass murderer Ted Bundy.

## C.  "TWENTY-TWO YEARS OF HELL"

66.  On or about July 31, 1980, the Plaintiff was found guilty of the murders of Naomi Gamble and Barbara Brown, in Broward County, Florida. He was found not guilty of the murder of Thelma Bell.

67.  On or about October 4, 1982, the Plaintiff pled guilty to the Broward murders of Cathy Moore and Terry Cummings. The

15

State filed a nolle prosequi with respect to the murder charge for Ernestine German.

68. On or about December 6, 1982, the Plaintiff entered a plea of guilty to the two Dade County homicides of Wanda Virga and Dorothy Gibson and one sexual battery of Pilbyian Beckford. At the time of said plea, the alleged victim Pilbyian Beckford was unavailable as a State witness.

69. The coerced false confessions were used not only to secure guilty verdicts against the Plaintiff, but also to induce him to plead guilty to the Miami homicides and rape, and were used to sentence him to two consecutive life sentences, in exchange for the prosecution waiving the death penalty.

70. As a result of being falsely charged and convicted, the Plaintiff was subjected to constant media publicity which caused him unwarranted embarrassment, humiliation and placed him in a life threatening situation during his twenty-two years of incarceration.

71. As a result of the intentional misconduct of Defendants BUTTERWORTH, JENNE, FANTIGRASSI, SCHLEIN and Detectives Boone and Roberson, the Plaintiff spent twenty-two years in prison. During his incarceration, the Plaintiff was in constant fear for his life. On numerous occasions he was placed in protective confinement due to death threats from other inmates.

72. Throughout his incarceration, Plaintiff was classified

16

as a maximum security and/or close custody prisoner requiring
that any activity or movement by the Plaintiff could only be done
while handcuffed and that all activities outside of his cell be
extremely limited.

73.   As a result of his convictions, Plaintiff was
classified as a sex offender which resulted in limited
visitations by family members and barred any visits by his young
daughter.

74.   At various times throughout his incarceration,
Plaintiff had to be placed in protective confinement which
necessitated no visitation by family members and no movement from
his cell due to death threats made by various inmates whose
family members had been killed by Mosley and for which the
Plaintiff had been convicted.

75.   During 1998 to 1999, after reviewing crime scene
evidence compared to the taped confession of the Plaintiff JERRY
FRANK TOWNSEND, Detective John Curcio and other members of the
Fort Lauderdale Police Department reopened three closed cases
from 1979, i.e., Sonja Marion, Cathy Moore and Arnette Tukes.  At
the time, the Plaintiff was under a life sentence for the murder
of Ms. Moore.

76.   Detective Curcio requested that the Broward County
Sheriff's Crime Laboratory examine certain DNA evidence from the
Sonja Marion crime scene.  On October 16, 2000, the Broward

17

County Sheriff's Office Crime Lab matched DNA taken from sperm on Sonja Marion's shorts as belonging to Eddie Lee Mosley. That DNA standard was also found to be a match to the DNA standard from the Shandra Whitehead murder, which had been investigated by an unnamed deputy sheriff under Defendant NAVARRO and who, as a result of similar type of misconduct had wrongfully, convicted Frank Lee Smith for said murder.

77. Following these DNA results which clearly exonerated both the Plaintiff and Frank Lee Smith, Defendant JENNE was left with no option except to agree to further DNA testing with respect to the other cases for which the Plaintiff had been charged and convicted.

78. On or about April 30, 2001, May 2, 2001, and May 14, 2001, as a result of further DNA tests which matched victims to Eddie Lee Mosley and not the Plaintiff, the criminal courts in Broward County, Florida entered orders granting the State's motions to vacate the Plaintiff's conviction and sentence in Case No. 79-7211CF10A, the first degree murder charge of Terry Cummings, Case No. 79-7217CF10A, the first degree murder charge of Naomi Gamble, Case No. 79-7217CF10A, the first degree murder charge of Barbara Brown, and Case No. 79-7211CF10A, the first degree murder charge of Cathy Moore. (Exhibits A, B, C, D).

79. On or about June 15, 2001, as a result of the court actions in Broward County, Florida, and further investigation by

18

Lt. George Cadavid and Detective Confesor Gonzalez from the City of Miami Police Department, the criminal court vacated the Plaintiff's convictions for the two homicides and the rape in Dade County, Florida. (Exhibit E).

80.   On or about June 16, 2001, the Plaintiff was released from prison.

## D.   RACKETEERING ACTIVITIES

81.   Defendants JENNE, BUTTERWORTH, NAVARRO, and other unnamed sheriffs have failed to provide proper oversight of the Broward County Sheriff's Office, failed to rein in and/or failed to follow the requirements of the United States Constitution and/or failed to stop Defendants FANTIGRASSI, SCHLEIN and all Broward County deputy sheriffs, who, as a continuous group, have caused false charges to be made against innocent persons, who have authored false reports about innocent persons, who have lied to prosecutors and on the witness stand to instigate and support false charges causing convictions on those charges, and who have done so as to Plaintiff, thereby making Defendants liable to Plaintiff.

82.   In violation of 18 U.S.C. §§1503 and 1512, Obstruction of Justice, which constitutes conduct proscribed by and in violation of 18 U.S.C. §1961, Defendants JENNE, BUTTERWORTH, and NAVARRO have interfered with the due administration of justice, improperly terminated felony

19

investigations, and secured indictments and verdicts based on false testimony and false evidence.

(A) Said Defendants withheld, concealed and/or destroyed evidence and records pertaining to the illegal conduct of their agents against Plaintiff and others.

(B) Said Defendants withheld or acted so as to make it foreseeable that others would withhold records, documents, or other evidence from official proceedings pertaining to the illegal conduct of their agents against Plaintiff and others.

(C) Their conduct hindered, prevented and/or delayed the communication of a Federal offense, thereby causing additional and separate injuries to the business and/or property of the Plaintiff, and others.

(D) Their conduct resulted in the continuing and ongoing injuries to Plaintiff.

83. Defendants BUTTERWORTH, NAVARRO, JENNE, FANTIGRASSI, SCHLEIN, and James E. Boone and Bruce Roberson, former police officers for the City of Miami Police Department, conspired to commit and/or solicit another person to commit crimes chargeable by indictment or information as listed in various sections of the United States Code listed in 18 U.S.C. §1961(1).

84. Defendants BUTTERWORTH, NAVARRO, JENNE, FANTIGRASSI and SCHLEIN had an interest in and/or acquired and/or maintained control over the Broward County Sheriff's Office (hereinafter

20

referred to as "the enterprise") through a pattern of racketeering activities, as set forth herein, in violation of 18 U.S.C. §1962(b).

85. Defendants BUTTERWORTH, NAVARRO, JENNE, FANTIGRASSI and SCHLEIN, being associated with said enterprise, conducted and/or participated in said enterprise's affairs through a pattern of racketeering activities, in violation of 18 U.S.C. §1962(c).

(A) Additionally, in violation of 18 U.S.C. §1962(d), Defendants BUTTERWORTH, NAVARRO, JENNE, FANTIGRASSI and SCHLEIN conspired to violate the provisions of subsections (b) and (c) of 18 U.S.C. §1962.

86. Defendants BUTTERWORTH, NAVARRO and JENNE, have joined in and participated in maintaining and continuing the pattern of criminal conduct of the enterprise from 1979 to the present day.

87. Defendants FANTIGRASSI and SCHLEIN conspired with Detectives Boone and Roberson to make and present a tape recorded document to prosecutors for a criminal trial, which they knew or in reckless regard for the truth, should have known to be false.

88. From September 6, 1979 to September 8, 1979, Defendants FANTIGRASSI and SCHLEIN and the above named persons repeatedly took Plaintiff, a mentally retarded and highly suggestible person, to various murder locations and prompted Plaintiff with details of the locations and crimes and repeatedly corrected

21

Plaintiff when he made statements inconsistent with the crimes, for the purpose of fabricating a tape recorded confession.

89. From September 6, 1979 to September 8, 1979, Defendants FANTIGRASSI and SCHLEIN and the above named persons also showed Plaintiff photographs of crime scenes and had discussions with Plaintiff to organize the facts in Plaintiff's mind prior to taking his tape recorded statement. Both FANTIGRASSI and SCHLEIN have testified in court that they had to work with Plaintiff to get the desired statement.

90. In or around July 1980, Defendants FANTIGRASSI and SCHLEIN and the above named persons presented said fabricated tape recorded document to prosecutors as evidence at a criminal trial which resulted in the wrongful imprisonment of Plaintiff for a period of twenty-two years.

91. Defendants FANTIGRASSI and SCHLEIN conspired with Detectives Boone and Roberson to alter said tape recorded document with the purpose of impairing its truthfulness and to conceal and/or withhold other evidence that would have excluded the Plaintiff as a suspect.

92. From September 6, 1979 to September 10, 1979, Defendants FANTIGRASSI and SCHLEIN and the above named persons, in the course of fabricating the evidence, repeatedly stopped the tape recording for the purpose of further prompting Plaintiff while off the record with corrected details of the various crimes

22

for which they were coercing his confession.

93. From September 6, 1979 until the close of trial on or about July 31, 1980 and afterwards, Defendants FANTIGRASSI and SCHLEIN and above named persons had access to numerous items of other evidence, some of which they knew excluded Plaintiff as the perpetrator of said crimes for which his confession was coerced.

94. From August 1979 onward, Defendants BUTTERWORTH, FANTIGRASSI and SCHLEIN and the above named persons had available detailed reports and evidence which disclosed the actual perpetrator of the heinous crimes for which they charged the Plaintiff. Defendants BUTTERWORTH, FANTIGRASSI and SCHLEIN and Detectives Boone and Roberson withheld said evidence with the purpose of preventing its availability in a criminal proceeding.

95. From September 6, 1979, until the close of the criminal trial on or about July 31, 1980, Defendants BUTTERWORTH, FANTIGRASSI and SCHLEIN and the above named persons withheld said evidence from a criminal proceeding and failed to investigate other evidence that would have excluded Plaintiff as the perpetrator of said crimes.

96. From September 6, 1979 through July 31, 1980, Defendants BUTTERWORTH, FANTIGRASSI and SCHLEIN conspired with Detectives Boone and Roberson, as part of a common plan, to close all of their unsolved case files on a series of well publicized and possibly related murders by arranging to fabricate, tamper

23

with and present documentary evidence in the form of a tape recorded statements to prosecutors for the purpose of implicating Plaintiff in a criminal trial for a capital felony when they knew there was no physical evidence to connect Plaintiff to the crimes and that there was other evidence which could exclude him from said crimes.

97. Defendants BUTTERWORTH, NAVARRO and JENNE engaged in or joined in the conspiracy to conceal the criminal conduct of their agents, Defendants FANTIGRASSI and/or SCHLEIN, aided and abetted the concealment of criminal conduct, aided and abetted the furtherance of the criminal conduct, failed to report the criminal conduct of Defendants FANTIGRASSI, SCHLEIN and other deputies, and, in violation of 18 U.S.C. §§1503 and 1512 and, withheld, concealed and/or destroyed evidence and records pertaining to said illegal conduct against Plaintiff and others, obstructed justice, obstructed a criminal investigation, evaded criminal and/or civil prosecution and liability, in furtherance of the racketeering conspiracy and enterprise.

98. During the tenure of Defendant NAVARRO, said Defendant had access to information that, despite the incarceration of the Plaintiff, the rapes and murders continued in the same vicinity and with the same modus operandi of the crimes for which Plaintiff had been falsely convicted.

(A) Said rapes and murders were investigated by deputy

24

sheriffs of the Broward County Sheriff's office.

(B)  Despite clearly exculpatory evidence, Defendant NAVARRO did nothing, allowing JERRY FRANK TOWNSEND to languish in prison for a further sixteen years, thereby aggravating and continuing his injuries.

(C)  The same illegal methods employed against Plaintiff were utilized against Frank Lee Smith for the murder of Shandra Whitehead.

(D) On May 20, 1987, Eddie Lee Mosley was arrested, confessed to and was charged with the 1983 murder of Emma Cook. Defendant NAVARRO was thereby provided with further notice that neither JERRY FRANK TOWNSEND nor Frank Lee Smith were the perpetrators of any of the crimes for which they had been charged, convicted and incarcerated.

(E) Despite this, Defendant NAVARRO allowed both Plaintiff and Smith to languish in prison and  withheld, concealed and/or destroyed evidence and records pertaining to the illegal conduct of his agents against Plaintiff and others.

(F) In furtherance of the affairs of the enterprise and as part of the conspiracy to cover up the illegal acts of Defendants FANTIGRASSI, SCHLEIN, Scheff, Amabile and other deputies, from January, 1985 to January, 1993, Defendant NAVARRO participated in the ongoing obstruction of justice by intentionally failing to investigate the criminal actions of his

25

agents by withholding, concealing and/or destroying evidence and records pertaining to said illegal conduct against Plaintiff and others.

99. As evidence of the continuing pattern and practice of the racketeering activity of the enterprise, in or around 1985 and 1986, Broward County Deputy Sheriffs Richard Scheff and Philip Amabile likewise coerced a false confession from a mentally retarded man, Frank Lee Smith, for a murder they knew or should have known was committed by Eddie Lee Mosley. From descriptions by witnesses and survivors of Mosley's attacks, a composite sketch had been created and circulated, which sketch was the basis for the arrest of Frank Lee Smith. Just as Defendants FANTIGRASSI and SCHLEIN have falsely claimed the composite bore a striking resemblance to Jerry Townsend, Richard Scheff also falsely claimed that the drawing of Eddie Lee Mosley bore a striking resemblance to Frank Lee Smith.

100. Scheff and Amabile, as part of a common plan to obstruct justice, tampered with witnesses and made false statements under oath in a criminal proceeding. In hearings in 1991 and 1998, Scheff and Amabile continued the deliberate obstruction of justice by fabricating evidence and further perjuring themselves in criminal proceedings.

101. Deputy Sheriffs Scheff, Amabile and Defendants NAVARRO and JENNE, throughout this time, had available detailed reports

26

and evidence which disclosed the actual perpetrator of the crime for which Frank Lee Smith was charged, just as Plaintiff was falsely charged six years earlier. Defendants NAVARRO, JENNE and the above named persons withheld said evidence with the purpose of impairing its availability in criminal proceedings.

102. Thus, Defendant NAVARRO committed predicate acts in violation of 18 U.S.C. §§1503 and 1512 which were the proximate cause of Plaintiff's ongoing and continuing injuries to business or property from January, 1985 onwards.

103. In furtherance of the affairs of the enterprise and as part of the conspiracy to cover up the illegal acts of Defendants FANTIGRASSI, SCHLEIN and other deputies, from December, 2000 and onwards, Defendant JENNE has continued to participate in the ongoing obstruction of justice by intentionally failing to investigate the criminal actions of his agents, by withholding, concealing and/or destroying evidence and records pertaining to said illegal conduct against Plaintiff and others and, instead of taking any disciplinary action whatsoever, has promoted Defendant FANTIGRASSI to head of BSO's Homicide Unit.

104. During the tenure of Defendant JENNE, said Defendant had access to and information that demonstrated the innocence of the Plaintiff.

(A) In late 1998, Detective Curcio of the Fort Lauderdale Police Department reopened investigations into the

27

serial rapes and murders dating back to 1973.

(B) Detective Curcio obtained semen evidence concerning the Marion murder from the Broward County Sheriff's office crime laboratory. The DNA results proved that JERRY FRANK TOWNSEND was innocent and that Eddie Lee Mosley was the actual killer.

(C) On December 12, 2000, Detective Curcio obtained a warrant for the arrest of Eddie Lee Mosley for the murder of Sonja Marion.

(D) JERRY FRANK TOWNSEND was indicted for the Marion murder on September 26, 1979.

(E) Despite the actions of Detective Curcio and the DNA results, Defendant JENNE resisted reopening the investigation into the crimes for which the Plaintiff was convicted. Plaintiff's incarceration continued.

(F) In March, 2001, Detective Curcio obtained further DNA test results concerning the Shandra Whitehead murder which demonstrated that Eddie Lee Mosley and not Frank Lee Smith was the killer. As a result, Defendant JENNE was left with no option but to initiate further DNA testing and review of Plaintiff's convictions.

105. Despite evidence of coercive and illegal tactics utilized by deputy sheriffs, such as Deputy Scheff and Defendant FANTIGRASSI, Defendant JENNE's response was to promote them, rather than discipline them. and, in particular, even after the

28

proof of coerced false confessions, evidence tampering and false convictions in a number of cases, including the instant case, Defendant JENNE has allowed Defendant FANTIGRASSI to maintain control over the originals of the very evidence and records pertaining to the arrests and convictions of the Plaintiff, Frank Lee Smith, Timothy Brown, and others.

106. As additional evidence of the continuing pattern and practice of the racketeering activity of the enterprise, Defendant JENNE has deliberately maintained a written policy for "multiple case clearance", also maintained by Defendants BUTTERWORTH and NAVARRO, which is a virtual blueprint for coercing false confessions. The policy includes specific details prescribing taking the suspect to various crime scene locations, prior to taking a confession, to ensure that accurate information about the location, modus operandi, date and time of the crime, and other information "that only the suspect would know" is obtained.

107. Additionally, Defendant JENNE has created a quota system for arrests and provided bonuses and other incentives for his agents to encourage "multiple case clearance" by obtaining confessions without any evidence that a suspect had committed the crime. The false confessions thus obtained on behalf of and in furtherance of the expansion of the enterprise have become so extensive and obvious that, in 2004, based on the scrutiny of the

29

news media, over 10,000 of the cases "cleared" in this manner are under investigation for false confessions and already there are numerous instances where a suspect has "confessed" to crimes that occurred while he was incarcerated or proved to be living elsewhere.

108. Thus, Defendant JENNE committed predicate acts in violation of 18 U.S.C. §§1503 and 1512 which were the proximate cause of Plaintiff's ongoing and continuing injuries to business or property from December, 2000 onwards.

109. The conduct of Defendants NAVARRO and JENNE was ongoing. Defendants NAVARRO and JENNE engaged in or joined in the conspiracy to conceal the criminal conduct of their agents, Scheff and Amabile, aided and abetted the concealment of criminal conduct, aided and abetted the furtherance of the criminal conduct, failed to report the criminal conduct of Scheff and Amabile, obstructed justice, obstructed a criminal investigation, evaded criminal and/or civil prosecution and liability, in furtherance of the racketeering conspiracy and enterprise.

110. In furtherance of the affairs of the enterprise and as part of the conspiracy to cover up the illegal acts of Scheff and Amabile, Defendants NAVARRO and JENNE have continued to participate in the ongoing obstruction of justice by intentionally failing to investigate the criminal actions of their agents.

30

111. Instead of taking any disciplinary action in the face of the posthumous exoneration of Frank Lee Smith and an independent investigation, authorized by the Governor, into the conduct of both deputy sheriffs, Defendant JENNE has promoted Deputy Sheriff Scheff.

112. As further evidence of the continuing pattern and practice of the racketeering activity of the enterprise, in or around 1990, Deputy Sheriff Scheff supervised Deputy Sheriffs Steven Wiley and Dominick Gucciardo, who coerced a false confession from Peter Dallas for a murder he did not commit.

113. Deputy Sheriffs Scheff, Wiley and Gucciardo falsely and knowingly charged Peter Roussonicolos and Stephen Rosati for a murder they did not commit.

114. In furtherance of the enterprise, Deputy Sheriffs Scheff, Wiley and Gucciardo, as part of a common plan to obstruct justice, tampered with witnesses and concealed exculpatory evidence.

115. Dallas, Roussonicolos and Rosati were freed after eighteen months in prison after the Florida Department of Law Enforcement arrested the true killers.

116. Defendants NAVARRO and JENNE engaged in or joined in the conspiracy to conceal the criminal conduct of their agents, Scheff, Gucciardo and Wiley, aided and abetted the concealment of criminal conduct, aided and abetted the furtherance of the

31

criminal conduct, failed to report the criminal conduct of Scheff, Gucciardo and Wiley, obstructed justice and evaded criminal and/or civil prosecution and liability in furtherance of the racketeering conspiracy and enterprise.

117. In furtherance of the affairs of the enterprise and as part of the conspiracy to cover up the illegal acts of Scheff, Gucciardo and Wiley, Defendant JENNE has continued to participate in the ongoing obstruction of justice by intentionally failing to investigate the criminal actions of his agents.

118. As additional evidence of the continuing pattern and practice of the racketeering activity of the enterprise, in 1990, Deputy Sheriffs Scheff, James Carr and Eli Thomasevich coerced a false confession from John Wood for a murder he did not commit, falsely claiming that Wood knew details that only the killer could know. The killers were subsequently arrested and Wood was released from jail.

119. Again in 1990, Deputy Sheriffs Scheff, Carr and Thomasevich coerced a false confession for murder from a mentally retarded fourteen year old boy, Timothy Brown. Brown was arrested without a warrant, shackled to the floor, threatened with the electric chair and interrogated for hours.

120. Under oath, Deputy Sheriff Scheff stated that Brown was "like clay, and you could get him to say whatever you wanted to." Despite this knowledge, Deputy Sheriffs Carr and Thomasevich, as

32

part of a common plan to obstruct justice, fabricated evidence and tampered with witnesses.

121. Additionally, in furtherance of the affairs of the enterprise and as part of the conspiracy to cover up the illegal acts of Scheff, Carr and Thomasevich, Defendants NAVARRO and JENNE have continued to participate in the ongoing obstruction of justice by intentionally failing to investigate the criminal actions of their agents.

(A) In 2001, in the matter involving Timothy Brown, new evidence demonstrated that the actual killer of deputy sheriff Patrick Behan was a disgruntled former employee of the Broward County Sheriff's office. Defendant FANTIGRASSI was appointed by Defendant JENNE to head the investigation.

(B) Defendant FANTIGRASSI in a detailed report analyzed the new evidence with respect to the suspect's motive, opportunity, and knowledge of the crime scene.

(C) In 2002, Timothy Brown was granted an 'Actual Innocence' hearing based on this new evidence. Defendant FANTIGRASSI, throughout the Brown proceedings, contradicted his report in an attempt to uphold Mr. Brown's conviction. Defendant FANTIGRASSI's statements were found to be "implausible" by the District Court in Brown v. Singletary, Case No. 95-CV-7207-GRAHAM.

(D) In March, 2003, based on his successful petition of

33

'Actual Innocence', Timothy Brown was granted habeas relief and released from prison.

122. Defendants BUTTERWORTH, NAVARRO and JENNE engaged in or joined in the conspiracy to conceal the criminal conduct of their agents, Defendants FANTIGRASSI, SCHLEIN, Deputy Sheriffs Scheff, Carr and Thomasevich, aided and abetted the concealment of criminal conduct, aided and abetted the furtherance of the criminal conduct, failed to report the criminal conduct of Scheff, Carr and Thomasevich, obstructed justice and evaded criminal and/or civil prosecution and liability in furtherance of the racketeering conspiracy and enterprise.

123. There exists a pattern by deputy sheriffs of the Broward County Sheriff's Office of obtaining coerced and false confessions. These include but are not limited to the Plaintiff; Frank Lee Smith; Timothy Brown; John Wood and Peter Dallas.

124. Throughout the tenure of Defendants BUTTERWORTH, NAVARRO, JENNE, and other unnamed sheriffs have engaged in or joined in the conspiracy to conceal the criminal conduct of their agents, aided and abetted the concealment of criminal conduct, aided and abetted the furtherance of the criminal conduct, failed to report the criminal conduct of their agents, obstructed justice, obstructed criminal investigations, evaded criminal and/or civil prosecution and liability, in furtherance of the racketeering conspiracy and enterprise.

34

## E.  DEFENDANT JENNE-PATTERN AND PRACTICE OF MISCONDUCT BY THE BROWARD COUNTY SHERIFF'S OFFICE

125.  Defendant JENNE, being sued in his official capacity, is synonymous with the Broward County Sheriff's Office.

126.  At all times material hereto, the following persons held the office of Sheriff of Broward County: Edward Stack (1969-1979); Robert A. Butterworth (1979-1982); George A. Brescher (1983-1985); Nick Navarro (1985-1993); Ronald Cochran (1993-September 1997); Susan E. McCampbell (September 1997-December, 1997); Kenneth C. Jenne, II (1998 to the present).

127.  Throughout the tenure of the above listed Sheriffs, the Broward County Sheriff's Office/Defendant JENNE has engaged in a history of pattern and/or practice of misconduct as evidenced by, but not limited to, the following:

(A)  Said Defendant knew that he could not prosecute Eddie Lee Mosley, as he had been declared legally incompetent to stand trial.

(B)  Said Defendant knew that he would benefit in the form of promotions, merits, public applause, and expansion of the Sheriff's Office by the prosecution of the Plaintiff.

(C)  Said Defendant continued to target mentally challenged individuals and charge them with Mosley crimes and other crimes.  Utilizing exactly the same tactics as he had used against the Plaintiff, Frank Lee Smith was maliciously prosecuted and falsely imprisoned for another Mosley murder.  Frank Lee

35

Smith died in prison after spending fifteen years on Florida's death row. He was exonerated posthumously.

(D) Said Defendant intentionally and/or incompetently investigated certain capital crimes, resulting in the false arrest and malicious prosecution of innocent people such as, but not limited to, the Plaintiff, Frank Lee Smith, Carl Stephen Rosati, Peter Roussonicolas, Peter Dallas, and/or Timothy Brown.

(E) Said Defendant intentionally and/or incompetently trained and/or, supervised and/or disciplined the deputy sheriffs under his supervision and control, which was the moving force behind individual officers violating the constitutional rights of citizens. Notice of such misconduct was provided to said Defendant by two federal cases, Goad v. Navarro, U.S. District Court Case No. 86-6563-CIV-ROETTGER and Hill v. Navarro, U.S. District Court Case No. 86-6388-CIV-ZLOCH.

(F) Said Defendant intentionally and/or incompetently covered up the misconduct and/or incompetence by destroying and/or having destroyed records pertaining to investigations into police misconduct, as well as criminal investigations.

(G) Despite notice of findings of inadequate and/or incompetent training and/or, supervision and/or discipline, said Defendant instituted no checks and balances to hold deputy sheriffs accountable for their misconduct.

(H) There exists a de facto policy within the Broward

36

County Sheriff's Office of covering up police misconduct by failing to properly investigate alleged misconduct, and/or by conducting investigations that were intentionally incompetent and/or by fabricating evidence to justify the misconduct. Said policy spans the tenure of all Sheriffs listed herein.

(I) Despite knowledge and acknowledgment of the misconduct within the Broward County Sheriff's Office, Defendant JENNE, at all times material hereto, failed to properly correct the obvious deficiencies which caused the injuries to the Plaintiff and the above listed individuals, thereby allowing said misconduct to be repeated, and causing and allowing further injuries to be inflicted on unknowing and innocent citizens by his deputy sheriffs.

128. Defendant JENNE's failure to properly train, supervise and discipline deputy sheriffs under his command was the proximate cause of the deprivation of rights suffered by the Plaintiff JERRY FRANK TOWNSEND.

129. Defendant JENNE had a duty to train, supervise, control or otherwise ensure that Defendants FANTIGRASSI, SCHLEIN, and other unnamed deputy sheriffs, did not violate the constitutional rights of persons such as the Plaintiff.

130. Defendant JENNE abdicated his policymaking and oversight responsibilities, thereby allowing the incident involving the Plaintiff to occur.

37

131. The above acts and omissions of Defendants, and each of them, constitute a course of conduct and failure to act, amounting to deliberate indifference to the rights, health, safety and welfare of the Plaintiff and those similarly situated, resulting in the deprivation of the Plaintiff's constitutional rights under state and federal law.

132. The applicable statutes of limitation are tolled because the Defendants BUTTERWORTH, NAVARRO, JENNE, FANTIGRASSI, SCHLEIN and Detectives Boone and Roberson fraudulently concealed their misconduct. As a result of said Defendants misconduct, Plaintiff was unable to discover the wrongfulness of said misconduct until independent DNA testing requested by the City of Fort Lauderdale Police Department exonerated the Plaintiff of all charges brought against him by Defendants BUTTERWORTH, JENNE, FANTIGRASSI, SCHLEIN and Detectives Boone and Roberson.

133. Pursuant to federal law, the applicable statute of limitations for a civil rights claim does not begin to run until April 30, 2001, May 2, 2001, May 14, 2001 and June 15, 2001, the dates when all criminal charges against the Plaintiff were dismissed by the criminal courts. (Exhibit A, B, C, D, E).

134. Plaintiff suffered irreparable damages and personal injury in the deprivation of his Fourth, Fifth, Sixth and Fourteenth Amendment rights, having been wrongfully tried for a capital felony and having been wrongfully incarcerated for a period of twenty years as a foreseeable result of the continuing

38

pattern and practice of illegal activities as set forth herein.

135.   Plaintiff was also injured in his business and property in the form of lost employment, employment opportunities, wages and other compensation, as well as actual physical harm, as a direct result of this continuing pattern and practice of illegal activities as set forth herein.

136.   As a direct and proximate result of the acts of Defendants BUTTERWORTH and/or NAVARRO and/or JENNE, and/or FANTIGRASSI and/or SCHLEIN, the Plaintiff JERRY FRANK TOWNSEND suffered the following injuries and damages:

(A)   Violation of his constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

(B)   Loss of his physical liberty;

(C)   Verbal and physical death threats during his twenty-two years of incarceration;

(D)   Loss of earning capacity;

(E)   Permanent physical and emotional injuries, humiliation and embarrassment and damage to his reputation, all of which continue to this day and are likely to continue into the future, and which require the expenditure of money for treatment.

137.   The actions of the Defendants violated the clearly established and well settled federal constitutional right of the Plaintiff to be free from unreasonable seizure of his person.

39

### COUNT I
### STATE TORT CLAIM AGAINST DEFENDANT FANTIGRASSI
### FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

138.   The Plaintiff JERRY FRANK TOWNSEND realleges paragraphs 1 through 10, 13 through 34, 36 through 80, 83 through 85, 87 through 97, and 131 through 137.

139.   Defendant FANTIGRASSI's conduct was extreme and outrageous and was intentional and/or done recklessly.

140.   The above-mentioned acts were beyond the bounds of human decency, let alone the confines of the law, and were virtually certain to and did in fact result in emotional distress to the Plaintiff JERRY FRANK TOWNSEND.

141.   As a result of Defendant FANTIGRASSI's conduct, Plaintiff experienced and continues to experience severe emotional distress resulting in bodily harm.

142.   As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life, has sustained loss of earnings and earning capacity, and has incurred and will continue to incur expenses for medical, emotional, and mental health treatment.

40

(A) At all times relevant hereto, Defendant FANTIGRASSI was acting outside the scope of his authority, and in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, rendering him individually liable.

(B) Plaintiff has provided Defendants and the Florida Department of Insurance with notice pursuant to Florida Statute Section 768.28 and has satisfied all conditions precedent to maintaining this action. (Exhibit F).

**WHEREFORE**, the Plaintiff JERRY FRANK TOWNSEND demands compensatory and punitive damages against Defendant FANTIGRASSI, costs and trial by jury on all issues so triable by right.

## COUNT II
### STATE TORT CLAIM AGAINST DEFENDANT JENNE
### FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

143. The Plaintiff JERRY FRANK TOWNSEND realleges paragraphs 1 through 10, 13 through 34, 36 through 80, 83 through 85, 87 through 97, and 131 through 137.

144. Defendant FANTIGRASSI's conduct was extreme and outrageous and was intentional and/or done recklessly.

145. The above-mentioned acts were beyond the bounds of human decency, let alone the confines of the law, and were virtually certain to and did in fact result in emotional distress

41

to the Plaintiff JERRY FRANK TOWNSEND.

146.  As a result of Defendant FANTIGRASSI's conduct,
Plaintiff experienced and continues to experience severe
emotional distress resulting in bodily harm.

147.  As a result of the above-described conduct, Plaintiff
has suffered and continues to suffer great pain of mind and body,
shock, emotional distress, physical manifestations of emotional
distress, embarrassment, loss of self-esteem, disgrace,
humiliation, and loss of enjoyment of life, was prevented and
will continue to be prevented from performing his daily
activities and obtaining the full enjoyment of life, has
sustained loss of earnings and earning capacity, and has incurred
and will continue to incur expenses for medical, emotional, and
mental health treatment.

(A) At all times relevant hereto, Defendant FANTIGRASSI
was acting within the scope of his authority and acting as agent
of Defendant JENNE, pursuant to §768.28 and §30.07, Florida
Statutes, rendering Defendant JENNE liable in his official
capacity.

(B) Plaintiff has provided Defendants and the Florida
Department of Insurance with notice pursuant to Florida Statute
Section 768.28 and has satisfied all conditions precedent to
maintaining this action. (Exhibit F).

42

**WHEREFORE**, the Plaintiff JERRY FRANK TOWNSEND demands compensatory damages against Defendant JENNE, costs and trial by jury on all issues so triable by right.

## COUNT III
### STATE TORT CLAIM AGAINST DEFENDANT SCHLEIN
### FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

148. The Plaintiff JERRY FRANK TOWNSEND realleges paragraphs 1 through 10, 13 through 34, 36 through 80, 83 through 85, 87 through 97, and 131 through 137.

149. Defendant SCHLEIN's conduct was extreme and outrageous and was intentional and/or done recklessly.

150. The above-mentioned acts were beyond the bounds of human decency, let alone the confines of the law, and were virtually certain to and did in fact result in emotional distress to the Plaintiff JERRY FRANK TOWNSEND.

151. As a result of Defendant SCHLEIN's conduct, Plaintiff experienced and continues to experience severe emotional distress resulting in bodily harm.

152. As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, was prevented and

43

will continue to be prevented from performing his daily
activities and obtaining the full enjoyment of life, has
sustained loss of earnings and earning capacity, and has incurred
and will continue to incur expenses for medical, emotional, and
mental health treatment.

(A)  At all times relevant hereto, Defendant SCHLEIN was
acting outside the scope of his authority, and in bad faith or
with malicious purpose or in a manner exhibiting wanton and
willful disregard of human rights, rendering him individually
liable.

(B)  Plaintiff has provided Defendants and the Florida
Department of Insurance with notice pursuant to Florida Statute
Section 768.28 and has satisfied all conditions precedent to
maintaining this action.  (Exhibit F).


**WHEREFORE**, the Plaintiff JERRY FRANK TOWNSEND demands
compensatory and punitive damages against Defendant SCHLEIN,
costs and trial by jury on all issues so triable by right.


### COUNT IV
### STATE TORT CLAIM AGAINST DEFENDANT JENNE
### FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

153.  The Plaintiff JERRY FRANK TOWNSEND realleges
paragraphs 1 through 10, 13 through 34, 36 through 80, 83 through

44

85, 87 through 97, and 131 through 137.

154. Defendant SCHLEIN's conduct was extreme and outrageous and was intentional and/or done recklessly.

155. The above-mentioned acts were beyond the bounds of human decency, let alone the confines of the law, and were virtually certain to and did in fact result in emotional distress to the Plaintiff JERRY FRANK TOWNSEND.

156. As a result of Defendant SCHLEIN's conduct, Plaintiff experienced and continues to experience severe emotional distress resulting in bodily harm.

157. As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life, has sustained loss of earnings and earning capacity, and has incurred and will continue to incur expenses for medical, emotional, and mental health treatment.

(A) At all times relevant hereto, Defendant SCHLEIN was acting within the scope of his authority and acting as agent of Defendant JENNE, pursuant to §768.28 and §30.07, Florida Statutes, rendering Defendant JENNE liable in his official

45

capacity.

(B) Plaintiff has provided Defendants and the Florida Department of Insurance with notice pursuant to Florida Statute Section 768.28 and has satisfied all conditions precedent to maintaining this action. (Exhibit F).

**WHEREFORE**, the Plaintiff JERRY FRANK TOWNSEND demands compensatory damages against Defendant JENNE, costs and trial by jury on all issues so triable by right.

## COUNT V
## 42 U.S.C. §1983 CLAIM AGAINST DEFENDANTS
## FANTIGRASSI AND SCHLEIN

158. The Plaintiff JERRY FRANK TOWNSEND realleges paragraphs 1 through 34, 36 through 80, 83 through 85, 87 through 97, 122 through 124, 127 (A)-(D), 129, and 131 through 137.

159. While Defendants ANTHONY FANTIGRASSI and MARK SCHLEIN were acting under color of state and federal law as deputy sheriffs for the Broward County Sheriff's Office/Defendant JENNE, they subjected the Plaintiff to the deprivation of rights and privileges secured to him under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

160. The actions and conduct of Defendants FANTIGRASSI and SCHLEIN violated the rights of the Plaintiff to due process of law under the Fifth Amendment, to a fair trial under the Sixth

46

Amendment, and to be free from unreasonable detention, search and seizure under the Fourth Amendment to the United States Constitution.

161. Defendants FANTIGRASSI and SCHLEIN caused the Plaintiff to be illegally detained, illegally prosecuted, and illegally imprisoned in violation of his constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

162. Defendants FANTIGRASSI and SCHLEIN caused the prosecution to be continued against the Plaintiff when they knew or should have known that said prosecution was without probable cause. The matters known to them at the time they continued the prosecution would not have warranted a reasonable law enforcement officer to believe the Plaintiff had committed the alleged crimes.

163. Defendants FANTIGRASSI and SCHLEIN instituted and continued the interrogation of the Plaintiff when they knew or should have known that the Plaintiff did not understand his constitutional rights and that their coercive and illegal interrogation tactics would induce the Plaintiff to make false statements. No prosecution would have occurred but for the actions of these Defendants.

164. Defendants FANTIGRASSI and SCHLEIN acted under color of state law and with malice in instituting and continuing the

47

prosecution demonstrated the lack of probable cause in the underlying arrest. Said prosecution was only able to continue as a result of their intentional acts of providing false information and evidence to the criminal courts, prosecutors, Plaintiff's counsel, and the public, knowingly or recklessly disregarding the rights of the Plaintiff.

165. As a direct and proximate result of the Defendants FANTIGRASSI and SCHLEIN's acts as related above, Plaintiff has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life, has sustained loss of earnings and earning capacity, and has incurred and will continue to incur expenses for medical, emotional, and mental health treatment.

166. 42 U.S.C. §1983 provides a remedy for violation of these rights.

**WHEREFORE**, the Plaintiff JERRY FRANK TOWNSEND, demands compensatory and punitive damages against Defendants FANTIGRASSI and SCHLEIN, attorney fees, costs and trial by jury for all issues so triable by right.

48

<u>COUNT VI</u>
<u>CONSPIRACY CLAIM AGAINST DEFENDANTS FANTIGRASSI AND
SCHLEIN TO VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHTS</u>

167. The Plaintiff JERRY FRANK TOWNSEND realleges paragraphs 1 through 34, 36 through 80, 87 through 97, 122 through 124, 127 (A)-(D), 129, 131 through 137, 139 through 142, 149 through 152(B), and 159 through 166.

168. In addition to the acts alleged above, Defendants FANTIGRASSI and SCHLEIN, conspired together and with other unnamed deputy sheriffs under the control and supervision of Defendant JENNE, as well as Detectives Roberson and Boone of the City of Miami Police Department, for the purpose of depriving the Plaintiff of equal protection under the law, due process of law, the right to privacy, the right to be free from unlawful search and seizure, freedom of association, and the right to seek redress for his injuries by covering up the misconduct.

169. The above stated actions by the Defendants were overt actions in furtherance of the conspiracy to deprive the Plaintiff of his constitutional rights.

170. Each of the Defendants understood, accepted, and either explicitly or implicitly knew that his overt actions would result in the deprivation of the Plaintiff's rights as alleged herein.

171. At all material times, Defendants FANTIGRASSI and

49

SCHLEIN acted voluntarily in committing the actions which resulted in the deprivation of the Plaintiff's rights.

172.  As a direct and proximate result of the Defendants FANTIGRASSI and SCHLEIN's acts as related above, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life, has sustained loss of earnings and earning capacity, and has incurred and will continue to incur expenses for medical, emotional, and mental health treatment.

173.  42 U.S.C. §1983 provides a remedy for violation of these rights.

**WHEREFORE**, the Plaintiff JERRY FRANK TOWNSEND, demands compensatory and punitive damages against Defendants FANTIGRASSI and SCHLEIN, attorney fees, costs and trial by jury for all issues so triable by right.

### COUNT VII
### 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT JENNE

174.  The Plaintiff JERRY FRANK TOWNSEND realleges paragraphs 1 through 137.

50

175. At all times material hereto, Defendant JENNE, as Sheriff for Broward County, was charged with the responsibility of hiring, screening, training, supervising, disciplining and controlling officers of the Broward County Sheriff's Office.

176. At all times material hereto, Defendant JENNE was deliberately indifferent in that he either expressly or impliedly acknowledged and assented to the failure to train and/or supervise and/or control and/or otherwise screen employees of the Broward County Sheriff's Office including, but not limited to, Defendants FANTIGRASSI and/or SCHLEIN for dangerous propensities, lack of training and/or skill or other characteristics making said deputy sheriffs unfit to perform their duties.

177. At all times material hereto, Defendant JENNE was deliberately indifferent to the rights of the public, including the Plaintiff, in that he failed to determine whether members of the Broward Sheriff's Office, including Defendants FANTIGRASSI and/or SCHLEIN, posed a threat to the public as a result of their propensity to commit unlawful acts.

178. At all times material hereto, Defendant JENNE, through his deliberate indifference, failed to ensure that deputy sheriffs of Broward County Sheriff's Office did not violate the constitutional and statutory rights of citizens of the State of Florida, including the Plaintiff, while said deputy sheriffs were acting under color of state law for the Broward County Sheriff's

51

Office.

179.  At all times material hereto, Defendant JENNE,
permitted and tolerated the above described acts and thereby
caused a pattern and practice of unjustified, unreasonable and
illegal false arrests, detentions and/or prosecutions by deputy
sheriffs of the Broward County Sheriff's Office against members
of the public, including Plaintiff, which violated their Fourth,
Fifth, Sixth and Fourteenth Amendment rights.  Although such acts
were improper, deputy sheriffs involved were not prosecuted,
and/or disciplined and/or subjected to retraining, and some of
said incidents were, in fact, covered up with official claims
that their acts were justified and proper.  As a result, Broward
County deputy sheriffs, including Defendants FANTIGRASSI and
SCHLEIN, were encouraged to believe that members of the public
could be subjected to illegal arrests, detentions and/or
prosecutions, and that said illegal arrests, detentions and/or
prosecutions would be permitted by Defendant JENNE.

180.  The Broward County Sheriff's Department, through its
deputy sheriffs, maintained a custom of making unlawful arrests,
detentions and/or prosecutions.

181.  The cited conduct represents a pattern in which
citizens were injured or endangered by the intentional and/or
reckless misconduct by the deputy sheriffs of the Broward County
Sheriff's Office and/or that serious incompetence or misbehavior

52

was widespread throughout the Broward County Sheriff's Office.

182. Defendant JENNE has maintained a system of review of incidents of abuse of lawful authority such as illegal and unlawful detentions and/or arrests and/or prosecutions, among other things, by deputy sheriffs, and complaints thereof, which has failed to identify the unlawful seizures by deputy sheriffs, and has failed to subject deputy sheriffs who employed such acts to appropriate discipline, and/or closer supervision and/or retraining, to the extent that it has become the de facto policy and custom of the Broward County Sheriff's Office to tolerate such acts by its deputy sheriffs.

183. Defendant JENNE, through the Broward County Sheriff's Office, has maintained a long-standing, widespread history of failure to properly hire and/or train and/or supervise and/or discipline its deputy sheriffs for, among other things, unlawful detentions and/or arrests and/or prosecutions, even though they had notice of such unlawful conduct by employees.

184. The foregoing acts, omissions, policies or customs of Defendant JENNE caused deputy sheriffs, including Defendants FANTIGRASSI and SCHLEIN, to believe that acts such as unlawful seizures and/or detentions, and/or arrests and/or prosecutions, among other things, would not be properly investigated, with the foreseeable result that deputy sheriffs, including Defendants FANTIGRASSI and SCHLEIN, were more likely to make unlawful

53

seizures and/or detentions and/or arrests and/or prosecutions.

185.   The Plaintiff JERRY FRANK TOWNSEND has been a victim of said abuses of lawful authority, and said illegal acts were the foreseeable result of the previously described acts, omissions, policies or customs of said Defendants.

186.   As a direct and proximate cause of the acts described above, the Plaintiff JERRY FRANK TOWNSEND has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life, has sustained loss of earnings and earning capacity, and has incurred and will continue to incur expenses for medical, emotional, and mental health treatment.

187.   42 U.S.C. §1983 provides a remedy for violation of these rights.

**WHEREFORE**, the Plaintiff JERRY FRANK TOWNSEND demands compensatory damages against Defendant JENNE, attorney fees, costs and trial by jury for all issues so triable by right.

54

## COUNT VIII
### RICO - VIOLATION OF 18 U.S.C. §1962(d)
#### CLAIM AGAINST DEFENDANTS JENNE, BUTTERWORTH, NAVARRO, FANTIGRASSI AND SCHLEIN

188.    The Plaintiff JERRY FRANK TOWNSEND, as to Defendants FANTIGRASSI and SCHLEIN, realleges paragraphs 1 through 34, 36 through 80, 83 through 85, 87 through 97, and 131 through 137; as to Defendant BUTTERWORTH: realleges paragraphs 1 through 97, 122 through 124, 131 through 137; as to Defendant NAVARRO: realleges paragraphs 1 through 38, 41 through 47, 56, 65 through 86, 97 through 102, 106, 109 through 110, 112 through 116, 118 through 124, 131 through 137; as to Defendant JENNE: realleges paragraphs 1 through 34, 36 through 37, 41 through 47, 52 through 53, 65 through 86, 97, 100 through 101, 103 through 111, 116 through 117, 121 through 124, 131 through 137.

189.    Defendants JENNE, BUTTERWORTH, NAVARRO, FANTIGRASSI, SCHLEIN and Detectives Boone and Roberson are persons under 18 U.S.C. §1961(3).

190.    The relationship between Defendants JENNE, BUTTERWORTH, NAVARRO, FANTIGRASSI, SCHLEIN and Detectives Boone and Roberson constitutes an enterprise under 18 U.S.C. Sec. 1961(4).

191.    The relationship between Defendants JENNE, BUTTERWORTH, NAVARRO, FANTIGRASSI, SCHLEIN and Detectives Boone and Roberson, constitutes an association-in-fact enterprise under 18 U.S.C. §1961(4) and the above named persons have engaged in a

55

pattern of conspiracy and racketeering activities in violation of 18 U.S.C. §1962, et. seq.

192. In violation of 18 U.S.C. §1962 (d), Defendants FANTIGRASSI and SCHLEIN conspired with Detectives Boone and Roberson in an agreement, the objective of which was in substantive violation of RICO, with an awareness of the essential nature and scope of the enterprise and with an intent to participate in it.

193. Defendants FANTIGRASSI and SCHLEIN and the above named persons agreed to enter into a conspiracy to violate the provision of 18 U.S.C. §1962(c) as described herein. As evidence of this agreement, Defendants and the above named persons conspired to fabricate and tamper with evidence and make false statements under oath in furtherance of this conspiracy and tamper with witnesses for the purpose of corruptly influencing the due administration of justice, in violation of 18 U.S.C. §§1503 and 1512.

(A) Defendants JENNE, BUTTERWORTH, and NAVARRO conspired to violate provisions of 18 U.S.C. §1962 et seq. by interfering with the due administration of justice, improperly terminating felony investigations, securing indictments and verdicts based on false testimony and false evidence, withholding, concealing and/or destroying evidence and records pertaining to the illegal conduct of their agents against Plaintiff and others, including concealing and/or destroying evidence and records pertaining to

56

the instant case, and deliberately and knowingly continued the wrongful detention and/or delayed the release of Plaintiff, thereby causing additional and separate injuries to the business or property of Plaintiff and others, in violation of 18 U.S.C. §1962(c).

(B)   Defendants JENNE, BUTTERWORTH and NAVARRO conspired to violate provisions of 18 U.S.C. §1962 et seq. by aiding and abetting the proscribed conduct of their employees, conspired to conceal and cover up such conduct and deliberately perpetuated the continuous pattern of racketeering activities and ongoing obstruction of justice, which directly caused injuries to business or property of multiple victims including Plaintiff, thus facilitating and furthering the affairs of the enterprise in violation of 18 U.S.C. §1962(d).

(C)   Defendants BUTTERWORTH, FANTIGRASSI, SCHLEIN and Detectives Boone and Roberson, in concert with each other and with the intent to conceal and defraud, conspired and came to a meeting of the minds whereby they would conceal the wrongdoing of Defendants FANTIGRASSI, SCHLEIN, and Detectives Boone and Roberson's conduct against Plaintiff.

(D)   As detailed more fully herein, Defendants JENNE, BUTTERWORTH and NAVARRO, for the purpose of financial gain and expansion of the Broward Sheriff's Office, have engaged in a conspiracy to facilitate the affairs of the enterprise conducted through a pattern of racketeering activity, of which the

57

Plaintiff is but one victim, which have a common theme with similar purposes, results, and/or methods of commission, the continuity of which is evidenced herein and threatens to continue into the future.

(E) Defendants JENNE, BUTTERWORTH and NAVARRO have joined in and participated in maintaining and continuing the pattern of criminal conduct of the enterprise from 1979 to the present day.

(F) Defendant NAVARRO, as detailed more specifically herein, from January, 1985 onwards, directly participated in the conspiracy to obstruct justice that resulted in perpetuating and aggravating Plaintiff's continuing injury to business and/or property.

(G) Defendant JENNE, as detailed more specifically herein, from December, 2000 onwards, directly participated in the conspiracy to obstruct justice that resulted in perpetuating and aggravating Plaintiff's continuing injury to business and/or property.

194.    Plaintiff suffered irreparable damages and personal injury in the deprivation of his Fourth, Fifth, Sixth and Fourteenth Amendment rights, having been wrongfully tried for a capital felony and having been wrongfully incarcerated for a period of twenty-two years as a direct result of the continuing pattern and practice of illegal activities as listed above.

195.    In furtherance of this conspiracy to fabricate and tamper with evidence, Defendants FANTIGRASSI and SCHLEIN

58

conspired with Detectives Boone and Roberson to make false statements in reports and under oath in affidavits which caused the indictments to be entered on September 26, 1979 in Broward County and on September 19, 1979 and September 27, 1979 in Dade County, Florida.

(A)    Defendants FANTIGRASSI and SCHLEIN and the above named persons knew that Plaintiff was mentally retarded and therefore not intellectually capable of understanding his Miranda rights or the consequences of abandoning such rights, yet they falsely testified under oath in the prosecution of a capital felony that they did not know Plaintiff was retarded.  These false statements were part of a plan to ensure that the Plaintiff's tape recorded statement, in the form of a coerced false confession, and the only evidence against him, would be admissible in court.

(B) Defendants FANTIGRASSI and SCHLEIN and the above named persons further falsely testified that Plaintiff had made a free and deliberate choice to waive his rights and make said statement, when in fact they knew that said confession was coerced by intimidation and deception and therefore inadmissible.

(C) From September 5 to September 10, 1979, for long periods in duration, Defendants FANTIGRASSI and SCHLEIN and the above named persons repeatedly interrogated Plaintiff and took him to various crime scenes while further interrogating him,

59

mentally and physically wearing Plaintiff down to the point he was crying and vomiting.

(D) From July 11 to July 21, 1980 and earlier, Defendants FANTIGRASSI and SCHLEIN and the above named persons further gave false testimony as to alleged material facts and statements allegedly made by Plaintiff not on the tape recorded statement and/or not included in any report made at the time of the arrest and interrogation.

(E) Defendants FANTIGRASSI and SCHLEIN both went to Chicago to investigate Plaintiff's alibi, placing him in Chicago at the time of the murders in Florida for which he was charged. Plaintiff had six alibi witnesses who placed him in Chicago for this entire time period. These witnesses included Plaintiff's aunt, uncle, employers and neighbors. Defendant FANTIGRASSI, without basis, testified that all six witnesses were either lying or mistaken. Defendant FANTIGRASSI then testified as to his numerous theories and assumptions in an attempt to explain away Plaintiff's corroborated alibi, stating that Plaintiff, a mentally retarded person, could have taken a bus to Florida and arrive in time to commit the first crime on June 29, 1973, returned to Chicago and traveled back and forth from Illinois to Florida each time to commit the crimes. Apart from the six alibi witnesses that place Plaintiff in Chicago during this entire period, there was also documentation that Plaintiff was in

60

Chicago on or before September 22, 1973. Defendant FANTIGRASSI then testified that there were some murders of prostitutes in Chicago during the fall of 1973 and attempted to implicate Plaintiff in those crimes.

(F) From July 11 to July 21, 1980 and earlier, Defendants FANTIGRASSI and SCHLEIN and the above named persons conspired to continue to make false statements under oath when they knew or should have known that Plaintiff was not the perpetrator of the crimes for which he was charged.

(G) From August 1979 to the close of trial on or about July 31, 1980, Defendants BUTTERWORTH, FANTIGRASSI and SCHLEIN and the above named persons had available detailed reports and evidence from the Fort Lauderdale Police Department and/or the Broward County Sheriff's Office as to the actual perpetrator, Mosley.

(H) Defendant FANTIGRASSI, having arrested, interrogated and released the actual perpetrator, furthered this conspiracy by falsely testifying that said actual perpetrator was not a suspect because the actual perpetrator's parents were impressive and believable when they proclaimed their son's innocence.

196. Defendants FANTIGRASSI and SCHLEIN conspired with Detectives Boone and Roberson to make two or more material statements, under oath in an official proceeding and in affidavits prior to an official proceeding, relating to the

61

prosecution of a capital felony, which contradicted each other. From July 11 to July 21, 1980 and earlier, Defendants FANTIGRASSI and SCHLEIN and the above named persons, in furtherance of this conspiracy to fabricate and tamper with evidence, repeatedly made material statements under oath, which contradicted each other:

(A)   Defendant SCHLEIN testified that Plaintiff was mentally retarded and that other persons had the opinion that Plaintiff was mentally retarded. Defendant SCHLEIN later falsely testified that Plaintiff was not mentally retarded and attempted to explain this statement by stating that Plaintiff's speech impediment made him appear to be mentally retarded.

(B)   Defendant FANTIGRASSI testified that Plaintiff's thought process was slow and then attempted to explain this statement by stating that Plaintiff's speech impediment was the cause of the apparent mental slowness.

(C)   Neither Defendant FANTIGRASSI or SCHLEIN or the above named persons made any attempt to ascertain whether Plaintiff, who appeared to be and is mentally retarded, was intellectually capable of understanding his Miranda rights and/or the consequences of abandoning such rights before they conspired to coerce Plaintiff's confession on a tape recorded statement without his representation by an attorney.

197.   From July 11 to July 21, 1980, Defendants FANTIGRASSI and SCHLEIN conspired with Detectives Boone and Roberson, as part

62

of a common plan, to close all of their unsolved case files on a series of well publicized and possibly related murders by making false and/or contradictory statements under oath prior to and in an official proceeding relating to the prosecution of a capital felony.

198.   Plaintiff was injured in his business and property in the form of lost employment, employment opportunities, wages and other compensation, as well as actual physical harm, as a direct result of the predicate acts involved in this continuing pattern and practice of illegal activities as listed above and by reason of the above violation of 18 U.S.C. §1962(d).

**WHEREFORE**, the Plaintiff JERRY FRANK TOWNSEND demands judgment against Defendants individually, jointly and severally, in an amount that is adjudged as fair and reasonable, treble damages, plus costs, disbursements, reasonable attorney's fees, interest, and whatever other relief the Court deems just and equitable.

### COUNT IX
### RICO - VIOLATION OF 18 U.S.C. §1962 (b)
### CLAIM AGAINST DEFENDANTS BUTTERWORTH, JENNE, FANTIGRASSI AND SCHLEIN

199.   The Plaintiff JERRY FRANK TOWNSEND, as to Defendants FANTIGRASSI and SCHLEIN, realleges paragraphs 1 through 34, 36 through 80, 83 through 85, 87 through 97, and 131 through 137; as

63

to Defendant BUTTERWORTH: realleges paragraphs 1 through 97, 122 through 124, 131 through 137; as to Defendant NAVARRO: realleges paragraphs 1 through 38, 41 through 47, 56, 65 through 86, 97 through 102, 106, 109 through 110, 112 through 116, 118 through 124, 131 through 137; as to Defendant JENNE: realleges paragraphs 1 through 34, 36 through 37, 41 through 47, 52 through 53, 65 through 86, 97, 100 through 101, 103 through 111, 116 through 117, 121 through 124, 131 through 137.

200. In violation of 18 U.S.C. §1962 (b), Defendants BUTTERWORTH, FANTIGRASSI and SCHLEIN conspired with Detectives Boone and Roberson to maintain control of an enterprise through a pattern of racketeering activity.

201. Predicate acts 5(a) through (c), in violation of 18 U.S.C. §§1503 and 1512 relating to the obstruction of justice, from September 6, 1979 through to the end of trial on or about July 31, 1980, Defendants FANTIGRASSI and SCHLEIN conspired with Detective Boone and Roberson, utilizing the state and interstate telephone system and making interstate telephone calls in furtherance of a continuing pattern and practice of racketeering activities with the purpose of defrauding depriving Plaintiff of his constitutional rights and to defraud the legal system.

(A) Defendants FANTIGRASSI and SCHLEIN and the above named persons, in furtherance of their conspiracy to fabricate evidence in the form of a tape recorded statement, utilized the

64

telephone system to aid and abet each other to acquire and maintain control of the association-in-fact enterprise with the common plan of fabricating and tampering with evidence, withholding or concealing other evidence and aligning their false testimony to support said fabricated evidence.

(B) Defendants FANTIGRASSI and SCHLEIN also utilized the interstate telephone system and made interstate telephone calls in furtherance of said conspiracy.

(C) Defendants FANTIGRASSI and SCHLEIN also traveled interstate in furtherance of said conspiracy to obstruct justice.

202. From September 6, 1979 through to the end of trial on or about July 31, 1980, Defendants FANTIGRASSI and SCHLEIN conspired with Detectives Boone and Roberson, to corruptly influence, obstruct, and impede the due administration of justice, thereby satisfying the Predicate acts 6 (a) through (d), in violation of 18 U.S.C. §§1503 and 1512 relating to the obstruction of justice.

(A) From September 6, 1979 to September 10, 1979, Defendants FANTIGRASSI and SCHLEIN conspired with each other and/or the above named persons to fabricate, tamper with and conceal evidence as detailed herein for the purpose of corruptly influencing the due administration of justice.

(B) From July 11 to July 29, 1980 and earlier, in furtherance of this conspiracy to fabricate and tamper with

65

evidence, Defendants FANTIGRASSI and SCHLEIN conspired with each other and/or the above named persons to make false statements in reports and under oath in affidavits and in an official proceeding relating to the prosecution of a capital felony, as detailed herein, for the purpose of corruptly influencing the due administration of justice.

(C) From September 6, 1979 to July 15, 1980, Defendants FANTIGRASSI and SCHLEIN conspired to tamper with witnesses, as detailed herein, for the purpose of corruptly influencing the due administration of justice.

(D) Defendants BUTTERWORTH and JENNE engaged in or joined in the conspiracy to conceal the criminal conduct of their agents, Defendants FANTIGRASSI and SCHLEIN, aided and abetted the concealment of criminal conduct, aided and abetted the furtherance of the criminal conduct, failed to report the criminal conduct of Defendants FANTIGRASSI and SCHLEIN, obstructed justice, obstructed a criminal investigation, evaded criminal and/or civil prosecution and liability, in furtherance of the racketeering conspiracy and enterprise.

(E) In furtherance of the affairs of the enterprise and as part of the conspiracy to cover up the illegal acts of Defendants FANTIGRASSI and SCHLEIN, Defendant JENNE, as detailed more specifically herein, has continued to participate in the ongoing obstruction of justice by intentionally failing to

66

investigate the criminal actions of his agents withholding, concealing and/or destroying evidence and records pertaining to the illegal conduct of their agents against Plaintiff and others and, instead of taking any disciplinary action whatsoever, has promoted Defendant FANTIGRASSI to head of BSO's Homicide Unit.

203.   From September 6, 1979 through to the end of trial on or about July 31, 1980, Defendants FANTIGRASSI and SCHLEIN conspired to corruptly persuade other persons with the intent to influence the testimony of said other persons in an official proceeding, thereby satisfying the predicate acts 7 (A) through (E), in violation of 18 U.S.C. §1512 relating to tampering with a witness.

(A) There were no eyewitnesses to any of the crimes for which Plaintiff was charged and convicted.  A composite drawing of a man seen in the area of the crimes had been made and circulated in the neighborhood of the crimes.  After Plaintiff's arrest and considerable press coverage, Defendants FANTIGRASSI and SCHLEIN showed Plaintiff's photograph to various witnesses as part of a photo lineup.

(B)  Defendant FANTIGRASSI testified that he and Defendant SCHLEIN had shown one witness a photo lineup on May 1, 1980 and that she had selected the Plaintiff as a man who had assaulted her.  In fact, said witness, having previously described the man as tall and dark skinned, testified that

67

Defendant FANTIGRASSI had shown her the photo lineup three times and that she had expressed her lack of certainty.

(C) Defendant FANTIGRASSI testified that he had shown the photo lineup to another witness on July 1, 1980, and that she had selected the Plaintiff as a person she had seen in the vicinity of one of the crimes. In fact, said witness had previously described a person she had seen as stout, dressed as a woman with a wig, and that she could not see the face or even be sure if the person was a man or a woman.

(D) Defendant FANTIGRASSI falsely testified that he had shown the two above named witnesses the photo lineup on May 1, 1980 and July 1, 1980 respectively. Defendant FANTIGRASSI testified that both witnesses had positively identified Plaintiff at that time. Said testimony was in conflict with the actual testimony of the witnesses and the evidence.

(E) Defendants FANTIGRASSI and SCHLEIN conspired to illegally influence the testimony of the witnesses in an official proceeding relating to the prosecution of a capital felony.

204. Plaintiff was injured in his business and property in the form of lost employment, employment opportunities, wages and other compensation, as well as actual physical harm, as a direct result of the predicate acts involved in this continuing pattern and practice of illegal activities as listed above and by reason of the above violation of 18 U.S.C. §1962(b).

68

**WHEREFORE**, the Plaintiff JERRY FRANK TOWNSEND demands judgment against Defendants, individually, jointly and severally, in an amount that is adjudged as fair and reasonable, treble damages, plus costs, disbursements, reasonable attorney's fees, interest, and whatever other relief the Court deems just and equitable.

## COUNT X
### RICO - VIOLATION OF 18 U.S.C. §1962 (c)
### CLAIM AGAINST DEFENDANTS BUTTERWORTH, NAVARRO, JENNE, FANTIGRASSI AND SCHLEIN

205. The Plaintiff JERRY FRANK TOWNSEND, as to Defendants FANTIGRASSI and SCHLEIN, realleges paragraphs 1 through 34, 36 through 80, 83 through 85, 87 through 97, and 131 through 137; as to Defendant BUTTERWORTH: realleges paragraphs 1 through 97, 122 through 124, 131 through 137; as to Defendant NAVARRO: realleges paragraphs 1 through 38, 41 through 47, 56, 65 through 86, 97 through 102, 106, 109 through 110, 112 through 116, 118 through 124, 131 through 137; as to Defendant JENNE: realleges paragraphs 1 through 34, 36 through 37, 41 through 47, 52 through 53, 65 through 86, 97, 100 through 101, 103 through 111, 116 through 117, 121 through 124, 131 through 137; as to Defendants FANTIGRASSI, SCHLEIN, BUTTERWORTH, NAVARRO and JENNE, realleges paragraphs 167 through 173, and 199 through 204.

69

206. The relationship between Defendants FANTIGRASSI, SCHLEIN and Detectives James E. Boone and Bruce Roberson, former police officers for the City of Miami Police Department, constitutes an association-in-fact enterprise under 18 U.S.C. §1961(4) and the above named persons have engaged in a pattern of conspiracy and racketeering activities in violation of 18 U.S.C. §1962, et. seq.

207. In violation of 18 U.S.C. §1962(c), Defendants FANTIGRASSI and SCHLEIN conspired with Detectives Boone and Roberson to participate in the affairs of an enterprise through a pattern of racketeering activity and predicate acts as herein described. The persons named above aided and abetted each other, conducted and participated directly or indirectly in the conduct and affairs of the enterprise and/or associated themselves with the enterprise through a pattern of racketeering activity by the predicate acts listed herein. Those specific acts included racketeering and conspiracy, and were of an ongoing nature continuing into the future.

208. Defendant BUTTERWORTH was part of the conspiracy and the enterprise at all times material herein.

209. Defendants BUTTERWORTH, FANTIGRASSI, SCHLEIN and Detectives Boone and Roberson, in concert with each other and with the intent to conceal and defraud, conspired and came to a meeting of the minds whereby they would conceal the wrongdoing of

70

Defendants FANTIGRASSI, SCHLEIN and Detectives Boone and Roberson's conduct against Plaintiff.

210.  As detailed more fully herein, Defendants BUTTERWORTH, NAVARRO and JENNE, for the purpose of financial gain and expansion of the Broward County Sheriff's Office, have committed various proscribed acts of obstruction of justice and engaged in a pattern of racketeering activity, of which the Plaintiff is but one victim, which have a common theme with similar purposes, results, and/or methods of commission, the continuity of which is evidenced herein and threatens to continue into the future.

211. Defendants BUTTERWORTH, NAVARRO and JENNE have joined in and participated in maintaining and continuing the pattern of criminal conduct of the enterprise from 1979 to the present day.

212. Defendant NAVARRO, as detailed more specifically herein, joined in and directly participated in maintaining and continuing the pattern of criminal conduct of the enterprise from January, 1985 to the present day.

213. Defendant JENNE, as detailed more specifically herein, joined in and directly participated in maintaining and continuing the pattern of criminal conduct of the enterprise from January, 1993 to the present day.

214. Defendants NAVARRO and JENNE, from January 1985 and December, 2000, during their respective terms as Sheriff of Broward County, as detailed more specifically herein, concealed

71

and/or destroyed evidence and records pertaining to their agents'
illegal conduct against Plaintiff and deliberately and knowingly
continued the wrongful detention and/or delayed the release of
Plaintiff, thereby causing additional and separate injuries to
the business or property of Plaintiff, in violation of 18 U.S.C.
§1962(c).

215. Plaintiff was injured in his business and property in
the form of lost employment, employment opportunities, wages and
other compensation, as well as actual physical harm, as a direct
result of the predicate acts involved in this continuing pattern
and practice of illegal activities as listed above and by reason
of the above violation of 18 U.S.C. §1962(c).

**WHEREFORE,** the Plaintiff JERRY FRANK TOWNSEND demands
judgment against Defendants, individually, jointly and severally,
in an amount that is adjudged as fair and reasonable, treble
damages, plus costs, disbursements, reasonable attorney's fees,
interest, and whatever other relief the Court deems just and
equitable.

**WE HEREBY CERTIFY** that a true copy of the foregoing Third Amended Complaint was furnished via U.S. Mail to:  Richard A. Beauchamp, Esq. of PANZA, MAURER & MAYNARD, P.A., 3600 N. Federal Highway, Third Floor, Fort Lauderdale, FL  33308 this _19th_ day of May, 2004.

                    HEYER & ASSOCIATES, P.A.
                    Attorney for Plaintiff
                    1311 SE 4th Avenue
                    Fort Lauderdale, FL 33316
                    (954) 522-4922/(561) 833-1068
                    Fax: (954) 522-4955


          BY: _____
                    BARBARA A. HEYER
                    BAR NO.  346691

73

**Crum&Forster**
**Insurance**

PXL 801116

# PUBLIC ENTITY EXCESS
## LIABILITY POLICY DECLARATIONS

| | |
|---|---|
| Renewal of: | PXL 801061 |

| | |
|---|---|
| Policy No : | 544-000008-6 |

Named Insured and Mailing Address: Broward County Sheriff's Office
PO Box 9507
Fort Lauderdale, FL  33310

Policy Period:    From   10/1/1999  10/1/20002  at 12:01 am Standard Time at your mailing address shown above

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy

Only a Coverage Form marked below with an "X" is part of this policy on its effective date:

☒ Excess General Liability
☒ Excess Automobile   *1

Defense Costs/Claims Expenses are included in the Limit:

| Limit of Insurance: | Each Accident or Occurrence Limit | $ See Endorsement |
|---|---|---|
| | Policy Aggregate Limit | $ See Endorsement |
| Self-Insured Limit Retention | | $ See Endorsement |

Advanced Premium
☒ Flat   ☐ Adjustable (see Premium Adjustment Endorsement)

Endorsements attached to this Policy: FM 206 12; CA 0001; CG-0001; CG 2160; CG 2135; IL 0017; IL 0021; CG 0220; FM 117 0 15; FM 117 0 16; FM 117 0 17; FM 117 0 22; FM 117 0 27; FM 117 0 28; FM 117 0 29; FM 2 0 775; FM GEN 01; FM GEN 02

Countersigned: _____

By _____
Authorized Representative

FM 117 0 27 (3/99)

C
ALL-STATE® INTERNATIONAL


**Crum&Forster**
**Insurance**

# THE NORTH RIVER INSURANCE COMPANY

PUBLIC ENTITY EXCESS LIABILITY FORMS

BROWARD COUNTY SHERIFF'S OFFICE

Policy Number: 544-000008-6

| FM 206.12 | (09/96) | Company Identification Page |
|---|---|---|
| CA 00 01 | (12/92) | ISO Business Auto Coverage Form |
| CG 00 01 | (11/88) | ISO General Liability Coverage Form |
| CG 2160 | (04/98) | ISO Exclusion Year –2000 Computer-related and Other Electronic Problems |
| CG 2135 | (01/87) | Exclusion – Coverage C—Medical Payments |
| IL 0017 | (11/85) | ISO Commmon Policy Conditions |
| IL 0021 | (11/85) | ISO Nuclear Energy Liability Exclusion Endorsement |
| CG 0220 | (07/92) | Florida Cancellation and Nonrenewal |
| FM 117.0.15 | (03/99) | SIR Endorsement |
| FM 117.0.16 | (03/99) | Municipality Endorsement |
| FM 117.0.17 | (03/99) | Personal Injury Protection Exclusion |
| FM 117.0.22 | (03/99) | Limited Personal Injury Liability Coverage |
| FM 117.0.27 | (03/99) | Declarations Page |
| FM 117.0.28 | (03/99) | Employee Benefits Liability Coverage |
| FM 117.0.29 | (03/99) | Public Officials and Employees Liability Insurance (Optional) |
| FM 2.0.775 | (02/96) | Consumer Complaint Notice |
| FM GEN 01 | (10/99) | General Endorsement |
| FM GEN 02 | (10/99) | General Endorsement |



RXL 801116

## Company Identification Page

The North River Insurance Company
A New Jersey Corporation
Home Office: Township of Morris, NJ

( A Capital Stock Company)

WE HAVE PROPERLY ISSUED THIS POLICY, BUT IT WILL NOT BE VALID
UNLESS COUNTERSIGNED ON THE COMMON DECLARATIONS PAGE BY ONE
OF OUR AUTHORIZED REPRESENTATIVES.

SIGNATURE

Valerie J. Gasparik
Secretary

SIGNATURE

James A. Stark
Chairman of the Board

FM 206 0 12 (9/96)

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict cov-
erage. Read the entire policy carefully to de-
termine rights, duties and what is and is not
covered.

Throughout this policy the words "you" and
"your" refer to the Named Insured shown in the
Declarations, and any other person or organ-
ization qualifying as a Named Insured under this
policy. The words "we," "us" and "our" refer to
the company providing this insurance.

The word "insured" means any person or or-
ganization qualifying as such under WHO IS AN
INSURED (SECTION II).

Other words and phrases that appear in quo-
tation marks have special meaning. Refer to
DEFINITIONS (SECTION V).

## SECTION I - COVERAGES

### COVERAGE A. BODILY INJURY AND PROP-
ERTY DAMAGE LIABILITY

1. **Insuring Agreement.**

   a. We will pay those sums that the insured
   becomes legally obligated to pay as
   damages because of "bodily injury" or
   "property damage" to which this insurance
   applies. We will have the right and duty
   to defend any "suit" seeking those dam-
   ages. We may at our discretion investigate
   any "occurrence" and settle any claim or
   "suit" that may result. But

      (1) The amount we will pay for damages
      is limited as described in LIMITS OF
      INSURANCE (SECTION III); and

      (2) Our right and duty to defend end when
      we have used up the applicable limit
      of insurance in the payment of judg-
      ments or settlements under Coverages
      A or B or medical expenses under
      Coverage C.

      No other obligation or liability to pay
      sums or perform acts or services is
      covered unless explicitly provided for
      under SUPPLEMENTARY PAYMENTS –
      COVERAGES A AND B.

   b. This insurance applies to "bodily injury"
   and "property damage" only if:

      (1) The "bodily injury" or "property dam-
      age" is caused by an "occurrence" that
      takes place in the "coverage territory;"
      and

      (2) The "bodily injury" or "property dam-
      age" occurs during the policy period.

   c. Damages because of "bodily injury" in-
   clude damages claimed by any person or
   organization for care, loss of services
   or death resulting at any time from the
   "bodily injury."

2. **Exclusions.**

   This insurance does not apply to:

   a. "Bodily injury" or "property damage" ex-
   pected or intended from the standpoint
   of the insured. This exclusion does not
   apply to "bodily injury" resulting from the
   use of reasonable force to protect per-
   sons or property.

   b. "Bodily injury" or "property damage" for
   which the insured is obligated to pay
   damages by reason of the assumption of
   liability in a contract or agreement. This
   exclusion does not apply to liability for
   damages:

      (1) Assumed in a contract or agreement
      that is an "insured contract," provided
      the "bodily injury" or "property dam-
      age" occurs subsequent to the exe-
      cution of the contract or agreement;
      or

      (2) That the insured would have in the
      absence of the contract or agreement.

   c. "Bodily injury" or "property damage" for
   which any insured may be held liable by
   reason of:

      (1) Causing   or   contributing   to   the
      intoxication of any person;

      (2) The furnishing of alcoholic beverages
      to a person under the legal drinking
      age or under the influence of alcohol;
      or

      (3) Any statute, ordinance or regulation
      relating to the sale, gift, distribution
      or use of alcoholic beverages.

      This exclusion applies only if you are in
      the business of manufacturing, distribut-
      ing, selling, serving or furnishing alcoholic
      beverages.

          Copyright, Insurance Services Office, Inc., 1988, 1991

d. Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. "Bodily injury" to:

(1) An employee of the insured arising out of and in the course of employment by the insured; or

(2) The spouse, child, parent, brother or sister of that employee as a consequence of (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

f.(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

(i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

g. "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

Copyright, Insurance Services Office, Inc., 1988, 1991     CG 00 01 11 88

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

    (a) Less than 26 feet long; and

    (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph f.(2) or f.(3) of the definition of "mobile equipment" (Section V.8.).

h. "Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice or preparation for, a prearranged racing, speed or demolition contest or in any stunting activity.

i. "Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

j. "Property damage" to:

(1) Property you own, rent, or occupy;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

k. "Property damage" to "your product" arising out of it or any part of it.

l. "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n. Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product;"

(2) "Your work;" or.

(3) "Impaired property;"

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions c. through n. do not apply to damage by fire to premises rented to you. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (SECTION III).

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement.

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this coverage part applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But

(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

b. This insurance applies to:

(1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

but only if the offense was committed in the "coverage territory" during the policy period.

2. Exclusions.

This insurance does not apply to:

a. "Personal injury" or "advertising injury:"

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

(4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

b. "Advertising injury" arising out of:

(1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

Copyright, Insurance Services Office, Inc., 1988, 1991     CG 00 01 11 88

(2) The failure of goods, products or services to conform with advertised quality or performance;

(3) The wrong description of the price of goods, products or services; or

(4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

## COVERAGE C. MEDICAL PAYMENTS

1. Insuring Agreement.

a. We will pay medical expenses as described below for "bodily injury" caused by an accident.

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. Exclusions.

We will not pay expenses for "bodily injury:"

a. To any insured.

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

d. To a person, whether or not an employee of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. To a person injured while taking part in athletics.

f. Included within the "products-completed operations hazard."

g. Excluded under Coverage A.

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

We will pay, with respect to any claim or "suit" we defend:

1. All expenses we incur.

2. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

3. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $100 a day because of time off from work.

5. All costs taxed against the insured in the "suit."

6. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

   a. Your employees, other than your executive officers, but only for acts within the scope of their employment by you. However, no employee is an insured for:

      (1) "Bodily injury" or "personal injury" to you or to a co-employee while in the course of his or her employment, or the spouse, child, parent, brother or sister of that co-employee as a consequence of such "bodily injury" or "personal injury," or for any obligation to share damages with or repay someone else who must pay damages because of the injury; or

      (2) "Bodily injury" or "personal injury" arising out of his or her providing or failing to provide professional health care services; or

      (3) "Property damage" to property owned or occupied by or rented or loaned to that employee, any of your other employees, or any of your partners

or members (if you are a partnership or joint venture).

   b. Any person (other than your employee), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

   a. "Bodily injury" to a co-employee of the person driving the equipment; or

   b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

Copyright, Insurance Services Office, Inc., 1988, 1991     CG 00 01 11 88

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits.".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products–completed operations hazard;" and

   c. Damages under Coverage B.

3. The Products–Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products–completed operations hazard."

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence."

6. Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises rented to you arising out of any one fire.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The limits of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. Bankruptcy.

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. Duties In The Event Of Occurrence, Claim Or Suit.

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation, settlement or defense of the claim or "suit;" and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. Legal Action Against Us.

No person or organization has a right under this Coverage Part

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. Other Insurance.

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected

unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

b. Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work;"

(2) That is Fire insurance for premises rented to you; or

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

Copyright, Insurance Services Office, Inc. 1988, 1991     CG 00 01 11 85

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. **Premium Audit.**

   a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

   b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

   c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. **Representations.**

   By accepting this policy, you agree:

   a. The statements in the Declarations are accurate and complete;

   b. Those statements are based upon representations you made to us; and

   c. We have issued this policy in reliance upon your representations.

7. **Separation Of Insureds.**

   Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

   a. As if each Named Insured were the only Named Insured; and

   b. Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us.**

   If the insured has rights to recover all or part of any payment we have made under this Coverage

Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew.**

   If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

   If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertising injury" means injury arising out of one or more of the following offenses:

   a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   b. Oral or written publication of material that violates a person's right of privacy;

   c. Misappropriation of advertising ideas or style of doing business; or

   d. Infringement of copyright, title or slogan.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

   c. All parts of the world if:

      (1) The injury or damage arises out of:

         (a) Goods or products made or sold by you in the territory described in a. above; or

(b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

(2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement

6. "Insured contract" means:

a. A lease of premises;

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

An "insured contract" does not include that part of any contract or agreement:

a. That indemnifies any person or organization for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

b. That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(1) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

(2) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

c. Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in b. above and supervisory, inspection or engineering services; or

d. That indemnifies any person or organization for damage by fire to premises rented or loaned to you.

7. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto;"

b. While it is in or on an aircraft, watercraft or "auto;" or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

8. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

Copyright, Insurance Services Office, Inc., 1988, 1991

CG 00 01 11 88

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   (1) Power cranes, shovels, loaders, diggers or drills; or

   (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a, b, c, or d, above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   (2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a, b, c or d above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos:"

   (1) Equipment designed primarily for:

      (a) Snow removal;

      (b) Road maintenance, but not construction or resurfacing;

      (c) Street cleaning;

   (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

9. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

10. "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e. Oral or written publication of material that violates a person's right of privacy.

11.a. "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except

   (1) Products that are still in your physical possession; or

   (2) Work that has not yet been completed or abandoned.

b. "Your work" will be deemed completed at the earliest of the following times:

   (1) When all of the work called for in your contract has been completed.

   (2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

   (3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

c. This hazard does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials;

**(3)** Products or operations for which the classification in this Coverage Part or in our manual of rules includes products or completed operations.

**12.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

**13.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

**14.** "Your product" means:

**a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(1)** You;

**(2)** Others trading under your name; or

**(3)** A person or organization whose business or assets you have acquired; and

**b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;" and

**b.** The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**15.** "Your work" means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

**b.** The providing of or failure to provide warnings or instructions.

Copyright, Insurance Services Office, Inc., 1988, 1991   CG 00 01 11 88

Crum&Forster
Insurance

CA 00 01 12 92

# BUSINESS AUTO COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION V - DEFINITIONS.

## SECTION I - COVERED AUTOS

ITEM TWO of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos." The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos."

### A. DESCRIPTION OF COVERED AUTO DESIGNATION SYMBOLS

| SYMBOL | DESCRIPTION |
|---|---|

1 = ANY "AUTO."

2 = OWNED "AUTOS" ONLY. Only those "autos" you own (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" you acquire ownership of after the policy begins.

3 = OWNED PRIVATE PASSENGER "AUTOS" ONLY. Only the private passenger "autos" you own. This includes those private passenger "autos" you acquire ownership of after the policy begins.

4 = OWNED "AUTOS" OTHER THAN PRIVATE PASSENGER "AUTOS" ONLY. Only those "autos" you own that are not of the private passenger type (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" not of the private passenger type you acquire ownership of after the policy begins.

5 = OWNED "AUTOS" SUBJECT TO NO-FAULT. Only those "autos" you own that are required to have No-Fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the policy begins provided they are required to have No-Fault benefits in the state where they are licensed or principally garaged.

6 = OWNED "AUTOS" SUBJECT TO A COMPULSORY UNINSURED MOTORISTS LAW. Only those "autos" you own that because of the law in the state where they are licensed or principally garaged are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement.

7 = SPECIFICALLY DESCRIBED "AUTOS." Only those "autos" described in ITEM THREE of the Declarations for which a premium charge is shown (and for Liability Coverage any "trailers" you don't own while attached to any power unit described in ITEM THREE).

8 = HIRED "AUTOS" ONLY. Only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent, or borrow from any of your employees or partners or members of their households.

9 = NONOWNED "AUTOS" ONLY. Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your employees or partners or members of their households but only while used in your business or your personal affairs.

### B. OWNED AUTOS YOU ACQUIRE AFTER THE POLICY BEGINS

1. If symbols 1, 2, 3, 4, 5 or 6 are entered next to a coverage in ITEM TWO of the Declarations, then you have coverage for "autos" that you acquire of the type described for the remainder of the policy period.

CA 00 01 12 92

2. But, if symbol 7 is entered next to a coverage in ITEM TWO of the Declarations, an "auto" you acquire will be a covered "auto" for that coverage only if:

a. We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and

b. You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

C. CERTAIN TRAILERS, MOBILE EQUIPMENT AND TEMPORARY SUBSTITUTE AUTOS

If Liability Coverage is provided by this Coverage Form, the following types of vehicles are also covered "autos" for Liability Coverage:

1. "Trailers" with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

2. "Mobile equipment" while being carried or towed by a covered "auto."

3. Any "auto" you do not own while used with the permission of its owner as a temporary substitute for a covered "auto" you own that is out of service because of its:

a. Breakdown;

b. Repair;

c. Servicing;

d. "Loss"; or

e. Destruction.

## SECTION II - LIABILITY COVERAGE

A. COVERAGE

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos." However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident."

We have the right and duty to defend any "suit" asking for such damages or a "covered pollution cost or expense." However, we have no duty to defend "suits" for "bodily injury" or "property damage" or a "covered pollution cost or expense" not covered by this Coverage Form. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

1. WHO IS AN INSURED

The following are "insureds":

a. You for any covered "auto."

b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except

(1) The owner or anyone else from whom you hire or borrow a covered "auto." This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.

(2) Your employee if the covered "auto" is owned by that employee or a member of his or her household.

(3) Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing or parking "autos" unless that business is yours.

(4) Anyone other than your employees, partners, a lessee or borrower or any of their employees, while moving property to or from a covered "auto."

(5) A partner of yours for a covered "auto" owned by him or her or a member of his or her household.

Copyright, Insurance Services Office, Inc., 1990, 1992
CA 00 01 12 92

Crum&Forster
Insurance

CA 00 01 12 92

c. Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

2. COVERAGE EXTENSIONS

a. Supplementary Payments In addition to the Limit of Insurance, we will pay for the "insured":

(1) All expenses we incur.

(2) Up to $250 for cost of bail bonds (including bonds for related traffic law violations) required because of an "accident" we cover. We do not have to furnish these bonds.

(3) The cost of bonds to release attachments in any "suit" we defend, but only for bond amounts within our Limit of Insurance.

(4) All reasonable expenses incurred by the "insured" at our request, including actual loss of earning up to $100 a day because of time off from work.

(5) All costs taxed against the "insured" in any "suit" we defend.

(6) All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

b. Out-of-State Coverage Extensions.

While a covered "auto" is away from the state where it is licensed we will:

(1) Increase the Limit of Insurance for Liability Coverage to meet the limits specified by a compulsory or financial responsibility law of the jurisdiction where the covered "auto" is being used. This extension does not apply to the limit or limits specified by any law governing motor carriers of passengers or property.

(2) Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered "auto" is being used.

We will not pay anyone more than once for the same elements of loss because of these extensions.

B. EXCLUSIONS

This insurance does not apply to any of the following:

1. EXPECTED OR INTENDED INJURY

"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured."

2. CONTRACTUAL

Liability assumed under any contract or agreement.

But this exclusion does not apply to liability for damages:

a. Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

b. That the "insured" would have in the absence of the contract or agreement.

3. WORKERS' COMPENSATION

Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

4. EMPLOYEE INDEMNIFICATION AND EMPLOYER'S LIABILITY

"Bodily injury" to:

a. An employee of the "insured" arising out of and in the course of employment by the "insured"; or

b. The spouse, child, parent, brother or sister of that employee as a consequence of paragraph a. above.

This exclusion applies:

(1) Whether the "insured" may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

But this exclusion does not apply to "bodily injury" to domestic employees not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract."

CA 00 01 12 92

5. **FELLOW EMPLOYEE**

"Bodily injury" to any fellow employee of the "insured" arising out of and in the course of the fellow employee's employment.

6. **CARE, CUSTODY OR CONTROL**

"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

7. **HANDLING OF PROPERTY**

"Bodily injury" or "property damage" resulting from the handling of property:

a. Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

b. After it is moved from the covered "auto" to the place where it is finally delivered by the "insured."

8. **MOVEMENT OF PROPERTY BY MECHANICAL DEVICE**

"Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto."

9. **OPERATIONS**

"Bodily injury" or "property damage" arising out of the operation of any equipment listed in paragraphs 6.b. and 6.c. of the definition of "mobile equipment."

10. **COMPLETED OPERATIONS**

"Bodily injury" or "property damage" arising out of your work after that work has been completed or abandoned.

In this exclusion, your work means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in paragraphs a. or b. above.

Your work will be deemed completed at the earliest of the following times:

(1) When all of the work called for in your contract has been completed.

(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

11. **POLLUTION**

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

a. That are, or that are contained in any property that is:

(1) Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

(2) Otherwise in the course of transit by or on behalf of the "insured"; or

(3) Being stored, disposed of, treated or processed in or upon the covered "auto";

b. Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

c. After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured."

Copyright, Insurance Services Office, Inc., 1990, 1992    CA 00 01 12 92

Crum&Forster
Insurance

CA 00 01 12 92

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

(1) The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

(2) The "bodily injury," "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment."

Paragraphs **b.** and **c.** above of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

(1) The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

(2) The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**12. WAR**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**C. LIMIT OF INSURANCE**

Regardless of the number of covered "autos," "insureds," premiums paid, claims made or vehicles involved in the "accident," the most we will pay for the total of all damages and "covered pollution cost or expense" combined, resulting from any one "accident" is the Limit of Insurance for Liability Coverage shown in the Declarations.

All "bodily injury," "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident."

## SECTION III – PHYSICAL DAMAGE COVERAGE

**A. COVERAGE**

1. We will pay for "loss" to a covered "auto" or its equipment under:

   a. **Comprehensive Coverage.** From any cause except

      (1) The covered "auto's" collision with another object; or

      (2) The covered "auto's" overturn.

   b. **Specified Causes of Loss Coverage.** Caused by:

      (1) Fire, lightning or explosion;

      (2) Theft;

      (3) Windstorm, hail or earthquake;

      (4) Flood;

      (5) Mischief or vandalism; or

      (6) The sinking, burning, collision or derailment of any conveyance transporting the covered "auto."

   c. **Collision Coverage.** Caused by:

      (1) The covered "auto's" collision with another object; or

      (2) The covered "auto's" overturn.

2. **Towing.**

   We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" of the private passenger type is disabled. However, the labor must be performed at the place of disablement.

3. **Glass Breakage – Hitting a Bird or Animal – Falling Objects or Missiles.**

   If you carry Comprehensive Coverage for the damaged covered "auto," we will pay for the following under Comprehensive Coverage:

   a. Glass breakage;

   b. "Loss" caused by hitting a bird or animal; and

   c. "Loss" caused by falling objects or missiles.

   However, you have the option of having glass breakage caused by a covered "auto's" collision or overturn considered a "loss" under Collision Coverage.

CA 00 01 12 92

4. **Coverage Extension.** We will pay up to $15 per day to a maximum of $450 for transportation expense incurred by you because of the total theft of a covered "auto" of the private passenger type. We will pay only for those covered "autos" for which you carry either Comprehensive or Specified Causes of Loss Coverage. We will pay for transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered "auto" is returned to use or we pay for its "loss."

B. **EXCLUSIONS**

1. We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

   a. Nuclear Hazard.

      (1) The explosion of any weapon employing atomic fission or fusion; or

      (2) Nuclear reaction or radiation, or radioactive contamination, however caused.

   b. War or Military Action.

      (1) War, including undeclared or civil war;

      (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

      (3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

2. **Other Exclusions.**

   a. We will not pay for "loss" to any of the following:

      (1) Tape decks or other sound reproducing equipment unless permanently installed in a covered "auto."

      (2) Tapes, records or other sound reproducing devices designed for use with sound reproducing equipment.

      (3) Sound receiving equipment designed for use as a citizens' band radio, two-way mobile radio or telephone or scanning monitor receiver, including its antennas and other accessories, unless permanently installed in the dash or console opening normally used by the "auto" manufacturer for the installation of a radio.

      (4) Equipment designed or used for the detection or location of radar.

   b. We will not pay for "loss" caused by or resulting from any of the following unless caused by other "loss" that is covered by this insurance:

      (1) Wear and tear, freezing, mechanical or electrical breakdown.

      (2) Blowouts, punctures or other road damage to tires.

C. **LIMIT OF INSURANCE**

   The most we will pay for "loss" in any one "accident" is the lesser of:

   1. The actual cash value of the damaged or stolen property as of the time of the "loss"; or

   2. The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

D. **DEDUCTIBLE**

   For each covered "auto," our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to "loss" caused by fire or lightning.

     Copyright, Insurance Services Office, Inc, 1990, 1992     CA 00 01 12 92

Crum&Forster
Insurance

CA 00 01 12 92

# SECTION IV - BUSINESS AUTO CONDITIONS

The following conditions apply in addition to the Common Policy Conditions:

## A. LOSS CONDITIONS

### 1. APPRAISAL FOR PHYSICAL DAMAGE LOSS

If you and we disagree on the amount of "loss," either may demand an appraisal of the "loss." In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss." If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

### 2. DUTIES IN THE EVENT OF ACCIDENT, CLAIM, SUIT OR LOSS

a. In the event of "accident," claim, "suit" or "loss," you must give us or our authorized representative prompt notice of the "accident" or "loss." Include:

(1) How, when and where the "accident" or "loss" occurred;

(2) The "insured's" name and address; and

(3) To the extent possible, the names and addresses of any injured persons and witnesses.

b. Additionally, you and any other involved "insured" must

(1) Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.

(2) Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit."

(3) Cooperate with us in the investigation, settlement or defense of the claim or "suit."

(4) Authorize us to obtain medical records or other pertinent information.

(5) Submit to examination, at our expense, by physicians of our choice, as often as we reasonably require.

c. If there is "loss" to a covered "auto" or its equipment you must also do the following:

(1) Promptly notify the police if the covered "auto" or any of its equipment is stolen.

(2) Take all reasonable steps to protect the covered "auto" from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

(3) Permit us to inspect the covered "auto" and records proving the "loss" before its repair or disposition.

(4) Agree to examinations under oath at our request and give us a signed statement of your answers.

### 3. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Form until:

a. There has been full compliance with all the terms of this Coverage Form; and

b. Under Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

### 4. LOSS PAYMENT - PHYSICAL DAMAGE COVERAGES

At our option we may:

a. Pay for, repair or replace damaged or stolen property;

b. Return the stolen property, at our expense. We will pay for any damage that results to the "auto" from the theft; or

c. Take all or any part of the damaged or stolen property at an agreed or appraised value.

CA 00 01 12 92

**5. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

**B. GENERAL CONDITIONS**

**1. BANKRUPTCY**

Bankruptcy or insolvency of the "insured" or the "insured's" estate will not relieve us of any obligations under this Coverage Form.

**2. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured," at any time, intentionally conceal or misrepresent a material fact concerning:

a. This Coverage Form;

b. The covered "auto";

c. Your interest in the covered "auto"; or

d. A claim under this Coverage Form.

**3. LIBERALIZATION**

If we revise this Coverage Form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

**4. NO BENEFIT TO BAILEE - PHYSICAL DAMAGE COVERAGES**

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this Coverage Form.

**5. OTHER INSURANCE**

a. For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance. However, while a covered "auto" which is a "trailer" is connected to another vehicle, the Liability Coverage this Coverage Form provides for the "trailer" is:

(1) Excess while it is connected to a motor vehicle you do not own.

(2) Primary while it is connected to a covered "auto" you own.

b. For Hired Auto Physical Damage Coverage, any covered "auto" you hire or borrow is deemed to be a covered "auto" you own.

c. Regardless of the provisions of paragraph a. above, this Coverage Form's Liability Coverage is primary for any liability assumed under an "insured contract."

d. When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

**6. PREMIUM AUDIT**

a. The estimated premium for this Coverage Form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any. If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

b. If this policy is issued for more than one year, the premium for this Coverage Form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

    Copyright. Insurance Services Office. Inc., 1990. 1992    CA 00 01 12 92

CrumsForster
Insurance

CA 00 01 12 92

7. **POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Form, we cover "accidents" and "losses" occurring:

a. During the policy period shown in the Declarations; and

b. Within the coverage territory

The coverage territory is:

a. The United States of America;

b. The territories and possessions of the United States of America;

c. Puerto Rico; and

d. Canada.

We also cover "loss" to, or "accidents" involving, a covered "auto" while being transported between any of these places.

8. **TWO OR MORE COVERAGE FORMS OR POLICIES ISSUED BY US**

If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "accident," the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

## SECTION V - DEFINITIONS

A. "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage."

B. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads but does not include "mobile equipment."

C. "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

D. "Covered pollution cost or expense" means any cost or expense arising out of:

1. Any request, demand or order; or

2. Any claim or "suit" by or on behalf of a governmental authority demanding

that the "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

a. That are, or that are contained in any property that is:

(1) Being transported or towed by, handled, or handled for movement into, onto or from the covered "auto";

(2) Otherwise in the course of transit by or on behalf of the "insured";

(3) Being stored, disposed of, treated or processed in or upon the covered "auto"; or

b. Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

c. After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured."

Paragraph a. above does not apply to fuels lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

(1) The "pollutants" escape, seep, migrate or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

(2) The "bodily injury," "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in paragraphs 6.b. or 6.c. of the definition of "mobile equipment."

CA 00 01 12 92

Paragraphs b. and c. above do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

(1) The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

(2) The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

E. "Insured" means any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

F. "Insured contract" means:

1. A lease of premises;

2. A sidetrack agreement;

3. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

4. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

5. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

6. That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your employees, of any "auto." However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your employees to pay for "property damage" to any "auto" rented or leased by you or any of your employees.

An "insured contract" does not include that part of any contract or agreement:

a. That indemnifies any person or organization for "bodily injury" or "property damage" arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road beds, tunnel, underpass or crossing; or

b. That pertains to the loan, lease or rental of an "auto" to you or any of your employees, if the "auto" is loaned, leased or rented with a driver; or

c. That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" over a route or territory that person or organization is authorized to serve by public authority.

G. "Loss" means direct and accidental loss or damage.

H. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

2. Vehicles maintained for use solely on or next to premises you own or rent;

3. Vehicles that travel on crawler treads;

4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

a. Power cranes, shovels, loaders, diggers or drills; or

b. Road construction or resurfacing equipment such as graders, scrapers or rollers.

5. Vehicles not described in paragraphs 1., 2., 3., or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

a. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

b. Cherry pickers and similar devices used to raise or lower workers

     Copyright, Insurance Services Office, Inc., 1990, 1992     CA 00 01 12 92

 Crum&Forster
Insurance

CA 00 01 12 92

6. Vehicles not described in paragraphs 1., 2., 3. or 4. above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

a. Equipment designed primarily for:

(1) Snow removal;

(2) Road maintenance, but not construction or resurfacing; or

(3) Street cleaning;

b. Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

I. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

J. "Property damage" means damage to or loss of use of tangible property.

K. "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," or "covered pollution cost or expense," to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such damages or "covered pollution cost or expense" to which you must submit or submit with our consent.

L. "Trailer" includes semitrailer.


CrumsForster
Insurance

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

CG 21 60 09 98

# EXCLUSION—YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to paragraph 2., Exclusions of Section I—Coverage A—Bodily Injury And Property Damage Liability and paragraph 2., Exclusions of Section I—Coverage B—Personal And Advertising Injury Liability:

2. **Exclusions**

This insurance does not apply to "bodily injury", "property damage", "personal injury", or "advertising injury" (or "personal and advertising injury" if defined as such in your policy) arising directly or indirectly out of:

a. Any actual of alleged failure, malfunction or inadequacy of:

(1) Any of the following, whether belonging to any insured or to others:

(a) Computer hardware, including micro-processors;

(b) Computer application software;

(c) Computer operating systems and re-lated software;

(d) Computer networks;

(e) Microprocessors (computer chips) not part of any computer system; or

(f) Any other computerized or electronic equipment or components; or

(2) Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in paragraph 2.a.(1) of this endorsement

due to the inability to correctly recognize process, distinguish, interpret or accept the year 2000 and beyond.

b. Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in paragraph 2.a. of this endorsement.



POLICY NUMBER:                                      COMMERCIAL GENERAL LIABILITY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION–COVERAGE C–MEDICAL PAYMENTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Description and Location of Premises or Classification:**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any locations or classification shown in the Schedule, coverage C. MEDICAL PAYMENTS (Section I) does not apply and none of the references to it in the Coverage Part apply.

The following is added to SUPPLEMENTARY PAYMENTS (Section I):

8. Expenses incurred by the insured for first aid to others at the time of an accident for "bodily injury" to which this insurance applies.

CG 21 35 01 87        Copyright. Insurance Services Office. Inc. 1986



# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

### A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

### B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

### C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

### D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

### E. PREMIUMS

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

### F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 85    Copyright, Insurance Services Office, Inc. 1983, 1992



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF TRANSPORTATION

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

   (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material," if:

   (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

   (2) The "nuclear material" is contained in "spent fuel" or "waste " at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured;" or

   (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material," "Special nuclear material" or "by-product material."

   "Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

"Nuclear facility" means:

(a) Any "nuclear reactor;"

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel," or (3) handling, processing or packaging "waste;"

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste;"

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

     Copyright. Insurance Services Office, Inc., 1984, 1991     IL 00 21 11 85



COMMERCIAL GENERAL LIABILITY
CG 02 20 07 92

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# FLORIDA CHANGES –
# CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Paragraph 2. of the CANCELLATION Common Policy Condition is replaced by the following:

2. CANCELLATION OF POLICIES IN EFFECT:

a. FOR 90 DAYS OR LESS

If this policy has been in effect for 90 days or less, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

(1) 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

(2) 20 days before the effective date of cancellation if we cancel for any other reason, except we may cancel immediately if there has been:

(a) A material misstatement or misrepresentation; or

(b) A failure to comply with the underwriting requirements established by the insurer.

b. FOR MORE THAN 90 DAYS

If this policy has been in effect for more than 90 days, we may cancel this policy only for one or more of the following reasons:

(1) Nonpayment of premium;

(2) The policy was obtained by a material misstatement;

(3) Failure to comply with underwriting requirements within 90 days of the effective date of coverage;

(4) A substantial change in the risk covered by the policy; or

(5) The cancellation is for all insureds under such policies for a given class of insureds.

If we cancel this policy for any of these reasons, we will mail or deliver to the first Named Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

(a) 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

(b) 45 days before the effective date of cancellation if we cancel for any of the other reasons stated in paragraph 2.b.

B. The following is added and supersedes any other provision to the contrary:

NONRENEWAL

1. If we decide not to renew this policy we will mail or deliver to the first Named Insured written notice of nonrenewal, accompanied by the reason for nonrenewal, at least 45 days prior to the expiration of this policy.

2. Any notice of nonrenewal will be mailed or delivered to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

CG 02 20 07 92          Copyright, Insurance Services Office, Inc. 1992


**Crum&Forster**
**Insurance**

# SELF-INSURED RETENTION ENDORSEMENT
## (Expenses Included in SIR)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

COMMERCIAL AUTOMOBILE COVERAGE PART.

1   In consideration of the premium charged and as a condition to the issuance and continuation of the Policy, it is agreed that the NAMED INSURED shall retain, as a self-insured retention, per occurrence and as respects combined insured damages and insured allocated costs and expenses of investigation, defense, negotiation and settlement applicable to such damages, the sum of <u>SEE ENDORSEMENT FM GEN 01 DOLLARS.</u> The company's limit of liability, as stated elsewhere in the Policy, shall apply solely in excess of the NAMED INSURED'S self-insured retention  Allocated costs and expenses of investigation, defense, negotiation and settlement shall not include any costs or expenses of any

A   claims management or service company of any INSURED, or

B   wages or salaries of any employee of any INSURED, or

C   operating expenses of any INSURED

2   In the event that any combined insured damages and insured allocated costs and expenses, as aforementioned, exceed, per occurrence, the NAMED INSURED'S self-insured retention and involve the liability of the company, then, solely as respects each such occurrence, the company will pay, in addition to its otherwise applicable limit of liability, all supplementary payments, as defined in the Supplementary Payments Conditions of the Policy, except that the company shall not, at any time, be obligated to pay any costs or expenses of any

A   claims management or service company of any INSURED, or

B   wages or salaries of any employee of any INSURED, or

C   operating expenses of any INSURED

3   The limit of the company's liability for all damages under all BODILY INJURY and PROPERTY DAMAGE liability coverages provided in this Policy, including damages for care and loss of services, shall not be greater than the sum <u>SEE ENDORSEMENT FM GEN 01 DOLLARS</u> per Occurrence and the sum of <u>SEE ENDORSEMENT FM GEN 01</u>  In the Aggregate  Workers' Compensation is <u>NOT COVERED.</u>

4.   In the event of any occurrence which, in the opinion of any INSURED, is likely to give rise to liability under this Policy, no costs or expenses, other than for immediate first aid to others, shall be incurred by any INSURED, except at his or her own cost, peril and expense, without the written consent of the company  The NAMED INSURED shall be obligated to

A   provide an adequate defense and investigation of any action for or notice of any actual, potential or alleged damages, and

B   accept any reasonable offer or settlement within the NAMED INSURED'S self-insured retention,

and, in the event of any NAMED INSURED'S failure to comply with any part of this paragraph, the company shall not be liable for any damages or costs or expenses resulting from any such occurrence.

5   The company may, at its sole option, pay, as damages, costs and expenses, any part or all of the NAMED INSURED'S self-insured retention in order to effect settlement of any and all actions against any INSURED and, upon notice to any NAMED INSURED of the company having done so, the NAMED INSURED shall, within ten (10) calendar days of sending of such notice. fully reimburse the company

⸦M 117 0 15 (3/99)                                    The North River Insurance Company

BROWARD COUNTY SHERIFF'S OFFICE, FLORIDA



*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ CAREFULLY*

# MUNICIPALITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART.**

This insurance does not apply to any liability:

A.  arising out of or caused or contributed to by any ownership, maintenance, operation, use, loading, unloading or control of or responsibility for any aircraft;

B.  arising out of or caused or contributed to by any ownership, maintenance, operation, use or control of or responsibility for any airfield, airport, runway, hangar, building or other property or facility designed for, used, connected, associated or affiliated with or in any way related to aviation or aviation activities;

C.  of an Insured who is a Licensed Medical Professional with respect to that Insureds Liability arising out of the rendering of or failure to render any Medical, Surgical or Dental Service

D.  actually or allegedly arising out of or caused or contributed to by or in any way connected with any principle or eminent domain, condemnation proceeding, inverse condemnation, dedication by adverse use or adverse possession, by whatever name called;

E.  arising out of, in connection with or caused or contributed to by any failure or inability to supply or any interruption of any adequate quantity of power, steam, pressure, fuel or water;

F.  arising out of or caused or contributed to by any subsidence, erosion or earth movement;

G.  arising out of or caused or contributed to by or connected with any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (Public Law 93–406) or any amendment thereto or any similar provision of any local, state or federal law, statutory or common;

H.  arising out of caused by or contributed to by any actual or alleged deterioration, bursting, breaking, leaking, inadequacy, design of, control of, maintenance of, or any other alleged responsibility for any structure device, or water course, natural or man-made, including, but not limited to, dams, reservoirs, levees, banks, embankments, gates, canals, ditches, gutters, sewers, aqueducts, channels, culvert, retaining walls, drains, tanks, watershed, or drains, a purpose of which is the containing, carrying, impeding, channeling, diverting, or draining of water or other liquid;

I.  arising out of the sale or distribution or handling of contaminants, or pollutants including but not limited to acids, alkylides, chemicals, metals or bacteria in water sold, handled or distributed by or on behalf of the NAMED INSURED;

J.  arising out of inhaling, ingesting or prolonged exposure to asbestos or goods or products containing asbestos, or the use of asbestos in constructing or manufacturing any good, product or structure, or the removal of asbestos from any good, product or structure, or the manufacture, sale, transportation, storage or disposal of asbestos or goods or products containing asbestos;

The coverage afforded by this policy does not apply to payment for the investigation or defense of any loss, injury or damage or any cost, fine or penalty or for any expense or claim or suit related to any of the above.


**Crum&Forster Insurance**

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

# PERSONAL INJURY PROTECTION EXCLUSION

*THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:*

COMMERCIAL AUTOMOBILE COVERAGE PART.

Personal Injury Protection (No-Fault) or other coverages provided in compliance with the No-Fault laws of any state or province are excluded from coverage herein.

FM 117 0 17 (3/99)                                   The North River Insurance Company



# LIMITED PERSONAL INJURY LIABILITY COVERAGE

## APPLICABLE TO POLICE/PEACE OFFICERS ONLY

PREMIUM FOR THIS COVERAGE                                    $ INCLUDED

## A. COVERAGE -- LIMITED PERSONAL INJURY LIABILITY

We will pay on **your** behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury (herein called "personal injury") sustained by any person or organization and arising out of one or more of the following offenses committed in the conduct of the named insured's business:

| | |
|---|---|
| Group A | False arrest, detention or imprisonment, or malicious prosecution; |
| Group B | The publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right or privacy; except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities conducted by or on behalf of the named insured. |
| Group C | Wrongful entry or eviction, or other invasion of the right of private occupancy; |
| Group D | Erroneous service of civil papers, false imprisonment, or assault and battery. |

If such offense is committed during the policy period within the United States of America, its territories or possessions, or Canada, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability as, stated in the policy, has been exhausted by payment or judgments or settlements.

## EXCLUSIONS

### This insurance does not apply:

1. to liability assumed by the insured under any contract or agreement;

2. to personal injury arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of any insured;

3. to personal injury arising out of any publication or utterance described in Group B, if the first injurious publication or utterance of the same or similar material by or on behalf of the named insured was made prior to the effective date of this insurance;

4. to personal injury arising out of a publication or utterance described in Group B concerning any organization or business enterprise, or its products or services, made by or at the direction of any insured with knowledge of the falsity thereof.

FM 117.0.22 (3/99)                **North River Insurance Company**                **Page 1 of 2**

B.   **PERSONS INSURED**

Each of the following is an insured under this insurance to the extent set forth below:

    1.    if the named insured is designated in the declarations as an individual, the person so designated and his spouse;

    2.    if the named insured is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such;

    3.    if the named insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

    4.    any employee of the Named Insured while acting within the scope of His duties as such.

This insurance does not apply to personal injury arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a named insured.

C.   **LIMIT OF LIABILITY**

Regardless of the number of

    1.    insured under this policy, or

    2.    persons or organizations who sustain personal injury, or

    3.    claims made or suits brought on account of personal injury,

the total limit of the company's liability under this coverage for all damages shall not exceed the limit of liability stated in the policy.

D.   **ADDITIONAL DEFINITIONS**

When used in reference to this insurance:

    **"damages"** means only those damages which are payable because of personal injury arising out of an offense to which this insurance applies.

    **"police/peace officer"** is defined as a member of an official civil force or department of the named insured designated in the declarations of the policy, organized to maintain order, prevent and detect crime, and enforce law.


**Crum&Forster**
**Insurance**

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

# EMPLOYEE BENEFITS LIABILITY COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

As modified by the Self-Insured Retention Endorsement **FM 117.0.15.**

In addition to words and phrases contained in the Commercial General Liability Coverage Part, other words and phrases that appears in quotation marks have special meaning. Refer to Paragraph E. - ADDITIONAL DEFINITIONS of this endorsement.

The definitions of the words and phrases "coverage territory", "insured" and "suit", contained in Paragraph E, apply in place of the definitions stated elsewhere in the policy, but only as respects coverage under this endorsement.

The provisions of this endorsement apply only as respects Employment Benefit Liability Coverage afforded hereunder.

## A. COVERAGE

1. Insuring Agreement

We will pay those sums that the insured becomes legally obligated to pay as damages because of any negligent act, error, or omission of the insured, or of any other person for whose acts the insured is legally liable. The negligent act, error or omission must be committed in the "administration" of your "employee benefit program" during the policy period. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS of this endorsement. The negligent act, error or omission must take place in the "coverage" territory". We will have the right and duty to defend any "suit" seeking those damages. But:

   a   The amount we will pay for damages is limited as described in Paragraph C — LIMITS OF INSURANCE

   b   We may at our discretion, investigate any report of a negligent act, error or omission and settle any claim or "suit" that may result; and

   c   Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

2. Exclusions

This insurance does not apply to:

   a. Loss arising out of any dishonest, fraudulent, criminal or malicious act or omission, committed by any insured

   b. "Bodily injury" or "property damage" or "personal injury";

   c. Loss arising out of failure of performance of contract by any insurer;

   d. Loss arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program";

   e. Any claim or "suit" based upon:

      (1) failure of any investment to perform as represented by an insured; or

      (2) advice given to any person to participate or not to participate in any plan included in the "employee benefit program".

   f.  Loss arising out of your failure to comply with the mandatory provisions of any law concerning workers compensation, unemployment insurance, social security or disability benefits;

**Crum&Forster Insurance**

g   Loss for which the insured is liable because of liability imposed on a fiduciary by the Employee Retirement Security Act of 1974, as now or hereafter amended; or

h   Loss or damage for which benefits have accrued under the terms of an employee

i   benefit plan to the extent that such benefits are available from funds accrued by the insured for such benefits or from collectible insurance notwithstanding the insured's act, error or omission in administering the plan which precluded the claimant from receiving such benefits.

3   Supplementary Payments

We will pay, with respect to any claim or "suit" we defend:

a. All expenses we incur

b. the cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds

c   All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit" including actual loss of earnings up to $100 a day because of time off from work.

d   All costs taxed against the insured in the "suit".

e   Pre-judgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance we will not pay any prejudgment interest based on that period of time after the offer.

f. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance

These payments will not reduce the limits of insurance

## B. WHO IS AN INSURED

1.   If you are designated in the Declarations as:

a An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner

b A partnership or joint venture, you are an insured. Your members, your partners, and their spouses

are also insureds, but only with respect to the conduct of your business

c. An organization other than a partnership or joint venture, you are an insured. Your directors and stockholders are also insureds, but only with respect to their liability as your directors or stockholders.

2   Each of the following is also an insured:

a. Each of your partners, executive officers and employees who is authorized to administer your "employee benefit program".

b. Your legal representative if you, die but only with respect to duties as such. That representative will have all your rights and duties under this endorsement

3.   Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will be deemed to be a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire, or form the organization or the end of the policy period whichever is earlier;

b. Coverage under this provision does not apply to any negligent act, error or omission that occurred before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or part partnership or joint venture that is not shown as a Named Insured in the Declarations.

## C. LIMITS OF INSURANCE

1.   The Limits of Insurance shown in the Schedule and the rules below fit the most we will pay regardless of the number of:

a. Insureds;

b   Claims made or "suits" brought;

c   Persons or organizations making claims or bring "suits";

d.   Acts, errors or omissions which result in loss; or

e   Plans included in your "employee benefit program"

FM 117.0.28 (3/99)    .    2 of 3


Crum&Forster Insurance

2  The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions committed in the "administration" of your "employee benefit program".

3  Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one employee, including the employee's dependents and beneficiaries, because of acts, errors or omissions committed in the "administration" of your "employee benefit program".

### D. SELF-INSURED RETENTION

1  Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the Self-Insured Retention

2  The Self-Insured Retention applies to all damages sustained by an employee because of an act, error or omission covered by this insurance

3  The terms of this insurance, including those with respect to:

  a. Our right and duty to defend any "suits" seeking those damages; and

  b  Your duties in the event of an act, error or omission claim or suit" apply irrespective of the application of the deductible amount.

### E. ADDITIONAL DEFINITIONS

1  "Administration" means:

  a. Counseling employees, including their dependents and beneficiaries, with respect to the "employee benefit program";

  b  Handling records in connection with the "employee benefit program"; or

  c  Effecting or terminating any employee's participation in a plan included in the employee benefit program

2  "Coverage territory" means the united States of America (including its territories and possessions), Puerto Rico and Canada

3  "Employee benefit program" means the following plans:

  a  Group life insurance, group accident and health insurance, "profit sharing plans", pension plans and "stock subscription plans", provided that no one other than an employee may subscribe to such insurance of plans;

  b. Unemployment insurance, social security benefits, workers compensation and disability benefits;

  c  Any other similar plan designated in the Schedule or added thereto by endorsement.

4  "Insured" means any person or organization qualifying as such under Paragraph B. - WHO IS AN INSURED

5  "Profit sharing plans" means only such plans that are equally available to all full time employees.

6  "Stock subscription plans" means only such plans that are equally available to all full time employees

7.  "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such damages to which you must submit or submit without consent.

### F. ADDITIONAL CONDITION

Item 2., Duties In The Event of Occurrence, Claim or Suit, Paragraphs a. and b. of SECTION IV. — COMMERCIAL GENERAL LIABILITY CONDITIONS are inapplicable to this endorsement and the following shall apply in lieu thereof:

**2. Duties In the Event Of Act, Error or Omission, Claim or Suit.**

  a.  You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a claim. Notice should include:

    (1) What the act, error or omission was and when it occurred;
    (2) The names and addresses of any employee who may suffer damages as a result of the act, error or omission.

  b.  If a claim is received by any insured you must:

    (1) Immediately record the specifics of the claim and the date received; and

    (2) Notify us as soon as practicable. You must see to it that we receive written notice of the claim as soon as practicable



*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

# Public Officials and Employees
# Liability Insurance

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART CG 00 01.**

The following insuring agreement is added to Section I:

## COVERAGE D. PUBLIC OFFICIALS AND EMPLOYEES LIABILITY INSURANCE

**1  Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of a "wrongful act" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) the amount we will pay for damages is limited as described in Limits of Insurance (SECTION III); and

(2) our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under coverage A or B, Medical Expenses under coverage C or Public Officials and Employees under Coverage D.

no other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS COVERAGES A and B.

b. This applies to:

(1) A "Wrongful Act" which is defined as any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty including misfeasance, malfeasance and nonfeasance by you, as a public official or as an employee of yours.

(2) A "Wrongful Act" which occurs prior to the inception date of this policy. However, coverage applies only if the "Wrongful Act" was unknown to you as a public official or to your employees until on or after the inception date of this policy. In addition, the "Wrongful Act" must have occurred within 1 year prior to the inception date of this policy.

2. Exclusions.

This insurance does not apply to any claim:

A. seeking any of the following to which you are not legally entitled:

(1) Profit;
(2) Gain;
(3) Advantage; or
(4) Other remuneration;

however, you shall be protected under the terms of this policy, unless a judgment or other final adjudication established such lack of legal entitlement;

B brought about or contributed to by your dishonesty; however, not withstanding the foregoing, you shall be protected under the terms of this policy as to any claims upon which suit is brought against you because of any alleged dishonesty on the part of you, unless a judgment or other final adjudication thereof adverse to you, shall establish that acts of dishonesty committed by you were:

(1) deliberate;
(2) with actual dishonest purpose and intent; and;
(3) material to the cause of action so adjudicated;
(4) Other remuneration;

C. seeking relief, or redress, in any form other than money damages; ·

D. for loss, damage to or destruction of any tangible property, including any resulting loss of use;

E. arising out of bodily injury, sickness, disease, death, or mental anguish;

F. for injury arising from:

1 false arrest, assault or battery, detention, imprisonment, malicious prosecution or abuse or process
2. disparagement, defamation including but not limited to libel, slander or violation of an individual's right or privacy; or

G arising from a publication or utterance in the course of or related to advertising, broadcasting, or telecasting activities, conducted by or on behalf of you;

H. arising from strikes, riots or civil commotions;

I. arising from inverse condemnation and/or adverse possession;

J. arising from the willful violation of any statute, ordinance or regulation committed by or with your knowledge or consent;



K.  arising from the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; regardless of whether such discharge, dispersal, release or escape is sudden and/or accidental. (This exclusion does not apply to Bodily Injury or Property Damage caused by heat, smoke, or fumes from a hostile fire).

L.  arising from your activities in a fiduciary capacity, with respect to any employee benefit plan or any self insurance fund;

M.  arising from activities of any attorney-at-law, medical personnel, architect, engineer or accountant, in the scope of his professional duties; however, not withstanding the foregoing, you shall be protected under the terms of this policy as to any claims made against them as Public Officials or Employees of yours;

N   arising out of breach of contract;

O.  arising out of any awards of back salary;

P.  to any cross claims or counter claims brought by one Insured under this Coverage against another insured under this coverage;

Q.  arising out of failure to pay any bond, interest on any bond, any debt, financial guarantee or debenture;

R.  arising out of failure to provide adequate insurance coverage;

The following additional paragraph is added to SECTION III -- Limits of Insurance:

8.  The Public Officials and Employees Liability Insurance each Occurrence Limit is the most we will pay under Coverage D for damages because of a "Wrongful Act". The Aggregate Limit shown in the declarations is the most we will pay for all damages under Coverage D.

 **Crum&Forster**
**Insurance**

## NOTICE

*CONSUMER COMPLAINT NOTICE*

If you have a problem or complaint concerning your insurance policy with us, we are always available to help you. For assistance, please contact your independent agent or the following company representative:

Marketing Department
Crum and Forster Insurance
601 South Lake Destiny Road
Maitland, FL    32751

(407) 660-0402

FM 2.0.775 (2/96)


*Crum&Forster*
*Insurance*

# NORTH RIVER INSURANCE COMPANY

## GENERAL ENDORSEMENT

This Endorsement effective October 1, 1999, 12:01 a m  Standard Time forms a part of Policy Number  544-000008-6 issued to the Broward County Sheriff's Office.

IN CONSIDERATION OF THE PREMIUM CHARGED, IT IS UNDERSTOOD AND AGREED THAT THE POLICY DECLARATIONS ARE AMENDED IN PART TO READ AS FOLLOWS:

LIMITS OF INSURANCE:

EACH ACCIDENT OR OCCURRENCE LIMIT     $4,000,000.
POLICY AGGREGATE LIMIT     NOT APPLICABLE

SELF-INSURED RETENTION

| LIABILITY OTHER THAN F.S. #768.28 | $200,000 PER OCCURRENCE |
|---|---|
| LIABILITY FOR F.S. #768.28 | $100,000 PER CLAIMANT $200,000 PER OCCURRENCE |

*ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.*

FM GEN 01 (10/1/99)     North River Insurance Co.     Broward County Sheriffs Office



# NORTH RIVER INSURANCE COMPANY

## GENERAL ENDORSEMENT

This Endorsement effective October 1, 1999 12:01 a.m. Standard Time forms a part of Policy Number: 544-000008-6 issued to the Broward County Sheriff's Office.

IN CONSIDERATION OF THE PREMIUM CHARGED, IT IS UNDERSTOOD AND AGREED THAT THE PREMIUM IS PAYABLE IN ANNUAL INSTALLMENTS AS FOLLOWS . . .

| | |
|---|---|
| OCTOBER 1, 1999 | $ 374,680 |
| OCTOBER 1, 2000 | $ 374,680 |
| OCTOBER 1, 2001 | $ 374,680 |
| TOTAL | $1,124,040 |

*ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.*

FM GEN 02 (10/99)        North River Insurance Co.        Broward County Sheriff's Office

# HICKS & KNEALE, P.A.

### ATTORNEYS AT LAW

MARK HICKS
JEAN KNEALE
IRENE PORTER
CINDY L. EBENFELD
DINAH S. STEIN
_____

GARY A. MAGNARINI
RICK A. PICCOLO*
JENNIFER A. KERR
ELLEN NOVOSELETSKY
JOHN R. ANDERSON
JOHN A. GRECO
BRETT C. POWELL
SUSAN Y. MARCUS
ELLIE A. LEVY**

OF COUNSEL:
ROGER L. BLACKBURN
H. DOHN WILLIAMS, JR.
*Also admitted in Connecticut
**Admitted in New York only

Dade:
799 Brickell Plaza, Suite 900
Miami, Florida 33131
Telephone (305) 374-8171
Fax (305) 372-8038

Broward:
9900 Stirling Road, Suite 243
Hollywood, Florida 33024
Telephone (954) 620-6371
Fax (954) 620-6372

*624-8700 - phone*
*624-8064 fax*

**Reply to Dade**

mhicks@mhickslaw.com
iporter@mhickslaw.com

June 6, 2003

**Via facsimile (713) 914-6006 and**
**Via U.S. Mail**
Chris Fuller
Sr. Claims Technical Specialist
Ranger Insurance
10777 Westheimer
Post Office Box 2897
Houston, Texas 77042

*INSURED'S*
*COVERAGE*
*COUNSEL*

RE:   *Townsend v. Jenne, II, Fatigrassi, Shlein, Butterworth, Nararro*, Case No. 02-018346-03,
        Broward County Circuit Court, Florida
        *Smith v. Scheff, Amabile, Navarro and Kenn*, Case No. 02-017699 CACE (13),
        Broward County Circuit Court, Florida
        Named Insured:      Broward County Sheriff's Office
        Claimants       :      Jerry Frank Townsend
                                    Frank Lee Smith
        Ranger File No.:      RAC 80000493
                                    RAC 80000492

Dear Mr. Fuller:

This firm represents the Broward Sheriff's Office and the individual former or current
deputy sheriffs and sheriffs of Broward County named in the above captioned lawsuits, with
regard to insurance coverage issues.



Chris Fuller
Ranger Insurance
June 6, 2003
Page 2

It is our understanding that the policies issued to the Broward County Sheriff's Office by Ranger Insurance and North River Insurance were in effect beginning 10/1/96 through the present.  In your letters dated December 4, 2002 addressed to Ms. Isela Collazos, Risk Management Division, Broward County Sheriff's Department, you have taken the position that any allegations which occurred prior to 10/1/1996 would not be covered under any policy issued by Ranger Insurance or North River Insurance.

Please be advised that under Florida law, all damages for malicious prosecution are covered by the policies, for the reasons set forth below.  Consequently, we disagree with your position and demand that you accept coverage for all damages.

We are also enclosing for your information a copy of the plaintiff's demand letter in the *Towsend* case which demands settlement in the amount of $3 million, with the offer to remain open until June 13, 2002.

We hereby demand, on behalf of our clients/your insurds, that you enter into good faith negotiations to effectuate a settlement of both the *Towsend* and *Smith* claims within the policy limits.

## FACTS

### The Townsend Lawsuit

The Amended Complaint filed by Jerry Frank Townsend alleges claims for, *inter alia*, malicious prosecution.  *See* ¶¶ 2, 46.  The complaint alleges that orders granting the State's motions to vacate the plaintiff's conviction and sentences in several cases were entered on or about April 30, 2001, May 2, 2001 and May 14, 2001 (¶78), and the criminal court vacated the plaintiff's convictions in other cases on or abut June 15, 2001 (¶ 79).  Consequently, the date of the favorable termination of the allegedly maliciously prosecuted actions fell on these dates.  All of these dates fall within the coverage periods of your policies.

### The Smith Lawsuit

The Amended Complaint filed by Virginia Smith, in her capacity a personal representative of the Estate of Frank Lee also alleges malicious prosecution against deputy sheriffs and sheriffs of Broward County.  *See* ¶ 7.  Counts II, IV, X , XII, and XIV are for malicious prosecution.  It is alleged that the Circuit Court of Broward County set aside the plaintiff's conviction on December 22, 2000. (¶ 117).  The malicious prosecution counts specifically allege that the plaintiff received a favorable outcome of the proceeding through his exoneration on December 22, 2000. (¶¶ 125, 139, 181, 190).  Consequently, the date of the favorable termination of the allegedly maliciously prosecuted action falls within the coverage periods of your policies.

Chris Fuller
Ranger Insurance
June 6, 2003
Page 3

<u>The Policies</u>

The policy for policy period 10/1/99 through 10/1/2002, policy number 44-000008-6, contains a separate coverage form (FM 117.0.22 (3/99)), titled "Limited Personal Injury Liability Coverage," "Applicable to Police/Peace Officers Only." It is our understanding that the policy for the earlier policy periods is the same. The insuring agreement of this liability coverage form states in pertinent part:

> We will pay on **your** behalf of the insured <u>all sums</u>[1] which the insured shall become legally obligated to pay as damages because of injury (herein called "personal injury") sustained by any person or organization and arising out of one or more of the following offenses committed in the conduct of the named insured's business:
>
> Group A      False arrest, detention or imprisonment, or malicious prosecution;
>
> &ast;&ast;&ast;
>
> If such offense is committed during the policy period within the United States of America, its territories or possessions, or Canada, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability as, stated in the policy, has been exhausted by payment or judgments or settlements. [p. 1 of 2].

The "Persons Insured" section states:

> Each of the following is an insured under this insurance to the extent set forth below:
>
> &ast;&ast;&ast;
>
> 3.      if the named insured is designated in the declarations as other that an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of His duties as such.

---

[1] All emphasis herein is supplied unless otherwise noted.

Chris Fuller
Ranger Insurance
June 6, 2003
Page 4

    4.    any employee of the Named Insured while acting within the
scope of His duties as such.

(p. 2 of 2).

    The named insured is Broward County Sheriff's Office.  The defendants sued in the above captioned lawsuits are insureds under these definitions.  Additionally, this coverage form defines "police/peace" officer as "a member of an official civil force or department of the named insured designated in the declarations of the policy organized to maintain order, prevent and detect crime, and enforce law." (p. 2 of 2).  The defendants are also police/peace officers within the meaning of this definition.

    Thus it is clear that the defendants are provided coverage for all damages arising out of the offense of malicious prosecution committed during the policy period.

    Additionally, the Commercial General Liability Form (GC 00 01 11 88) also provides coverage to the defendants for all damages because of malicious prosecution committed during the policy period.  The insuring agreement for Personal and Advertising Injury Liability Coverage states:

    a.    We will pay those sums that the insured becomes legally
obligated to pay as damages because of "personal injury"
or "advertising injury" to which this coverage part applies
***

    b.    This insurance applies to:

    (1)    "Personal injury" caused by an offense arising out
of your business, excluding advertising, publishing,
broadcasting or telecasting done by or for you;
***
but only if the offense was committed in the "coverage
territory" during the policy period.

(p. 4 of 12).  "Personal injury" is defined as:

"Personal injury" means injury, other than "bodily injury," arising
out of one or more of the following offenses:

    a.    False arrest, detention or imprisonment;
    b.    Malicious prosecution;
***

(p. 11 of 12).

Chris Fuller
Ranger Insurance
June 6, 2003
Page 5

## LAW

Under Florida law the offense of malicious prosecution is deemed to occur on the date that the allegedly maliciously prosecuted action was favorably terminated, for the purposes of determining insurance coverage. If the action was terminated in favor of the defendant in the maliciously prosecuted action during the policy period, there is coverage despite the fact that the maliciously prosecuted action was instituted at an earlier date, prior to the policy period. *Roess v. St. Paul Fire and Marine Ins. Co.*, 383 F. Supp. 1231 (M.D. Fla. 1971) (applying Florida insurance coverage law). Additionally, the insurer is liable for all sums for which the insured is liable up to the limits of the policy. *Id.* at 1236.

In *Roess v. St. Paul*, the insured, Roess, brought a breach of contract action against his insurer, St. Paul, who had refused a defense and refused to pay for the insured's settlement of a claim of malicious prosecution filed against him. The allegedly maliciously prosecuted suit was filed against the claimant prior to the issuance of the policy, but was favorably terminated in the victim's favor (on appeal) during the policy period. The policy provided coverage for "personal injuries" caused by the insured, including, by definition, "malicious prosecution." 383 F. Supp. at 1233.

St. Paul argued that it had no duty to provide coverage because the maliciously prosecuted action was commenced prior to the policy period. The court flatly rejected this argument, adopting the rule that "the date of favorable termination (rather than commencement) of the malicious action against [the claimant] was the operative occurrence, upon which the effectiveness of the policy stands or falls," 383 F. Supp. at 1235, and concluded that as a matter of law the claim for malicious prosecution was covered because it was finally terminated during the policy period:

> It is the conclusion of the Court, therefore, that a cause of action for the tort of malicious prosecution in Florida does not arise, mature or accrue until all of the essential elements of the tort have materialized, including favorable termination of the malicious action in favor of the victim. Thus, in the context of this case, the date of favorable termination (rather than commencement) of the malicious action against Koubeck was the operative occurrence upon which the effectiveness of the policy stands or falls.
>
> \*\*\*
>
> In summary, then, the Court is compelled to the result as a matter of law that the Koubeck claim against Roess for malicious prosecution did not mature until the taxpayer's action was finally terminated in the Supreme Court of Florida on August 19, 1968, within the operative term of the policy previously issued on May 3, 1968. Koebek's claim, therefore, was within the coverage afforded to Roess by the policy.

Chris Fuller
Ranger Insurance
June 6, 2003
Page 6

383 F. Supp. at 1235.

The *Roess* court then considered St. Paul's argument that the coverage of the policy could be limited to those damages suffered by the claimant after the effective date of the policy. The court held that <u>all damages</u> were covered:

> B.   EXTENT OF COVERAGE
>
> The second issue is <u>whether, on the facts of this case, St. Paul can limit the coverage of the policy to those damages suffered</u> by Koubeck (the victim of the insured's tort) <u>after the effective date of the policy</u> where, admittedly, certain elements of the tort and perhaps certain items of damage occurred before the policy was issued. So stated, however, the question itself tends to supply the answer. <u>If the operative event triggering liability occurs within the policy period so that coverage is found to exist, then absent an explicit provision in the policy to the contrary (and there is none), such 'coverage' must extend to all sums for which the insured is liable up to the limits of the policy.</u>/
>
> > /The primary liability of the carrier, after all, is to its insured, not the victim of the tort.
> > ***
>
> In the absence of persuasive authority to the contrary, therefore, <u>the Court concludes that the insurance extends to all damages for which the insured was liable even though some items of the victim's damage may have been incurred prior to the issuance of the policy.</u>

383 F. Supp. at 1235-36.

In the instant case, as in the *Roess* case, there is no explicit provision in the policy that limits coverage to damages incurred during the policy periods. To the contrary, the policy expressly states that the company will pay on behalf of the insured "all sums which the insured shall become legally obligated to pay as damages because of injury (herein called "personal injury") sustained by any person ... and arising out of one or more of the following offenses ... malicious prosecution; ... [i]f such offense is committed during the policy period." Consequently, it is clear that the policy requires Ranger/North River to pay all damages the insured is legally obligated to pay for malicious prosecution. Coverage is not and cannot be limited.

Chris Fuller
Ranger Insurance
June 6, 2003
Page 7

## CONCLUSION

Based on the foregoing, it is clear that Ranger/North River is liable to provide coverage for all damages for malicious prosecution because the offense of malicious prosecution is deemed to have occurred during the policy periods.

We hereby demand, on behalf of our clients/your insureds, that you honor your obligations under the policies and under Florida law to provide coverage for all damages and to negotiate a settlement in good faith within the limits of the policy.

Sincerely,

Mark Hicks
Irene Porter

MHip
Enclosure:    Copy of demand letter dated May 5, 2003 from Barbara A. Heyer, attorney for
              Jerry Frank Townsend

cc:    Mark A. Emanuele, Esq., Panza, Maurer & Maynard, P.A.
       Isela Collazos, Broward County Sheriff's Office, Division of Risk Management

g:\bao\hr\ranger-001.doc

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

North River Insurance Company

## DEFENDANTS

Broward County Sheriff's Office, et al

05-60747

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **New Jersey**
(EXCEPT IN U.S. PLAINTIFF CASES)

Broward 05CV6074-7 KMM

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **Florida**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Joshua D. Lerner, Esq.
Rumberger, Kirk & Caldwell, P.A.
80 S.W. 8th Street, Suite 3000
Miami, FL 33130
Tel: (305) 358-5577

ATTORNEYS (IF KNOWN)

CIV-MOORE

MAGISTRATE
GARBER

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, **BROWARD**, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR Plaintiff AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | B☐ 644 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl' Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | B☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | A☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS –Third Party 26 USC 7609 | X☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | A OR B (DEC ACTION) |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

**This is an action for declaratory judgment pursuant to Title 28, U.S.C., §2201, for damages in excess of $75,000.00.**

LENGTH OF TRIAL
via _____ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE
05/06/05

SIGNATURE OF ATTORNEY OF RECORD

JS 44 Reverse
(Rev. 12/96)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

## Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings, and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.       **(a) Plaintiffs – Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.      **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.     **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.      **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to other district courts under Title 28 U.S.C., Section 441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to the District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

V.       **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.      **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

VII.     **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases.** This section of the JS-44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.